# Exhibit 1

**ATF** Bureau of Alcohol, Tobacco, Firearms and Explosives

WHO WE ARE     WHAT WE DO     RESOURCES

About Home

Executive Staff

Organization Structure

Budget & Performance

Statistics

History

ATF Canines

Frequently Asked Questions

**Email Updates**

Subscribe to receive news and update from the Bureau of Alcohol, Tobacco, Firearms and Explosives

★ *Enter Email Address*

Submit

# Who We Are



The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) was established as a separate component within the Department of Justice pursuant to Title XI of the Homeland Security Act of 2002, Public Law 107-296, on January 17, 2003.

The mission of ATF is to protect communities from violent criminals, criminal organizations, the illegal use and trafficking of firearms, the illegal use and storage of explosives, acts of arson and bombings, acts of terrorism, and the illegal diversion of alcohol and tobacco products.

The major functions of ATF are to:

- Reduce the risk to public safety caused by illegal firearms trafficking.

- Reduce the risk to public safety caused by criminal possession and use of firearms.

- Reduce the risk to public safety caused by criminal organizations and gangs.

- Improve public safety by increasing compliance with Federal laws and regulations by firearms industry members.

- Reduce the risk to public safety caused by bombs and explosives.

# Exhibit 2



**Congressional Research Service**

# Gun Control: Statutory Disclosure Limitations on ATF Firearms Trace Data and Multiple Handgun Sales Reports

**William J. Krouse**
Specialist in Domestic Security and Crime Policy

May 27, 2009

Congressional Research Service
7-5700
www.crs.gov
RS22458

**CRS Report for Congress**
*Prepared for Members and Committees of Congress*

# Summary

For FY2003-FY2009, a rider on the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) appropriations has prohibited that agency from disclosing firearm trace data (based on firearm transfer records maintained in part by licensed gun dealers) and multiple handgun sales reports data for any purpose other than supporting a criminal investigation or agency licensing proceeding. This rider is known as the "Tiahrt" amendment, for its sponsor in full committee markup of the FY2004 Commerce-Justice-State appropriations bill, Representative Todd Tiahrt. A coalition of 210 city mayors led by New York City Mayor Michael Bloomberg favors the repeal of this rider, but the Fraternal Order of Police favors retaining it, as does ATF. For FY2008, Congress included modified Tiahrt amendment language in the Consolidated Appropriations Act, 2008 (P.L. 110-161). This modified language states explicitly that it *does not* prohibit the release of aggregate statistical data on illegal gun trafficking or statistical information on the U.S. firearms industry. For FY2009, similar language was included in the Omnibus Appropriations Act, 2009 (P.L. 111-8).

# Contents

Background .................................................................................................................................... 1

ATF Firearm Trace Data and Multiple Handgun Sales Reports ...................................................... 2

    Firearm Trace Process ................................................................................................................ 2

    YCGII and Comprehensive Tracing ......................................................................................... 2

    Methodological Limits on Firearms Trace Data ........................................................................ 3

    Multiple Handgun Sales Reports .............................................................................................. 3

    Operational Limits on Illegal Firearms Trafficking Indicators ................................................. 4

Lawsuits Against the Gun Industry ................................................................................................ 5

Related Legislative Proposals ........................................................................................................ 5

# Contacts

Author Contact Information ............................................................................................................ 6

# Background

Located in the Department of Justice (DOJ),[1] ATF is the lead law enforcement agency charged with administering and enforcing federal laws related to the manufacture, importation, and distribution of firearms and explosives. ATF also investigates arson cases with a federal nexus and violations of laws related to the manufacture, importation and distribution of alcohol and tobacco. In the Omnibus Appropriations Act, 2009 (P.L. 111-8), Congress provided ATF with its regular appropriation of $1.054 billion for FY2009, a 4.2% increase over the FY2008 enacted level, and 2.6% increase over the Administration's request.[2] Of the FY2009 appropriation, DOJ budget documents indicated that the Administration plans to allocate $759 million (72%) toward firearms compliance and investigations.[3]

Under the Tiahrt amendment, for FY2003-FY2007, ATF has not disclosed trace data or multiple handgun sales reports to any person or entity, unless the request for such data was part of a criminal investigation within their jurisdiction. As a result, firearms trace data were no longer available for municipalities and other third parties to build cases against gun manufacturers and dealers in civil lawsuits. While arguably the Tiahrt amendment never prevented ATF from releasing statistics on the U.S. firearms industry or aggregate statistics on illegal firearms trafficking, for FY2008, Congress modified the language of the limitation to state explicitly that it *does not* prevent the

- disclosure of statistical information concerning total production, importation, and exportation of firearms;

- sharing or exchange of such information among and between federal, state, local, or foreign law enforcement agencies, federal, state, or local prosecutors, and federal national security, intelligence, or counterterrorism officials; or

- publishing of annual statistical reports on products regulated by ATF, including total production, importation, and exportation by each licensed importer and licensed manufacturer, or statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations.[4]

The FY2008 Tiahrt language, however, continues to prohibit the release of firearm trace data for the purposes of suing gun manufacturers and dealers. Moreover, the limitation includes the phrase, "in fiscal year 2008 and thereafter," which make the limitation permanent law according

---

[1] As part of the Homeland Security Act (P.L. 107-296, 116 Stat. 2135), Congress transferred ATF's enforcement and regulatory functions for firearms and explosives to the DOJ from the Department of the Treasury, adding "explosives" to ATF's title. The regulatory aspects of those laws related to the manufacture, importation, and distribution of alcohol and tobacco are the domain of the Tax and Trade Bureau (TTB), which remained at the Department of the Treasury.

[2] For further information, see CRS Report RL34514, *The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF): Budget and Operations*.

[3] Due to rounding, these amounts do not total precisely to $1.054 billion. U.S. Department of Justice, Justice Management Division, *FY2010 Budget and Performance Summary*, (May 2009), available at http://www.usdoj.gov/jmd/2010summary/.

[4] Consolidated Appropriations Act, 2008 (P.L. 110-161).

to the Government Accountability Office.[5] For FY2009, similar language was included in the Omnibus Appropriations Act, 2009 (P.L. 111-8).

# ATF Firearm Trace Data and Multiple Handgun Sales Reports

To enforce federal firearms laws, ATF conducts firearm traces for federal, state, tribal, county, and municipal law enforcement agencies. Gun dealers must also report multiple handgun sales to ATF. Firearm trace data and multiple handgun sales reports, along with other investigative data, can be strong indicators of illegal firearms trafficking. For several reasons, however, there are methodological and operational limits on the use of such data and reports, in addition to the statutory limitations, as discussed below.

## Firearm Trace Process

As part of a trace, law enforcement officers submit to ATF certain information about a firearm in question, including the manufacturer, model, caliber, and serial number. In turn, ATF firearm specialists systematically research the firearm's transfer documents, which Federal Firearms Licensees (FFLs) are required to maintain, as a firearm passes through the commercial chain of distribution, from manufacturer/importer, to wholesaler/distributor, and to first retail seller. From the first retail dealer's transfer records (bound log book and ATF Form 4473s), ATF can determine the first private person to whom the firearm was transferred. When dealers go out of business, these records are sent to, and maintained by, ATF.[6] By following up with the private person to whom the firearm was last transferred, investigators are often able to generate new leads to solve firearms-related crimes.

## YCGII and Comprehensive Tracing

As gun violence increased from the mid-1980s to the early 1990s, law enforcement agencies increasingly availed themselves of ATF's firearm tracing capabilities. As the firearm trace database grew, it yielded new insights for law enforcement agencies. In 1994, ATF made "comprehensive tracing," which entails tracing all "crime guns" recovered by law enforcement in a particular geographic area, an agency objective. In 1996, the Clinton Administration launched the Youth Crime Gun Interdiction Initiative (YCGII). Under this initiative, participating cities were provided funding to comprehensively trace crime guns and improve information about the illegal sources of firearms. In FY1996, 27 cities participated in this program. By FY2004, it had been expanded to more than 60 cities. For FY2005, the Bush Administration requested and received funding to expand Project Safe Neighborhoods (PSN) and YCGII to 80 cities, yet ATF dropped the YCGII program in FY2005 and began promoting the PSN program as part of its wider integrated violence reduction strategy.

---

[5] U.S. Government Accountability Office, "Bureau of Alcohol, Tobacco, Firearms, and Explosives—Prohibition in the 2008 Consolidated Appropriations Act," July 15, 2008, available at http://www.gao.gov/decisions/appro/316510.pdf.

[6] Another ATF appropriations rider prohibits those records from being searched electronically by firearm or firearm owner to prevent their use as a gun registry. Those records are currently indexed by firearm serial number.

For the years 1997 through 2000, ATF published YCGII reports that included data on firearm traces by participating city.[7] Although the data in those reports were anonymized and did not identify individual FFLs, ATF has issued no additional YCGII reports. ATF had also made trace data available to researchers under contract with disclosure restrictions, but such data were only released after five years, because ATF did not want to compromise ongoing investigations, among other things. After reviewing the trace data, some researchers suggested that through comprehensive crime gun tracing new findings could be made regarding illegal gun trafficking—especially at the regional level,[8] while others noted methodological shortcomings in the firearms trace data that arguably have precluded making conclusions about crime guns at a national level.[9]

## Methodological Limits on Firearms Trace Data

ATF has defined "crime gun" to mean any firearm that is illegally possessed, used in crime, or suspected to have been used in crime. An abandoned firearm may also be categorized as a crime gun if it is suspected it was used in a crime or illegally possessed.[10] Under this definition, most, but not all, traced firearms are "crime guns." Firearms trace data, however, are limited and may be biased by several factors:

- traced firearms are generally recovered by law enforcement, and they may not be representative of firearms possessed and used by criminals;

- there remains significant variation over time and from jurisdiction to jurisdiction as to "when, why, and how" a firearm is recovered and selected to be traced; and

- a substantial percentage of recovered firearms cannot be successfully traced for several reasons including poor recordkeeping by FFLs.

According to ATF, the firearms trace database is an operational system designed to aid in ongoing investigations, rather than a system to capture "crime gun" statistics.[11] Nevertheless, combined with multiple handgun sales reports and other investigative data, firearm trace data have proven to be a viable tool for ATF in targeting regulatory and investigative resources with greater effect.

## Multiple Handgun Sales Reports

Federal law requires FFLs to report to the Attorney General (AG) whenever they transfer more than one handgun (pistol or revolver) to any nonlicensee within five consecutive business days.[12] The FFL must also forward this information to either the state police or local law enforcement agency that has jurisdiction in the area where the transfer occurred.[13] Furthermore, except for

---

[7] Those reports are available at http://www.atf.treas.gov/firearms/ycgii/2000/index.htm.

[8] Philip J. Cook and Anthony A. Braga, "Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets," *Arizona Law Review*, vol. 43:2, 2001, p. 290.

[9] Ibid.

[10] See U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, *Crime Gun Trace Reports (2000), National Report, The ATF Youth Crime Gun Interdiction Initiative*, (July. 2002), p. A-3. Available at http://www.atf.gov/firearms/ycgii/2000/index.htm.

[11] Ibid.

[12] 18 U.S.C. 923(g)(3).

[13] Ibid.

information pertaining to persons prohibited from possessing firearms, federal law prohibits state or local law enforcement agencies from disclosing those records to any person or entity, and requires those records be destroyed within 20 days of receipt, so that those records cannot be used as a registry of firearms or firearms owners.[14] At the end of every six-month period, the state or local law enforcement agency is required to certify to the AG that the record nondisclosure and destruction requirements were complied with.

## Operational Limits on Illegal Firearms Trafficking Indicators

ATF analyzes firearm trace data, multiple handgun sales reports, and firearms-trafficking investigative data to more effectively target armed violent criminals and gun traffickers for prosecution. By aggregating these data, ATF analysts are often able to discern regional illegal firearms trafficking trends and patterns. Working with contract researchers at Northeastern University, ATF developed indicators of illegal firearms trafficking:[15]

- multiple crime guns traced to an FFL or first retail purchaser;

- short time-to-crime for crime guns traced to an FFL or first retail purchaser;

- incomplete trace results, due to an unresponsive FFL or other causes;

- significant or frequently reported firearms losses or thefts by an FFL;

- frequent multiple sales of handguns by an FFL or multiple purchases of firearms by a non-licensee, combined with crime gun traces; and

- recovery of firearms with obliterated serial numbers.

In February 2000, ATF reported that (1) out of 83,200 FFLs, about 1,020 had 10 or more firearms that were traced back to them in 1998; (2) while those FFLs only represented about 1.2% of licensed retail dealers, they accounted for more than 50% of traces to retail dealers in that year; and (3) less than 1% of retail dealers, about 330 FFLs, had 25 or more firearms traced back to them.[16] By concentrating their enforcement and regulatory actions on this small percentage of FFLs, ATF sought to prevent the further diversion of firearms into illegal channels of commerce.

At the same time, ATF's findings might have undergirded the policies of a number of municipalities, under which civil lawsuits were pursued against the gun industry for gun violence in their jurisdictions. This is despite the fact that ATF has consistently stated that trace frequency, in and of itself, is not indicative of criminal activity by an FFL. In addition, with ATF data, gun control advocates began identifying and publishing the names of FFLs who in their judgement were "bad apple" dealers, as the data showed "crime guns" being traced back to their businesses, along with multiple handgun sales reports, in numbers the gun control advocates found unacceptable.[17]

---

[14] In the 109th Congress, section 7 of H.R. 5005 (discussed below) would have repealed the multiple handgun reporting requirement to state and local law enforcement.

[15] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, *Commerce in Firearms in the United States* (February 2000), p. 22.

[16] Ibid.

[17] Brady Campaign to Prevent Gun Violence, "Brady Campaign to Prevent Gun Violence: Ten Worst 'Bad Apple' Gun Dealers in America," July 16, 2003.

As noted above, while multiple handgun sales reports, along with firearm trace and other investigative data, can be strong indicators of illegal firearms trafficking, alone they do not constitute proof of criminal wrongdoing on the part of an FFL. As required under the appropriations rider, which was initially predicated on ATF's disclosure policy, ATF declined to disclose such data to the City of Chicago. ATF argued in part that trace and multiple handgun sales data were exempt from the Freedom of Information Act (FOIA), as such data could potentially compromise ongoing investigations. While the 7th Circuit rejected ATF's FOIA arguments, the Tiahrt amendment was enacted, preventing ATF from releasing trace data for any purpose other than a "bona fide" criminal investigation.[18]

# Lawsuits Against the Gun Industry

Mayors and other municipal leaders have sought to curb gun violence in their communities by filing civil lawsuits against gun manufacturers and dealers based on three arguments: (1) the firearms they sold were defective, (2) the gun industry had engaged in improper marketing techniques, and (3) the proliferation of firearms in certain urban areas constituted a public nuisance. Many lawsuits against the gun industry were dismissed, while others were not. In some of these cases, analyses of ATF firearms trace and investigative data by nongovernmental parties were submitted as evidence showing liability on the part of gun manufacturers and/or dealers.

Congress passed the Protection of Lawful Commerce in Arms Act (P.L. 109-92) to limit the tort liability of gun manufacturers and dealers by prohibiting civil actions or proceedings or administrative proceedings against any gun manufacturer or dealer, or trade association for damages resulting from the criminal or unlawful misuse of a firearm or ammunition.[19] Exceptions were provided under certain circumstances. The city of New York has pursued a public nuisance civil suit against multiple gun manufacturers based in part on ATF trace and investigative data that were acquired under a strict confidentiality order entered by a federal judge before the disclosure limits were enacted.[20]

# Related Legislative Proposals

For FY2003-FY2009, a rider on the ATF appropriations language has prohibited that agency from disclosing data on illegal gun trafficking based on firearm traces and FFL transfer records, as well as multiple handgun sale reports, for any purpose other than supporting a "bona fide" criminal investigation. This rider is known as the "Tiahrt" amendment, for its sponsor in full committee markup of the FY2004 Commerce-Justice-State appropriations bill, Representative Todd Tiahrt.

Proponents of the Tiahrt amendment contend that the business records of FFLs should be confidential, and that access to these records is only authorized under federal law for the purposes of conducting ATF trace requests in order to solve crimes. They argue further that it was never

---

[18] For further information, see *City of Chicago* v. *U.S. Department of Treasury*, 297 F.3d 672 (7th Cir. 2002), *vacated and remanded*, 537 U.S. 1229 (2003), *vacated on rehearing*, 423 F.3d 377 (7th Cir. 2005).

[19] For further information, see CRS Report RS22074, *Limiting Tort Liability of Gun Manufacturers and Gun Sellers: Legal Analysis of P.L. 109-92 (2005)*, by Henry Cohen.

[20] For further information, see *City of New York* v. *Beretta U.S.A.*, No. 00-CV-3641, 2006 U.S. Dist. LEXIS 24452 (E.D.N.Y. April 27, 2006).

intended that firearm trace data be used to support civil, public nuisance lawsuits against firearms manufacturers and dealers. Opponents of the amendment counter that every tool is needed to "crackdown" on irresponsible FFLs by analyzing firearm trace data on a regional and national basis, so that federal, state, and local law enforcement authorities can be informed of the source and market areas for "crime guns."[21] A coalition of 210 city mayors led by New York City Mayor Michael Bloomberg favors the repeal of this amendment, but the Fraternal Order of Police reportedly favors retaining it,[22] as does ATF.[23]

In the 109th Congress, House Judiciary Committee ordered reported H.R. 5005, a bill that included a provision (Section 9) that would have codified the Tiahrt amendment; however, that bill saw no further action. In addition, Senator Robert Menendez and Representative Steven R. Rothman introduced identical bills (S. 2460/H.R. 5033) to repeal the FY2006 appropriation rider. Senator Charles Schumer introduced a similar bill (S. 2629), which he has reintroduced in the 110th Congress (S. 77).

In the 110th Congress, Senator Richard Shelby amended the FY2008 Commerce-Justice-Science (CJS) appropriations bill (S. 1745; S.Rept. 110-124) with a modified rider in full committee markup. A similar rider was included in the House-reported and passed CJS appropriations bill (H.R. 3093). The Senate passed H.R. 3093, amended with the language of S. 1745. While conference negotiations on H.R. 3093 broke down for reasons unrelated to gun control, the FY2008 CJS appropriations and the Tiahrt language were enacted as part of the Consolidated Appropriations Act, 2008 (P.L. 110-161). Although the Tiahrt language was modified to authorize the release of aggregate firearms trace data on illegal gun trafficking, it still prohibits the use of those data for the purposes of suing gun manufacturers and dealers. Without any public debate, similar language was included in the Omnibus Appropriations Act, 2009 (P.L. 111-8).

# Author Contact Information

William J. Krouse
Specialist in Domestic Security and Crime Policy
wkrouse@crs.loc.gov, 7-2225

---

[21] Sewell Chan, "15 Mayors Meet in New York to Fight Against Gun Violence," *New York Times*, April 26, 2006, p. A18.

[22] Alex Wayne, "Senate Democrats May Pursue Wider Access to Gun Crime Information," *CQ Today*, April 19, 2007.

[23] Michael J. Sullivan, "Gun-Trace Data Shared—Prudently," *Boston Herald*, May 2, 2007.

# Exhibit 3



**denverpost.com**                    **Colorado News**

5/24/2018

| Home | News | Politics | Sports | Business | Entertainment | Lifestyle | Opinion | Outdoors | Multimedia | Travel |

| CLASSIFIEDS | JOBS | AUTOS | REAL ESTATE | SHOP |

Real Estate News    Rentals    Find a Home    Open Houses    Place an Ad

WEEKLY AD SPECIALS
FROM THE DENVER POST

DPO
DenverPost.com
FRONT PAGE
SITE INDEX
SEARCH

BACK TO NEWS
RELATED

- Police routinely sell guns
- Webb calls for sale ban
- Diagram of guns



guns for sale
## Police guns in the hands of criminals
**By David Olinger**
**Denver Post Staff Writer**
Copyright 1999 The Denver Post

**Sept. 20** - Scot Thomasson called the San Diego Sheriff's Department to report what he thought was a stolen deputy's gun. As an undercover agent, he had bought it from a gang peddling firearms and 125 pounds of pilfered cocaine across the country. He wanted the sheriff to know that a deputy's sidearm somehow had fallen into the hands of criminals whose ranks included an undocumented Colombian, a guy with neo-Nazi ties and a young man he met selling guns at a low-income housing project in Colorado Springs.

Thomasson gave the sheriff's office the serial number of a Model 66 Smith & Wesson revolver. A deputy checked the records. No, Thomasson was told, the weapon hadn't been stolen. "That was one of the guns that was sold."

He was stunned. As an undercover agent for the federal Bureau of Alcohol, Tobacco and Firearms, Thomasson had risked getting shot with a gun sold by a fellow law-enforcement officer. "Let's just say I wasn't happy," he said.

Thomasson's discovery in 1997 that a criminal suspect possessed a used police gun is no longer an uncommon event in the United States. Last year, it happened an average of three times a day.

Years before Buford Furrow was charged with using a former police firearm last month to shoot children at a Los Angeles Jewish community center and kill a postal worker, ATF began noting whenever a gun traced from a crime scene had been sold by a law-enforcement agency.

The bureau created a computer code to identify those crime guns. Using that code, The Denver Post analyzed thousands of ATF firearms tracing records from 1994 through 1998. The results: At least 2,821 times, crime-gun traces requested by law-enforcement agencies nationwide ended at the doors of other law-enforcement agencies.

Jerry Nunziato, director of ATF's national gun-tracing center from 1991 to 1998, was not surprised by those numbers. "I think that's reasonable," he said of The Post's analysis. "Probably on the low end."

Dozens of former police guns have been traced as suspected crime guns in Colorado.

In Aspen, a ski resort town that hadn't had a homicide in 14 years, police were called to a gruesome scene in September 1997. They found a local man dead on the floor of a store. He had walked in with a loaded handgun, threatened to kill his girlfriend, then turned the gun on himself.

ATF traced the man's semiautomatic Glock pistol to a police department in Weymouth, Mass., that had traded its used pistols for new guns just months before.

In Denver, police brought a search warrant in August 1998 to the home of Alamanina Adams, a woman suspected of selling drugs. They found a baggie of crack cocaine when they searched her, as well as several loaded handguns in the trunk of her car. One was a semiautomatic Glock pistol that Denver police traced to another law-enforcement agency, according to ATF records.

Three weeks later, the Denver gang unit took a Glock pistol from Phillip Jefferson, who had served a six-year manslaughter sentence for killing two men on a Denver street in 1986. "He's one of our original Crips gang members," said Kurt Peterson, one of the officers who found the gun in a search of Jefferson's car.

Denver police traced Jefferson's gun to a police department in Georgia, which also had traded its used Glock pistols to the manufacturer for new pistols.

ATF's national tracing center started noticing in the early 1990s that used police guns were showing up more often in crime-gun traces requested by police agencies.

"It was becoming a problem," Nunziato said, "a source of guns that we didn't like to see."

a gun they had sold was traced from a crime scene. That practice ended with a policy change in 1997, and "I think that's a disservice to those police departments," Nunziato said. "They don't know what they're doing."

Nunziato and other firearms experts say criminals typically get their hands on police guns, like other guns, through private, unregulated sales.

Police departments that sell used or confiscated weapons generally deal either with a manufacturer or a licensed firearms dealer, and all customers of firearms dealers are required to pass criminal background checks. But the customer, in turn, may resell the gun privately - and legally - to someone with a criminal record.

How many used police guns actually end up in criminal hands? There is no precise answer. The best statistical record belongs to ATF, the repository of crime-gun traces, and its records are incomplete and inconsistent.

Judging from ATF's computer data, police guns have been traced from a wide variety of crimes nationally, including 230 homicide-related traces and 253 drug-related traces from 1994 to 1998. Of the 2,821 traces identified in The Post analysis, at least 35 were related to Colorado cases.

Those numbers may underestimate how often former police guns are used in crimes. Many guns recovered at crime scenes never get traced, and some traced to police sales were not identified with the "law-enforcement" code in the ATF database. On the other hand, some of the data indicating criminal uses of police guns may be misleading.

For example, ATF traced 16 police guns in Colorado because an agent was suspicious of gun trades between a sheriff's office and an indicted firearms dealer.

In Tucson, three of four police gun traces classified as homicide-related in the ATF database apparently were related to fatal shootings of suspects by police officers: The department traces its own weapons in such cases. The fourth gun was a Smith & Wesson .38 caliber revolver used by Linda Caufman to kill her husband last September, according to Tucson homicide detective Tom Thompson.

ATF records show that Caufman's revolver had been bought by a law-enforcement agency in 1986. Thompson didn't know that. He said his department's knowledge of the murder weapon's history stopped in 1993, when the firearm was stolen in a burglary in Napa County, Calif.

---

Scot Thomasson, now an ATF supervisor in Indiana, met the gang with the stolen cocaine and the San Diego sheriff's gun during an undercover investigation of firearms and drug trafficking in Colorado Springs conducted jointly with the Drug Enforcement Administration.

"I was introduced undercover to a fellow, Christopher Valle, who had approached one of my confidential informants attempting to sell guns in a low-income housing project," he said.

"Over the course of several months I purchased several firearms, purchased cocaine. (Valle) was armed with these guns while he's selling me the cocaine."

Finally, he met four of Valle's associates, who invited him to a popular restaurant in Colorado Springs and sold him a pound of cocaine for $9,000. All were armed.

"Five of them, five handguns. Plus they had other guns," Thomasson said.

He learned that their drug supply "was actually part of a 56-kilo cocaine robbery. These guys had robbed another drug dealer in California (and) they're off-loading it as fast as they can." He learned that one of Valle's associates, Moresio Roman, was a Colombian illegally in the United States, and that another, Richard Roister, "has ties to the Aryan Nations out of Washington."

Valle was arrested in January 1997 after the restaurant cocaine sale. When ATF agents caught up with Roister and Roman a month later at a Greyhound bus stop in Springfield, Mo., "they had a bagful of handguns and a Nazi uniform," Thomasson said.

Thomasson had bought the used San Diego police revolver from Valle at an apartment building in Fountain, near Colorado Springs. He never learned how Valle and his partners acquired the gun. When the San Diego sheriff's office switched to 9mm pistols a decade ago, deputies were allowed to buy their old Model 66 revolvers. After checking department records, Lt. Ron VanRaaphorst confirmed that the gun Thomasson got from Valle had been sold to a deputy.

"Obviously, he probably resold it," VanRaaphorst said, adding that the San Diego sheriff no longer sells used department

weapons. We destroy them. That's been our policy for some time now.

The Weymouth, Mass., police gun took a short, traceable route to Colorado.

According to Aspen police, it was sold in 1997 by a police department trading its used pistols to Glock for a discount on new pistols. Glock sold it to Interstate Arms in Billerica, Mass., a leading wholesaler of used police guns. Interstate Arms shipped it to a gun store in Glenwood Springs, where it was bought by the man Aspen police found dead in September 1997 in the store where his girlfriend worked.

Loren Ryerson, assistant Aspen police chief, doesn't fault another police department for selling that handgun. He said the man who bought it had no criminal record, and although he and his girlfriend had fought before, none of their disputes had resulted in a call to police or a restraining order.

Under any background-check system, "he could have bought that gun," Ryerson said.

Weymouth police Capt. Jim Thomas said his department is not responsible for anything that happens with guns traded to a legitimate dealer.

"If I was going to buy a new car, I would trade in my old car," he said. "Same with weapons."

The Glock pistol taken from a Crips gang member in Denver came from a small police department in Georgia that traded its 9mm pistols for a larger caliber model, said Lt. Frank Conner, a Denver police spokesman.

"They sold that particular Glock to the manufacturer. Glock turned around and resold the gun to a dealer in Cleveland, Ohio. Somehow it was sent to a gun dealer out here."

How the gun got from a Colorado dealer to Phillip Jefferson is unknown.

Within the law-enforcement community, there has been a gradual change in philosophy about selling used department weapons and guns confiscated from crime scenes. Many police agencies that once sold guns to reduce expenses and buy new equipment now chop them up or melt them down.

This change was exemplified by a resolution adopted last year by the International Association of Chiefs of Police. It urged police departments to stop selling used and confiscated guns and destroy them instead.

"It's really a tough issue," said Larry Todd, the Los Gatos, Calif., police chief who brought the resolution before the association. "The weapon itself has economic value that belongs to the taxpayers. As city officials we are obligated to use taxpayer dollars the best way we can.

"But there are about 38,000 people killed each year with firearms in the United States, and it's estimated that for every one killed, there are 10 that are wounded. So that's about 380,000 people wounded by firearms each year. The majority end up being treated in hospitals."

In economic terms alone, Todd questions whether taxpayers gain anything from police sales of firearms. Then there is the moral question.

"Even if one person is killed as a result of a weapon that we sold back into society, are we really doing our job of protecting public safety? I don't think we are," Todd said.

On rare occasions, criminals with police guns have brought notoriety to the department that sold the weapon.

In New York, the state police stopped selling their used handguns after a man now on California's death row used one in a murderous armed robbery.

Last month, Buford Furrow put the little town of Cosmopolis, Wash., on the map by using a Glock pistol its police department sold in the Jewish community center attack.

The Cosmopolis department bought the pistol for evaluation in 1996, decided not to keep it and traded it to a local gun dealer for a new pistol. The gun had changed hands at least five times by the time Furrow bought it, including one sale to a gun dealer outside a gun show, Cosmopolis police Chief Gary Eisenhower said.

Eisenhower said his department generally destroys guns used in violent crimes. But used department weapons, "I would go ahead and trade, as long as it's legal for me to do so," he said. "I simply can't afford not to."

Usually, crime guns traced to police agencies garner little or no publicity.

For example, in Othello, another small town in Washington, police arrived at the home of 26-year-old Raul Garcia with a warrant to search for cocaine.

They found it. They also found a pump-action shotgun, one step away from his stash, that was traced to a police department in

# Exhibit 4

## Wiped clean



*Benny Sieu*

Badger Guns

*By John Diedrich of the Journal Sentinel*
Published on: 1/3/2010

Federal investigators recommended revoking the license of Badger Outdoors gun shop after a 2006 inspection - a rare move that could have closed the West Milwaukee business, a Milwaukee Journal Sentinel investigation has found.

But there was no revocation and the store remains open, operating as Badger Guns. Federal records show the license recommended for revocation was voluntarily relinquished, the players inside the operation took on new roles and a new license was issued, creating what one federal official called a "clean slate" for the store.

Badger Guns came under intense scrutiny in the past year after two Milwaukee officers were shot with a gun purchased there. Over the past two years, six Milwaukee officers in all were wounded by people using guns purchased from Badger Guns or Badger Outdoors.

Badger Outdoors and later Badger Guns have sold the bulk of crime guns recovered by police in Milwaukee for at least the past decade, according to records obtained by the Journal Sentinel.

And federal court records since 2004 for eastern Wisconsin show three-quarters of straw buyer criminal cases - where someone with a clean record buys a gun for a felon - involved purchases from Badger Guns or Badger Outdoors.

Following the 2006 inspection, after which revocation was recommended, several changes were made, according to federal documents and officials.

• Milton "Mick" Beatovic, 63, vice president and co-owner of Badger Outdoors, told officials during the November 2006 inspection that he was retiring. He gave up the license the following year. A corporation controlled by Beatovic still owns the building and is the landlord, receiving rent payments from the business.

• Walter Allan, 56, the president and other owner of Badger Outdoors, became an employee at Badger Guns.

• Adam Allan, a longtime Badger Outdoors employee and son of Walter Allan, took out a new license. Federal documents show the 28-year-old had little knowledge of the store's management prior to the changeover. The store name became Badger Guns, but little else changed at the operation on S. 43rd St. Badger Guns pays rent to Beatovic's corporation.

The moves not only halted the revocation process but also erased violations found by federal regulators over 17 years at Badger Outdoors - which had been the top seller of crime guns not just in Milwaukee but the nation in 2005 with 537 such guns, according to records from the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives obtained by the newspaper through the Freedom of Information Act.

The rankings revealed that a tiny percentage of gun dealers sell a majority of crime guns. Congress then sharply restricted release of the information behind the rankings. Congress also forbade ATF from revealing what violations it finds at gun stores.

In the case of Badger Outdoors, all the violations found by ATF over the years were blacked out in 400 pages of documents released to the newspaper.

But in an interview, a top ATF official said inspectors found "inventory discrepancies" during the November 2006 inspection and added that his agency doesn't recommend revocation for minor violations.

ATF inspectors treat problems in a gun store's inventory records seriously because those records are their tool for tracking guns, according to experts and a federal judge, who recently upheld the revocation of a Washington state gun dealer.

"This is a serious problem because those weapons are not accounted for," wrote U.S. District Judge Ricardo Martinez of that gun store's inventory record problems.

In the instance of Badger Outdoors, Beatovic said his decision to give up the license, sell the business and retire to Arizona had nothing to do with the problems found in the November 2006 inspection, which he called "paperwork stuff." He said he knew nothing about the recommended revocation.

"Just get this straight. I was never told that," Beatovic said in an hourlong telephone interview from his home in Phoenix. "That was not the reason I retired."

Badger Outdoors co-owner Walter Allan also said he knew nothing about the revocation recommendation. Badger Guns owner Adam Allan declined to comment for this article.

Top ATF officials themselves initially denied revocation was recommended. They later admitted there was a recommendation for revocation but said the process stopped because of the sale.

ATF documents obtained by the newspaper through FOIA confirm revocation was recommended. The documents were heavily redacted, but certain key points remain clear.

In a report during Adam Allan's application to open Badger Guns, an ATF investigator referred to the November 2006 inspection of Badger Outdoors.

The "Firearms Qualification Report" dated Aug. 14, 2007, said: "The current FFL (federal firearm licensee) at this location is Badger Outdoors Inc. They had a compliance inspection

"To date, no action on this recommendation has taken place. A telephone call placed to ATF attorney (name blacked out) on 5/8/2007 resulted in an e-mail stating at this time due to the pending bona fide sale of Badger Outdoors no action would be taken concerning the pending revocation of their license. Applicant Adam Allan is the son of one of the current owners of Badger Outdoors Wally Allan."

Since Badger Guns began operations Sept. 1, 2007, the ATF has uncovered more violations, documents show. A warning letter was issued May 30, 2008, telling Adam Allan he may face revocation if the agency finds more violations.

The ATF won't say if investigators have returned to Badger Guns for an inspection since 2008, citing a law that doesn't allow them to disclose information on gun store operations.

Federal regulators said they don't track how often gun stores remain open after a license recommended for revocation is relinquished and a new license is issued. They added the law limits their ability to stop it.

When it comes to regulating other licenses, such as alcohol wholesalers, regulators can delve deeply into whether there are secret owners, according to officials at ATF, which used to oversee those licenses. The agency doesn't have that same power when it comes to gun dealer licenses.

The law says investigators cannot consider violations found under the previous gun license - even if the same people are involved in the operation, ATF officials said.

"If the (gun dealer) corporation is a new baby that's just been born, then that comes into the world with no record and you are not going to have anything," said Jim Zammillo, deputy assistant director for field operations at ATF headquarters. "The way the statute is worded, it is basically a clean slate."

In Tacoma, Wash., a gun dealer that supplied the rifle used in the Washington, D.C., sniper case had his license revoked after he couldn't account for hundreds of firearms, according to court records.

But the store - called Bull's Eye Shooter Supply - remains open after the former owner's friend received a new license, according to court records. The former store owner still owns the building, runs the shooting range in the same building and sells ammunition, which does not require a federal license, his attorney said.

In the Badger transaction, ATF used what authority it had to investigate whether the former owners continued to control the operation, but they could not prove that, Zammillo said.

Milwaukee County District Attorney John Chisholm said he first learned of the violations and the recommended revocation of Badger Outdoors from the Journal Sentinel - despite his nine years of working with the ATF on gun issues.

After reviewing ATF documents provided to him by the newspaper, Chisholm said ATF rules may say the Badger Outdoors sale was legitimate, but he doesn't agree.

"From a common-sense assessment of what is going on here, of course this wasn't sold," Chisholm said. "These guys are cagey, sophisticated dealers and they have legally thwarted every attempt ATF has made to regulate their conduct. . . . They have a built-in escape clause. What other industry gets that kind of sweetheart deal?"

## Limits of the law

The case of Badger and other gun dealers shows how ATF's ability to regulate dealers is limited by laws, budget constraints and its own practices, according to experts, the agency and federal watchdogs.

ATF investigators can work a case for a year without a revocation or a federal court order. Yet, the agency doesn't come close to inspecting all 115,000 dealers annually.

Investigators made it to about one in 10 dealers in the fiscal year ending in September, even though the number of dealers is less than half what it was 15 years ago, according to the agency. Violations are typically found at 58% of the dealers inspected, the ATF said.

When they find problems, inspectors have few punitive options short of revocation. Under the law, ATF has very limited suspension authority and no power to fine.

To revoke a gun selling license, the law requires the ATF to prove that the dealer committed "willful" violations - a higher standard of proof than for other federal licenses, according to the ATF.

In other words, once violations are found, the ATF generally has to first issue a letter notifying gun dealers they could lose their license if they continue to break the law. In rare cases, the ATF can skip that step and go straight for revocation, agency officials said.

The agency says it revoked 64 licenses in fiscal year 2009 stemming from more than 11,000 inspections.

Revoking a license can take years. The law allows gun dealers to appeal revocations directly into federal court, and the ATF can allow stores to sell guns as the appeal proceeds, officials said.

Revocations are rare by design, officials said, citing a philosophy of cooperation with dealers.

"In 99.9% of the time, it doesn't need to be adversarial. We are all working toward the same goal," said Sherry Duval, an ATF spokeswoman. "Our business is not to put them out of business."

A 2004 Department of Justice Inspector General report on the ATF, the most recent outside review, found that the agency fails to use what power it has to regulate gun dealers.

"We concluded that the ATF's FFL (Federal Firearms Licensee) inspection program did not consistently ensure that FFLs comply with federal firearms laws," the report said.

ATF officials said changes have been made since the audit's release to beef up the inspection program, but they don't have enough inspectors to get to all gun dealers.

Critics of the ATF said that the agency's oversight of gun dealers is lax compared to other businesses.

"I think it has been watered down to basically where there is no regulation," said Gerald Nunziato, who retired from the ATF after 29 years. "It is a perfect industry to do whatever you wish."

The National Rifle Association, which lobbies on behalf of gun owners and dealers, argues just the opposite. It says some gun shops have been harassed by the ATF.

"There are some ATF agents who do a good job, and some are overzealous in their efforts," said NRA spokesman Andrew Arulanandam. "If firearms retailers are involved in criminal conduct, they ought to pay the price, but if not, they ought to be left alone."

## Started in 1987

The West Milwaukee gun store, first known as "Badger Guns & Ammo," was opened in 1987 by Beatovic, his brother, Curtis, and Walter Allan. Curtis Beatovic later left the business.

ATF investigators found violations at the store in 1989, reports show. It is impossible to determine how serious the violations were because so much of the ATF documents was

Because of the store's high volume of gun sales, inspectors recommended Badger Guns & Ammo be inspected every year, but that didn't happen, records show.

Mick Beatovic said problems in the early years involved the store's inventory records.

"Our records were so screwed up. It was so bad because I was doing the books," he said, adding he then hired a secretary to do them. Beatovic said he made clerical errors but no guns were missing or sold illegally.

Investigators returned in 1991 and 1992, finding violations both times, records show.

The ATF issued Badger Guns & Ammo a warning letter in August 1993 that closed by saying, "repeated violations of those listed above will be viewed as willful and may result in the revocation of your license."

Beatovic said he never received that warning letter. The ATF records indicate it was sent to Badger Guns & Ammo via certified mail.

Warning letters have been cited by federal judges reviewing gun shop revocations as ATF's best way to prove a dealer is willfully violating the law over time.

The ATF returned to Badger Guns & Ammo once a year from 1995 to 1999, recording one violation during that time.

Because of redactions, it is unclear from the paperwork if those were full-blown compliance inspections, which can take more than week. ATF also can be called into a gun dealer for a specific problem, resulting in a more limited records check, officials said.

In 1999, a federal report on the top sellers of crime guns in the country was released showing Badger Guns & Ammo was No. 1. Crime guns are defined as any gun recovered by police. The report showed 1% of gun dealers account for 57% of all crime guns.

Beatovic said his numbers were high because of his volume and relative proximity to Milwaukee's high-crime areas.

Later in 1999, the store's owners changed the name to "Badger Outdoors," according to state records.

Also that year, Beatovic created a new company, called Regdab Properties - Badger spelled backward - which serves to this day as the property management company for the building, records show.

In a May 2002 inspection, the ATF found seven violations at Badger Outdoors, according to records. No action was taken.

The heavily redacted document says, "The violations could not be shown as willful. Further, there is a time lapse between inspection and report of over one year. The delay was due to other assignment priorities. Circumstances could have changed during this timeframe, which possibly would reflect current business practices in compliance with ATF laws and regulations."

Prosecutor Chisholm said that reads to him like ATF dropped the ball.

"What is your other priority?" Chisholm asked of the agency. "You damn well better meet your time limits and not use the excuse, 'We were too busy.' I don't know what else would be more important."

## Focus on inventory

The ATF provided proof on dict discrepancies in the 28 inspections that were ordered from 2003 to 2005.

In May 2006, an ATF document was released through a federal lawsuit showing Badger Outdoors was the top seller of crime guns in the nation in 2005, with 537.

Six months later, ATF investigators returned to Badger Outdoors and found problems as they began checking the inventory, according to Zammillo of ATF headquarters, who was later briefed on the inspection.

Investigators routinely compare the records of the guns that have been shipped to the gun store with the inventory records, he said. The store must either have the firearm or a record of whom it was sold to.

Citing federal law limiting disclosure, Zammillo said he could not disclose the violations found at Badger but described them as "inventory discrepancies."

Zammillo said Beatovic told ATF investigators during the inventory check that he was retiring. Zammillo wasn't sure if Beatovic and the other owner, Walter Allan, knew what problems were found - though he noted that Badger Outdoors employees were doing the inventory check with ATF investigators.

ATF has not released any documents directly from that November 2006 inspection - despite repeated requests by the Journal Sentinel.

But that 2006 inspection and the recommendation for revocation were noted in a 2007 report on Badger Guns' license application, which was released with certain parts blacked out.

During the Journal Sentinel's investigation, the ATF gave different accounts of what occurred during the 2006 inspection of Badger Outdoors.

In December 2007, Zammillo told a reporter from the paper that revocation of Badger Outdoors' license was not considered. But two weeks later Zammillo called back to say he had been given incorrect information and that revocation was contemplated.

"We did not actually complete our deliberative process on his revocation in that it never got to counsel to do their review and reach a conclusion as to whether we would revoke or not because of the change" in ownership, Zammillo said.

ATF officials noted that there are several steps to the revocation process and that was not completed in the Badger Outdoors case.

"No notice of revocation was ever issued," said Mary Jo Hughes, head of ATF's industry operations in the region covering Wisconsin. "If a bona fide sale had not gone through, it would be pure speculation to say we would have gone through to revocation."

After an acknowledged rough start at record-keeping, Beatovic said his business kept stellar records. He said there were some minor problems over the years but nothing serious.

"You sell 60,000 guns and you are going to have problems with bookkeeping," Beatovic said, declining to say over what period that figure applied to.

Beatovic stressed the 2006 inspection was not a factor in his decision to retire. He said it was planned for years and he knew nothing about a recommended revocation.

"I wasn't privy to that information," he said. "If someone was planning on doing it, I think they would have had a hell of a time getting the license away from me."

## Ownership change

Two months later, Adam Allan - a Walter Allan
employee at the store on and off for much of his life - filed paperwork with the state creating a new company called Badger Guns Inc., according to Department of Financial Institutions records dated Jan. 29, 2007.

Adam Allan worked full-time at Badger Outdoors from 2003 to March 2006 when he opened a tattoo parlor, ATF documents said. Adam Allan returned to working at Badger Outdoors full time in January 2007, they said.

Attorney John H. Shore represented Badger Guns Inc. in the state filing as he had done for Badger Outdoors Inc. Shore did not respond to interview requests or written questions from the Journal Sentinel for this article.

In March 2007, Badger Guns Inc. applied for an occupancy permit with the village of West Milwaukee. It was signed by Walter Allan, Adam's father and the president of Badger Outdoors, village records show.

Village records show the landlord of the store would be Regdab Properties - controlled by Beatovic.

During his interview for the federal gun dealer's license, Adam Allan told ATF inspectors he expected to make few changes in the store, records show.

Allan didn't know key details about the gun store he was buying, records show.

For instance, the report says: "I asked Allan to estimate the dollar value of the inventory. He said he had no idea and asked (Beatovic) when he came in the room."

Inspectors also asked him about how he would pay for the inventory. Allan's answer is blacked out in the report.

Zammillo said a federal law, which pertains only to gun dealers, doesn't allow ATF to look behind the person applying when considering granting a new license.

"You could have the same players involved and it is a new corporation because the statute doesn't get to the principals behind the corporate name. It only looks at the corporation, and the corporation is the applicant," Zammillo said.

That is different than licensing for other businesses, including liquor wholesalers, where inspectors investigate all the people behind the business and deny a license if one of those people is barred or is likely to break the law, he said.

"It gave you access to the character and the record of the people behind the corporate name," Zammillo said of alcohol business regulation, which is now handled by the Treasury Department. "This (gun dealer) statute, the way it is worded, does not give us that authority."

Using its limited authority, ATF investigated whether Beatovic and Walter Allan were "secret owners," Zammillo said. Investigators couldn't prove it, he said.

After reviewing ATF documents provided by the Journal Sentinel, Milwaukee Police Chief Edward Flynn questioned the federal agency's conclusion.

"It looks like a cynical shell game to me," Flynn said.

Flynn has been sharply critical of Badger Guns after the department revealed in October that each of the guns used to wound six Milwaukee police officers shot in the past two years was purchased at Badger Guns or its predecessor, Badger Outdoors.

In June, Milwaukee police launched an ongoing undercover mission, stopping customers outside the store. In six months of stops, one in five people stopped leaving the store has

been found ... side Badger, which is illegal. Police also said they also found evidence of straw buying.

Federal court records show 21 of the 27 straw buyer criminal cases prosecuted in the past five years in the Eastern District of Wisconsin involved Badger Guns or its predecessor.

Seven months after Adam Allan took over and opened Badger Guns, ATF conducted its once-a-year inspection and found three violations. Again details were blacked out, but at least one of the violations appeared under the section titled "Inventory," documents show.

Allan also received a warning letter that says revocation would be possible if violations were found again.

## Washington case

Experts say gun dealers know they can halt punishment and keep an operation going if licenses change.

They point to the case of Bull's Eye in Tacoma, Wash. - the source for the Bushmaster semiautomatic rifle that was used to kill at least 10 people and wound three others in 2002 by the so-called Washington, D.C., snipers.

That gun was reportedly stolen by one of the men who learned to shoot at the store's range in 2002. The shop also was the source for weapons used in other mass shootings, according to published accounts.

ATF found hundreds of guns were missing from Bull's Eye in 2000 and issued a warning, according to court records.

The agency revoked owner Brian Borgelt's license in 2003 after the shop couldn't account for more than 100 guns, records said. In September 2009, a federal judge upheld the ATF's revocation of Borgelt's license.

Bull's Eye remains open. Borgelt sold the business to a friend who took out a new license and runs it, according to Borgelt's attorney, James Frush. Borgelt owns the building, running a shooting range in the same location and selling ammunition, Frush said. Borgelt has no hand in the gun shop operation, he said.

Joseph Vince Jr., who worked for ATF for nearly 30 years, said cases such as Bull's Eye and Badger Outdoors show the ATF's authority can be undermined when licenses change.

"It is just an easy way to circumvent the law," he said.

Former West Milwaukee Police Chief Eugene Oldenburg said he was puzzled in 2007 when he learned that the gun store had been run by Beatovic and Walter Allan now would be run by Adam Allan.

"That is one where I scratched my head," the retired chief said. "Wally is the co-owner and all the sudden now Wally is working for his son?"

As a local police chief, he had no say in the sale of a gun store. Told about the violations at Badger Outdoors and the license change, Oldenburg said it raises more questions.

"So this looks like the straw sale of a gun store," he said.

# Exhibit 5



 PRINT THIS

**WATCHDOG REPORTS** | WIPED CLEAN | A JOURNAL SENTINEL WATCHDOG REPORT

# Ineffective rules let gun stores endure

In some cases, new federal license erases revocation



Jason Lee, an employee at Family Indoor Shooting Range in Indianapolis, holds a Smith & Wesson Model 29 .44 Magnum handgun with scope. The store was known as Popguns before owner Mike Hilton lost his federal firearms dealer's license. Hilton then transferred ownership to his wife, who obtained a new license. Credit: D. Kevin Elliott/For the Journal Sentinel

*By John Diedrich and Ben Poston of the Journal Sentinel*

Dec. 15, 2010

Hobbled by Congress, federal watchdogs rarely revoke the licenses of lawbreaking gun dealers. And when they do, stores can easily beat the system by having a relative, friend or employee pull a fresh license - something that routinely happens across the country, a Journal Sentinel investigation has found.

The newspaper identified more than 50 stores in 20 states over the past six years where such a move was made, wiping the operation's slate clean. The newspaper's review, which involved contacting more

than 150 gun dealers, uncovered 34 additional stores with indications a revoked license holder remains connected to a gun-dealing operation.

Earlier this year, the newspaper reported that licenses changed at a Milwaukee area gun store in 2007. A recommended revocation of the Badger Outdoors license by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives disappeared when the license was surrendered, a co-owner retired and a different owner's son pulled a new license, changing the name to Badger Guns.

Those operations have been the top sellers of crime guns recovered by Milwaukee police for at least the past decade, according to Milwaukee police data obtained by the newspaper. In the past three years, six Milwaukee police officers were wounded with guns sold by Badger Guns or Badger Outdoors - accounting for all but one of the officers shot during that period.

In Indianapolis, Popguns - another top dealer of crime guns according to ATF data - had its license revoked by the agency in 2006. The business remains in operation after owner Mike Hilton's wife received a fresh license and the violations disappeared. Mike Hilton remains closely involved in the operation.

"The fact that I can be in here and work in the store other than in a clerk capacity, it is kind of asinine, I agree," Hilton told the Journal Sentinel one day recently while working at the store. "You revoke a license but then the person whose license is revoked, they can come right back in and can be an integral part of it."

The license loophole is the latest example of how Congress protects even the biggest sellers of crime guns by crippling the enforcement agency responsible for regulating them - the focus of the newspaper's yearlong "Wiped Clean" investigation, launched after a pair of Milwaukee police officers were severely wounded with a gun purchased from Badger Guns.

Gun-rights advocates say enforcement of existing laws is enough to curb bad actors. But Congress has gutted those laws regarding the

sellers of crime guns and has made it extremely difficult for the public to find out which dealers are arming criminals.

The latest Journal Sentinel investigation also found:

• The ATF inspects less than 20% of the nation's roughly 62,000 federally licensed firearms dealers each year and tries to shut down just a fraction of them, with the number dramatically dropping in the past six years. And when the agency tries to take away a license, it succeeds just half the time.

• An analysis of ATF data shows it took an average of 15 months for the agency to process a recommendation to revoke or deny license renewal. The data, however, doesn't measure the entire process. The agency estimates the time is probably 18 to 24 months. And it can drag on for years if the stores take it to court.

• In its nationwide review of ATF data, the newspaper determined at least 52 current dealers have connections to a revoked dealer. In Wisconsin alone, there are five such dealers.

Revocation is the only meaningful punishment Congress allows ATF to use for a lawbreaking store.

Dozens of revoked dealers freely admitted to the newspaper's reporters a license was revoked and a new one was acquired by someone close to the former license holder.

A revoked Mississippi gun dealer said he sold the store to his wife for $1 and now works for her. A dealer in Pennsylvania whose license was revoked simply started using a spare license he had acquired. And a revoked Alabama shop remains in the gun business after an employee created a new corporation that holds the new license.

"We call it the phoenix rising from the ashes," said Teresa Ficaretta, ATF's deputy assistant director for enforcement programs and services.

Dealers who do get closed also pose a risk. They can simply move the store's firearm inventory into their personal collection and sell an

unlimited number of guns without background checks – an approach sometimes referred to by critics as the "fire sale provision."

Congress not only hinders the agency from effectively regulating lawbreaking dealers, it also has made secret nearly all federal records about gun stores, including why licenses are revoked. Congress put the information off-limits in 2003 following widespread news articles about stores such as Badger Outdoors and Popguns being among the top sellers of crime guns in the nation.

Next year, lawmakers may further cripple the agency when they consider a law that would make it harder to revoke a firearms license.

Gun store advocates argue the agency can be overzealous in its inspections and sometimes goes after licenses for petty violations, a charge agency officials dispute.

Andrew M. Molchan, director of the Professional Gun Retailers Association, acknowledged stores sometimes have spare licenses in case they have problems with ATF. He stressed that the majority of dealers are following the law.

"If you have a whole truckload of apples, not every apple is going to be perfect," he said. "There are going to be some bad ones in there."

The newspaper's findings raise questions about the ATF's ability to shut down those troubled stores. This much is clear: The public has a hard time getting information about them.

Some gun store owners say it's not difficult to prevent illegal gun sales to straw buyers, noting their policies against cell phone use in the store, watching the parking lot and tough questioning of customers. There is nothing that requires them to sell guns to anyone.

ATF is frustrated it can't do more to stop the license swaps by dealers facing revocation, according to a former high-ranking agency official who recently retired. Federal officials have more power to investigate a license to sell liquor than for dealing guns, said James Zammillo, ATF's former deputy assistant director.

Many times ATF is mischaracterized as the problem," he said, "when the reality is the law, as it was written, is the problem."

## Mecca For Crime Guns

The Popguns case shows how Congress hamstrings ATF's regulatory authority.

Between 1996 and 2004, more than 1,100 crime guns were traced back to the store, making it one of the stores with the most traces in the nation, according to ATF records and owner, Mike Hilton.

Crime guns are defined as any gun recovered by police in a criminal investigation. A report in the 1990s showed 1% of gun dealers account for 57% of all crime guns. That was the last time such a report was made public.

Wanting to see if Hilton was trafficking guns illegally, the ATF zeroed in.

During an inspection, investigators found the store's inventory records - vital for detecting such trafficking - in disarray, Hilton said.

His license was revoked.

"My paperwork was absolutely horrendous," Hilton said. "I got what I deserved."

Hilton said he never sold any guns illegally. He argued his high number of crime-gun traces was explained by the store's large volume and ATF's broad definition of crime guns.

Hilton appealed the revocation for more than a year, and kept selling guns. During appeals, Congress has ordered and courts have agreed that stores be allowed to continue selling guns.

In 2006, Hilton stopped fighting the revocation. Around that time, his wife, Carolyn Hilton, was issued a new license under the name Family Indoor Shooting Range, according to ATF records. The operation continues today much as it did when it was officially called Popguns. The same sign even remains atop the store.

Mike Hilton said he spends most days at the gun store, working on the business' websites and helping the manager. He said his wife - the business owner and license holder - stops in once a week.

## Authority Diminished

Over the past 25 years, Congress has increasingly limited ATF's regulation of gun stores and shrouded what it does in secrecy.

The 1986 Firearm Owners' Protection Act laid out special rules for gun dealers. ATF can inspect gun dealers once each year without a federal court order, but they inspect only about one in five because there aren't enough investigators. Thousands of dealers have not been inspected in five years or more, Zammillo said.

The agency's first priority is inspecting the nation's nearly 11,000 explosives dealers, which Congress required get a visit once every three years following the Sept. 11, 2001, attacks.

When the agency finds violations at gun stores, Congress generally only allows ATF to issue a warning or revoke; it has very narrow suspension or fining authority.

Since 2003, Congress passed a provision that forbids ATF from releasing gun-trace data and what violations they find at gun stores. Congress has even told ATF it cannot require stores to take an inventory.

When questioned, many revoked dealers dismissed their violations as paperwork errors. But given the law, and other restrictions, that is the only kind of violation the agency can find. The most common sort of paperwork violation involves guns missing from the inventory book or paperwork not done on purchases, according to ATF records.

Last year, 752 inspections, or about 7% of the total, turned up missing guns - some 18,000-plus in all, according to ATF data.

"There is no such thing as a minor paperwork error," said attorney Christopher Chiafullo in New Jersey, who defends gun stores. "As

someone who sells guns in this country, you have to be a good record-keeper."

Richard Gardiner, a Virginia lawyer who also defends stores, disagrees. As chief counsel for the National Rifle Association, he helped write the law governing ATF inspections of stores.

"Congress didn't want licenses to be revoked for unintentional errors," he said. "They recognized that a lot of this paperwork is not important anyway. All of this is a big farce, a waste of time. You don't need it for preventing crimes."

The ATF's Ficaretta countered that missing paperwork means ATF can't do its job.

"Indifference by noncompliant gun dealers does jeopardize public safety," she said. "Law-abiding citizens can't afford the cost of indifference."

## Repeated Violations

Gary Bertrand, owner of Bertrand's Sport Shop in Green Bay, said he lost his license in 2005 for "a clerical error."

Federal court documents, however, reveal that Bertrand repeatedly had guns missing from his inventory records. The usually secret violations were revealed because Bertrand appealed in court.

ATF repeatedly warned Bertrand until it finally denied renewal of his license - considered the same as a revocation. But that was not the end of Bertrand's store.

"We had to apply for a new license under a different person," Bertrand said. In this case, that person was Bertrand's daughter. Gary Bertrand still owns the store.

ATF is aware of revoked gun dealers who make simple changes to the business structure and stay in operation. Ficaretta said the agency trains its investigators to watch for hidden ownership, but the law makes it difficult to stop because it requires the agency to treat the business as a new applicant.

We believe that applicants and attorneys are getting a lot more savvy in how they structure the new businesses to avoid denial," Ficaretta said.

A new company was formed after Wiley Outdoor Sports, in Decatur, Ala., was denied renewal in 2007. ATF repeatedly found guns missing from the inventory records, according to court records.

Jerry Peevy - who worked for Wiley - created The Wing Shooter, which would operate inside Wiley's and sell guns. Peevy said customers probably didn't notice a change, but they are separate entities.

"It didn't defeat the revocation process. Wiley's no longer can purchase or receive or sell guns," he said. "It was disclosed in the (firearms) license process. ATF signed off on it."

If ATF can prove the corporation was created just to circumvent the law, ATF can deny the license. To get that information, however, the ATF has to get business records. But the agency has no right to compel applicants to produce many business documents, in contrast with other licenses such as alcohol wholesalers.

"It is very difficult for us to get the evidence we need to deny an application," Ficaretta said. "We ask for documentation, particularly in these hidden ownership cases, but more and more frequently we are finding that applicants are telling us to go pound sand."

Gardiner, the Virginia attorney, said he has never heard of cases where revoked dealers remained in the gun-selling business. Gardiner also said the agency has enough authority to dig into applicants' background.

"They have the power to find out a lot of this information from public sources," he said. "That is public information that any idiot can get. A lot of times they don't need subpoena to find out those things."

But Zammillo said ATF's hands are tied when digging into a gun dealer's application. The law does not allow the agency the tools or

the authority to look behind the license. That is different from other federal licenses.

"The Congress chose, in the instance of alcohol, to write the law going behind the company and see who the people were to say whether they should be in business," he said. "That is what they chose not to do with regards to firearms."

In Milwaukee, ATF investigators recommended revoking Badger Outdoors' license but there was no revocation. The license was relinquished voluntarily, the players inside the operation took on new roles and a new license was issued to a previous owner's son. The operation, located on S. 43rd St. in West Milwaukee, remains largely unchanged.

The former owner of Badger Outdoors said he knew nothing about the recommended revocation, and he had decided to turn in the license and retire. The current owner of Badger Guns declined to comment.

Four of the six wounded police officers have sued Badger Guns and Badger Outdoors, contending they are the same operation and were negligent in the gun sales.

## Audit Finds Failure

The Journal Sentinel's review of the ATF's revocation process is the first since 2004, when a U.S. Department of Justice inspector general's audit found the agency failed to make sure gun dealers were following the law.

In that audit, auditors reviewed a sample of 50 revocation cases and found, on average, it took about a year to process a revocation or denial.

The Journal Sentinel's analysis of nearly 700 cases showed the time to revoke or deny a license is longer today, averaging 15 months from a supervisor's recommendation to the case closing.

Before the audit, Zammillo said gun dealers didn't generally take ATF's revocation very seriously.

"ATF pretty much got a reputation for being a paper tiger," said Zammillo, a top official at the time.

After the audit, Zammillo said he ordered changes to how inspections were done. That led to a slight spike in revocations five years ago, he said. The number dropped by half to about 60 this year, the newspaper found.

The inspector general is doing a follow-up audit. The results are expected to be released next year.

Also next year, Congress is expected to consider a bill that experts said would make it more difficult for ATF to revoke dealers' licenses.

Called the ATF Modernization Act, the bill also would give the agency power to fine or suspend licenses, but critics say the fine amounts are too low and the suspension power too limited.

"If the restrictions are so tight on ATF and there are meaningless penalties, there will be no effort to go after anybody," said Gerald Nunziato, who worked for ATF for 29 years and retired as head of the National Tracing Center. "As bad as it is now, it will get even worse."

## Still Minding The Store

In calls to the current gun dealers across the country, the Journal Sentinel found dozens of revoked license holders were still working in the stores.

Mike Hilton of Popguns in Indianapolis said he initially promised ATF inspectors he would not be in the store, but later agency officials said it was fine for him to be there.

In Verona, Miss., Audie Morgan said he had to make no such promise and still works in the store.

The ATF revoked Audie Morgan's license to deal guns at the Verona Trading Post & Pawn Shop in 2006. He said he sold the business

including the gun inventory to his wife, Barbara Morgan, for $1. His wife is now his boss, Audie Morgan said. He works as the gun salesman and does federal firearms paperwork.

"It's all legal," said Audie Morgan. "I don't see anything wrong with it."

### Sales Without Background Checks

When ATF succeeds in shutting down a gun store, the agency can run into more trouble.

Federal court rulings allow revoked dealers to move their inventory into their private collection and sell the firearms without federal scrutiny - what critics call the "fire sale provision."

Indeed, that twist is one of the reasons why the agency allowed Shawano Gun & Loan near Green Bay to continue selling guns while it appealed its revocation in federal court.

Shawano Guns' license was revoked by ATF more than three years ago for repeatedly failing to keep accurate records and for making suspected straw gun sales - that is, selling to people who were buying guns for felons and others who can't buy them. The store appealed.

Shawano's owner told investigators he might turn over the store to his nephew, who would pull a fresh license, possibly erasing the violations.

The ATF tried to finally cut off firearm sales at Shawano Gun, but U.S. District Judge William Griesbach overruled the ATF while the case goes to federal appeals court.

In Michigan, the agency succeeded last year in revoking the license of Wah Wong, owner of the Firearm Exchange gun shop outside of Detroit. ATF revoked the license when 300 guns came up missing from his books, according to federal court documents.

Wong said he tried to have his wife and an employee take out a new license, but ATF denied it.

Picaretta, a top official at ATF, said Wong may have admitted too much.

"He may not have been saying the right things; he may not have formed his business organization well enough to make it look like other than what it sounds like it is: a sham," she said. "It depends on the sophistication of applicants and maybe their ability to obtain good counsel, too."

After he was revoked, Wong said he moved about 1,800 guns into his "personal collection" and he has been selling at gun shows and online, where he is not required to do background checks. The law does not consider him a "dealer" because he isn't actively acquiring guns, only selling them.

Wong still runs a gun range where he rents guns and sells ammunition - neither of which requires having a gun dealer license. Wong said he has sold about 1,200 guns without background checks in the past year and plans to sell the rest until they are gone.

"I am selling them off. They are my personal guns now," Wong said. "What are you going to do with six, seven hundred guns?"

---



**About John Diedrich**
John Diedrich writes about crime, federal issues, ultimate fighting and guns. His investigations have been honored with various national awards including a George Polk Award for reporting on rogue gun stores and an IRE award for exposing botched undercover federal stings.

🐦 @john_diedrich    ✉ jdiedrich@journalsentine...    📞 414-224-2408

---

**About Ben Poston**
Ben Poston is the Journal Sentinel's investigative reporter focusing on database and mapping analysis. He joined the newspaper in June 2007 and has written about weaknesses in the region's tornado warning system, inspection delays for dangerous dams and convicted felons who obtain gun hunting licenses. Previously, he worked as a data analyst at the National Institute for Computer-Assisted Reporting in Columbia, Mo. Prior to that, he worked for three years as a reporter for Cox Newspapers in Ohio. Poston worked for a year as a freelance reporter on a wrongful conviction murder case in Southeastern Missouri that was published in the St. Louis Post-Dispatch. He wrote stories from Mississippi detailing the aftermath of Hurricane Katrina that won a 2006 Best of Cox Newspapers Award. Poston holds a bachelor's degree in international studies from Miami University (Ohio) and a master's degree in journalism from the University of Missouri, where he focused on database, mapping and social network analysis. He can be reached at bposton@journalsentinel.com or (414) 224-2572.

✉ bposton@journalsentinel.com    📞 (414) 224-2572

# Exhibit 6

Advertisement

**CORRECTION TO THIS ARTICLE**
This article incorrectly implied that federal law prohibits people younger than 21 from buying firearms from
licensed dealers. That is true of handguns, but the minimum age for purchases of rifles and shotguns from
licensed dealers is 18.

# Industry pressure hides gun traces, protects dealers from public scrutiny

By James V. Grimaldi and Sari Horwitz
Washington Post Staff Writers
Sunday, October 24, 2010; 6:00 AM

Under the law, investigators cannot reveal federal firearms tracing information that shows how often a dealer
sells guns that end up seized in crimes. The law effectively shields retailers from lawsuits, academic study
and public scrutiny. It also keeps the spotlight off the relationship between rogue gun dealers and the black
market in firearms.

Such information used to be available under a simple Freedom of Information Act request. But seven years
ago, under pressure from the gun lobby, Congress blacked out the information by passing the so-called Tiahrt
amendment, named for Rep. Todd Tiahrt (R-Kan.). The law removed from the public record a government
database that traces guns recovered in crimes back to the dealers.

"It was extraordinary, and the most offensive thing you can think of," said Chuck Wexler, director of the
Police Executive Research Forum, a nonprofit group for police chiefs. "The tracing data, which is now secret,
helped us see the big picture of where guns are coming from."

The amendment also kept the data from being used by cities and interest groups to sue the firearms industry,
an avenue of attack modeled after the lawsuits against tobacco companies. "They were trying to drive a stake
through the heart of the [gun] industry," said Lawrence Keane, general counsel for the National Shooting
Sports Foundation, a trade group for firearms dealers and makers. "It took an act of Congress to stop the
litigation."

To break through the federal secrecy imposed by the Tiahrt amendment, The Post obtained hundreds of
thousands of state and local police records and did its own tracing and analysis. To develop Maryland
statistics, The Post took records of handgun sales from a state database and cross-referenced them against
lists of gun serial numbers from police evidence logs in the District and Prince George's County. For Virginia,
The Post gathered records of gun traces from a State Police database.

The National Rifle Association and other gun rights activists say releasing the tracing data unfairly tainted
honest businesses by demonizing legal gun sales. Tiahrt and defenders of his amendment say it was backed
by a national police union and the federal Bureau of Alcohol, Tobacco, Firearms and Explosives, which
wanted the database to be kept secret to protect undercover officers.

But Bradley A. Buckles, ATF director at the time, said his agency did not ask for the amendment. "It just
showed up," he said. "I always assumed the NRA did it."

The NRA said the amendment protects gun owners and manufacturers. The data were being "used to push a
political agenda," said Chris W. Cox, executive director of the NRA Institute for Legislative Action. "None of
these individual dealers or companies was going to be able to withstand the avalanche of lawsuits and being
held literally responsible for crime."

The proposal surprised some members of the House Appropriations Committee when it came up for a vote in
July 2003. As a result, it barely passed, 31-30, though the committee was full of NRA supporters such as
Rep. Frank R. Wolf (R-Va.), who voted no because he was troubled at being "caught flat-footed and
blindsided."

After the vote, Rep. James P. Moran Jr. (D-Va.) objected. "It was not the subject of hearings. It has no support
from law enforcement. It has no support from Attorney General [John] Ashcroft. It really serves to protect

Tracing began in 1968, when Congress required dealers to collect certain information when a firearm is sold. A buyer must affirm that he or she is at least 21 and not a felon, a fugitive, an illegal immigrant or mentally ill. Dealers must list the information on Form 4473, with the firearm's serial numbers, to allow police to trace guns.

For three decades, tracing was used mostly to help police catch criminals linked to recovered guns. But in 1995, Professor Glenn L. Pierce of Northeastern University analyzed ATF tracing data and discovered that a tiny fraction of gun dealers - 1 percent - were the original sellers of a majority of the guns seized at crime scenes - 57 percent.

Pierce's analysis "blew everybody away" at the ATF, recalled Joseph R. Vince Jr., then deputy chief of the firearms division. Law enforcement might be able to reduce crime by focusing on a relative handful of gun dealers.

The Clinton administration seized on the findings to encourage police to request a trace on every gun they confiscated. In 2000, Treasury Secretary Lawrence H. Summers, who oversaw the ATF, announced "intensive inspections" of the 1 percent - 1,012 gun stores.

The inspections detected serious problems. Nearly half of the dealers could not account for all of their guns, for a total of 13,271 missing firearms. More than half were out of compliance with record-keeping. And they had made nearly 700 sales to potential traffickers or prohibited people. More than 450 dealers were sanctioned, and 20 were referred for license revocation.

The ATF proposed tougher rules, such as requiring dealers to conduct regular inventories to detect lost or stolen guns. The gun industry opposed the rule, calling it a step toward a national registry of gun ownership.

Lawmakers and groups such as the Brady Center to Prevent Gun Violence used the tracing data to identify the top 10 "bad apple" gun dealers. That angered gun store owners and manufacturers, who argued that selling traced guns does not prove wrongdoing.

The industry turned its anger into action.

For years, the ATF had been releasing tracing data that was at least a year old. A Freedom of Information Act lawsuit pushed for contemporaneous data, but the ATF balked because it felt that the release of real-time trace data could threaten investigations. The standoff landed in the Supreme Court.

In February 2003, before oral arguments, the NRA persuaded Rep. George R. Nethercutt (R-Wash.) to add a provision codifying the time delay into a 544-page omnibus spending bill. In a dramatic move, the high court canceled arguments. The case eventually was tossed out.

Next, the gun lobby moved to take the trace data out of public circulation altogether. In July 2003, Tiahrt introduced his amendment, saying, "I wanted to make sure I was fulfilling the needs of my friends who are firearms dealers."

Tiahrt - who lost in this year's Republican Senate primary - said he also was lobbied by the Fraternal Order of Police. "They believed it would allow criminals to track down who undercover officers were," Tiahrt said. But FOP Executive Director James Pasco Jr. said the union played no role in drafting the amendment. "We were not there before the fact," he said. "We were supportive after the fact."

An appeals court in Chicago ridiculed the undercover argument, saying it was one of several "far-fetched hypothetical scenarios" offered to oppose releasing the data. Although the FOP supported the Tiahrt amendment, police chiefs across the country have opposed it as an impediment to local law enforcement.

In 2007, mayors led by New York's Michael R. Bloomberg attacked the amendment, saying it shielded dealers who broke the law. Armed with trace information from before the ban, New York filed civil suits against more than two dozen dealers in Georgia, Ohio, Pennsylvania, South Carolina and Virginia. The city hired investigators to do undercover stings for illegal gun sales. Twenty-one dealers accepted court monitoring of their businesses.

# Exhibit 7

**The New York Times** | https://nyti.ms/Tt3x9X

U.S.

# Legal Curbs Said to Hamper A.T.F. in Gun Inquiries

By ERICA GOODE and SHERYL GAY STOLBERG   DEC. 25, 2012

MARTINSBURG, W.Va. — The Bureau of Alcohol, Tobacco, Firearms and Explosives has been without a permanent director for six years, as President Obama recently noted. But even if someone were to be confirmed for the job, the agency's ability to thwart gun violence is hamstrung by legislative restrictions and by loopholes in federal gun laws, many law enforcement officials and advocates of tighter gun regulations say.

For example, under current laws the bureau is prohibited from creating a federal registry of gun transactions. So while detectives on television tap a serial number into a computer and instantly identify the buyer of a firearm, the reality could not be more different.

When law enforcement officers recover a gun and serial number, workers at the bureau's National Tracing Center here — a windowless warehouse-style building on a narrow road outside town — begin making their way through a series of phone calls, asking first the manufacturer, then the wholesaler and finally the dealer to search their files to identify the buyer of the firearm.

About a third of the time, the process involves digging through records sent in by companies that have closed, in many cases searching by hand through cardboard boxes filled with computer printouts, hand-scrawled index cards or even water-stained sheets of paper.

In an age when data is often available with a few keystrokes, the A.T.F. is forced to follow this manual routine because the idea of establishing a central

database of gun transactions has been rejected by lawmakers in Congress, who have sided with the National Rifle Association, which argues that such a database poses a threat to the Second Amendment. In other countries, gun rights groups argue, governments have used gun registries to confiscate the firearms of law-abiding citizens.

Advocates for increased gun regulation, however, contend that in a country plagued by gun violence, a central registry could help keep firearms out of the hands of criminals and allow law enforcement officials to act more effectively to prevent gun crime.

As has been the case for decades, the A.T.F., the federal agency charged with enforcing gun laws and regulating the gun industry, is caught in the middle.

Law enforcement officials say that in theory, the A.T.F. could take a lead role in setting a national agenda for reducing gun crime, a goal that has gained renewed urgency with the school massacre in Newtown, Conn. But it is hampered, they say, by politically driven laws that make its job harder and by the ferocity of the debate over gun regulation.

"I think that they've really been muzzled over the last several years, at least, from doing their job effectively," said Frederick H. Bealefeld III, a former police commissioner in Baltimore. "They've really kind of been the whipping agency, caught in the political turmoil of Washington on the gun issue."

The bureau's struggles are epitomized by its lack of a full-time director since Congress, prodded by the N.R.A., decided that the position should require Senate confirmation. That leadership vacuum, Mr. Bealefeld and others said, has inevitably depleted morale and kept the agency from developing a coherent agenda.

At a news conference last Wednesday, Mr. Obama called on the Senate to confirm a permanent director, saying lawmakers should "make this a priority early in the year." But given the complicated politics, it may be difficult for the White House to get a director confirmed. Mr. Obama's Republican predecessor, George W. Bush, was unable to do so.

In 2010, Mr. Obama nominated Andrew Traver, who is now the head of the bureau's Denver division, for the post. But Mr. Traver, whose candidacy is

opposed by the N.R.A., has yet to have a hearing, and his nomination has languished in the Senate Judiciary Committee. The senior Republican on the panel, Senator Charles E. Grassley of Iowa, has raised questions about Mr. Traver's nomination, and his prospects for confirmation looked so dim that the White House told Democrats on the committee to make nominations for other posts a higher priority, according to a Senate Democratic aide.

The persistent controversy over the A.T.F.'s role, historians say, also contributed to its neglect in the financing bonanza that followed the Sept. 11 terrorist attacks. While other law enforcement agencies like the F.B.I. have benefited from greatly increased budgets and staffing, the A.T.F.'s budget has remained largely stagnant, increasing to about $1.1 billion in the 2012 fiscal year from just over $850 million a decade ago.

The bureau's tracing center performed 344,447 gun traces in the 2012 fiscal year, but its staffing is no higher than it was in 2004, according to its chief, Charles Houser. Still, he added, the center manages to complete urgent traces in about an hour, and routine traces are done within several days.

The distrust between the A.T.F. and gun rights groups is longstanding. The bitterness runs so deep that some critics of the agency are still angry about events from more than 40 years ago. Alan Gottlieb, the founder and executive vice president of the Second Amendment Foundation, cited a 1971 case in which A.T.F. agents raided the apartment of Ken Ballew in Silver Spring, Md., in the belief that he was stockpiling unregistered grenades. Agents found a cache of weapons, according to a lawsuit filed in the case, and Mr. Ballew was shot in the head after pointing a revolver in the agents' direction.

The 1992 siege of Ruby Ridge in Idaho and the 1993 raid on the Branch Davidian complex near Waco, Tex., are also sore points, Mr. Gottlieb said.

"Waco is not something that made us feel warm and fuzzy about A.T.F.," he said.

Mr. Gottlieb said the "low point" came with the bungled gun trafficking investigation known as Operation Fast and Furious, in which A.T.F. agents, in an effort to trace guns to a network based in Arizona, did not quickly intervene as the weapons were smuggled over the border to Mexico. Last Wednesday, in a development that may inflame the controversy further, Mr. Grassley sent letters

to Attorney General Eric H. Holder Jr. and the Justice Department's Office of the Inspector General demanding an investigation and requesting more information about why a gun bought by an A.T.F. agent involved in Operation Fast and Furious was found at the scene of a homicide in Mexico.

Marc Willis, a spokesman for the A.T.F., said the bureau could not comment on continuing investigations.

The bureau's acting director, B. Todd Jones, who was installed in the summer of 2011 to revamp the agency after the trafficking investigation, has said he has increased oversight and has carried out changes recommended by the inspector general in a report in September.

Yet law enforcement officials and criminal justice experts who would like the A.T.F. to have greater latitude in fighting crime say its effectiveness in reducing gun violence is still hampered by a thicket of laws that limit the information it can obtain and constrain its day-to-day functioning.

The Firearm Owners Protection Act of 1986, for example, prohibits A.T.F. agents from making more than one unannounced inspection per year of licensed gun dealers. The law also reduced the falsification of records by dealers to a misdemeanor and put in place vague language defining what it meant to "engage in business" without a dealer's license.

Both provisions, said William J. Vizzard, an emeritus professor of criminal justice at California State University, Sacramento, and a former A.T.F. special agent, made it more difficult for the bureau to go after gun sellers who broke the law.

The so-called Tiahrt amendments — named for Todd Tiahrt, a former Republican congressman from Kansas, and first attached as riders to appropriations bills in 2003 and 2004 — limited the A.T.F.'s ability to share tracing information on firearms linked to crimes with local and state law enforcement agencies and with the public. Those restrictions have been loosened in subsequent versions of the amendments. But under the most recent Tiahrt amendment, adopted in 2010, the A.T.F. still cannot release anything but aggregate data to the public. The amendment still prohibits the bureau from using tracing data in some legal proceedings to suspend or revoke a dealer's license, and it requires that records of background checks of gun buyers be

destroyed within 24 hours of approval. Advocates of tighter regulation say this makes it harder to identify dealers who falsify records or buyers who make "straw" purchases for others.

Mr. Gottlieb said the Tiahrt amendment protected data "from people who are anti-gun rights who want to manipulate things" to bolster support for gun regulation.

Congress has long resisted the idea of a central transaction database.

David Kopel, a lawyer and the Second Amendment project director at the Independence Institute, a research group concerned with individual choice, said Congress was aware that a registry could be misused. "We don't have an automated database of everybody who's had an abortion or of anyone who owns controversial books," he said.

But Mr. Bealefeld, the former Baltimore commissioner, said the notion that a central database would create "some Orwellian Big Brother oversight that's going to monitor target shooters and hunters and sneak into their houses in the dead of night to steal their rifles and their pistols" was "more fiction than reality."

"I've hunted since I was 7 years old," he said, "and I don't live in fear that anyone's going to come and take my hunting rifles."

Erica Goode reported from Martinsburg, and Sheryl Gay Stolberg from Washington. Michael S. Schmidt contributed reporting from Washington.

A version of this article appears in print on December 26, 2012, on Page A1 of the New York edition with the headline: Legal Curbs Said To Hamper A.T.F. In Gun Inquiries.

© 2018 The New York Times Company

# Exhibit 8



Bureau of Alcohol, Tobacco, Firearms and Explosives

# News Release

Headquarters



Contact: Public Affairs Division
202-648-8500
www.atf.gov

For Immediate Release
Friday, September 29, 2017

## ATF Releases 2016 U.S. Firearms Trace Data Report

WASHINGTON — The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) released firearms trace data today for all U.S. states and territories for calendar year 2016. Data was gathered from ATF's National Tracing Center (NTC), which is the nation's only crime gun tracing facility. Trace data relates to firearms recovered by law enforcement. For calendar year 2016, the NTC traced more than 364,000 firearms.

In 2016, 289,223 firearms were recovered and traced in the United States, of which 211,384 were traced to a final retail purchaser. Comparatively, in 2015, 271,018 firearms were recovered and traced in the United States, of which 190,538 were traced to a final retail purchaser. The majority of the traces involved 9 mm (more than 67,000) and .22 caliber (more than 35,000) firearms. The top three types of firearms traced last year were pistols (more than 172,000 traces), revolvers (more than 44,000 traces) and rifles (more than 40,000 traces).

Trace information provides valuable investigative leads to law enforcement and can link a suspect to a firearm in a criminal investigation. Firearms traces help identify potential firearms traffickers by detecting in-state, interstate and international firearms trafficking patterns, including the sources and types of crime guns; specific trend data for ATF and its law enforcement partners, and information on the movement of a firearm from the manufacturer or importer through the distribution chain to identify its first retail purchaser.

The released firearms trace data offers a description of firearms recovered and traced in each state along with the source states of the firearms recovered.

In addition to recovered and traced firearms per state, the report includes recovery location information, the average time from first purchaser to recovery in a crime, and the criminal offense associated with the firearm.

ATF is dedicated to reducing firearms trafficking and firearms-related violent crime. For more information on ATF or to view the 2016 firearms trace data, please see our web site at www.atf.gov/content/About/statistics.

###

**Field Division:** Headquarters

# Exhibit 9

# Fact Sheet - eTrace: Internet-Based Firearms Tracing and Analysis

May, 2018

## Fast Facts

1. The National Tracing Center assists domestic and international law enforcement agencies by tracing the origin of firearms that have been recovered in criminal investigations.

2. A firearm trace is conducted when a law enforcement agency recovers a firearm at a crime scene and requests information regarding its origin to develop investigative leads.

3. eTrace is a paperless firearms trace request submission system and interactive trace analysis module that facilitates firearms tracing and assists ATF's efforts to combat firearms trafficking.

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is the federal agency authorized to stem firearms-related violent crime and regulate the firearms industry in America. The ATF National Tracing Center (NTC) assists domestic and international law enforcement agencies by tracing the origin of firearms that have been recovered in criminal investigations.

Firearms tracing through eTrace is the systematic tracking of a recovered firearm from its manufacturer or importer and subsequent introduction into the distribution chain (wholesaler/retailer) to an unlicensed purchaser. A firearms trace is conducted when a law enforcement agency recovers a firearm at a crime scene and requests information regarding its origin to develop investigative leads. That information is used to link a suspect to a firearm in a criminal investigation; to identify potential traffickers; and, when sufficient comprehensive tracing is undertaken in a given community, to detect interstate, intrastate and international patterns regarding the sources and types of crime guns.

Pursuant to the Gun Control Act (GCA) of 1968, the U.S. attorney general is authorized to administer firearms tracing. The attorney general has delegated ATF the sole federal agency authorized to trace firearms. The NTC is only authorized to trace a firearm for a law enforcement agency involved in a bona fide criminal investigation.

ATF eTrace is a paperless firearms trace request submission system and interactive trace analysis module that facilitates firearms tracing and assists ATF efforts to combat firearms trafficking. The eTrace system provides the electronic exchange of crime gun incident data in a web-based environment with a portal to the Firearms Tracing System (FTS) database. The system provides real-time capabilities that allow law enforcement agencies to submit electronic firearms trace requests, monitor the progress of traces, retrieve completed trace results and query firearms trace-related data in the FTS database.



In addition, registered users are able to initiate a search of all traces submitted by their law enforcement agency, based on virtually any data field or combination of data elements such as firearm serial numbers, an individual's name, type of crime, date of recovery or other identifiers. The eTrace system also provides participating law enforcement agencies with the ability to opt-in to a Collective Data Sharing agreement, through which they can share all of their trace data with any other agencies in

their state. As a result, state-level contact centers within a particular state to which agencies that have opted-in will be able to access trace data for other participating agencies within their state.

The benefits of eTrace include the ability to (1) develop investigative leads; (2) significantly reduce the turnaround time required to process a trace request; (3) improve quality of trace-related information because of real-time data validation; (4) monitor the status of traces; (5) view/print/download completed trace results; and (6) generate statistical reports and perform online analytical research.

The eTrace system allows a law enforcement agency to conduct comprehensive traces of recovered crime guns and establish an information platform for developing the best investigative strategies to reduce firearms-related crime and violence. The application is available 24/7 and is provided free of charge to authorized law enforcement agencies. Each participating law enforcement agency must sign a memorandum of understanding with ATF.

Distribution of eTrace to the law enforcement community began in January 2005. As of December 2017, over 6,800 law enforcement agencies throughout the U.S. and 45 foreign countries actively use eTrace in their investigative work. The NTC processed over 400,000 trace requests in fiscal year 2017.

In December 2009, ATF released eTrace 4.0, the bilingual version of the application, allowing law enforcement agencies to capitalize on the full benefits of eTrace in English or Spanish. The software is an enhancement of the original English-only version and provides Spanish-speaking countries a full language translation capability that increases the ease of use of this pivotal crime fighting tool. In the past, the NTC conducted firearms tracing for foreign governments in a time-consuming, manual process. The 4.0 eTrace software, produced at the request of Spanish-speaking countries, allows users to input and retrieve data in Spanish and, at the same time, enables others to retrieve and search the data in English. It also allows international law enforcement agencies to capitalize on the full benefits of eTrace in Spanish or English and provides data conventions in accordance with international standards.

Foreign countries with signed eTrace agreements include Albania, Anguilla, Antigua and Barbuda, Aruba, Australia, the Bahamas, Barbados, Belgium, Belize, Bermuda, Brazil, British Virgin Islands, Canada, Cayman Islands, Colombia, Costa Rica, Curacao, Czech Republic, Dominica, Dominican Republic, El Salvador, Finland, Germany, Grenada, Guatemala, Guyana, Honduras, Jamaica, Japan, Kosovo, Mexico, Montserrat, the Netherlands, Nicaragua, Panama, Paraguay, Philippines, Slovakia, Spain, St. Kitts & Nevis, St. Lucia, St. Vincent and the Grenadines, Suriname, Trinidad and Tobago, and the United Kingdom.

###

www.facebook.com/hqatf    www.twitter.com/atfhq    www.instagram.com/atfhq

U.S Department of Justice
Bureau of Alcohol, Tobacco, Firearms
and Explosives
www.atf.gov



# Exhibit 10



# GUN TRACE | REPORT

## 2017

**CITY OF CHICAGO** • OFFICE OF THE MAYOR

CHICAGO POLICE DEPARTMENT




## INTRODUCTION

Since 2013, the Chicago Police Department has recovered nearly 7,000 "crime guns" each year.  For the purposes of this report, a crime gun refers to a firearm recovered by CPD that was illegally possessed, used, or suspected to be used in furtherance of a crime.[1] The overwhelming majority of these firearms were originally purchased outside of the city limits and brought into Chicago.  So far in 2017, CPD is already on pace to exceed last year's gun recoveries.  It is self-evident that the availability of illegally circulated firearms in Chicago is directly connected to its deadly street violence.  Simply put, each conflict becomes potentially more lethal due to easy access to a gun.[2]  In an unfortunate but persistent reality, certain retailers and jurisdictions disproportionately account for the guns trafficked into Chicago that sustain its illegal gun market and associated violent crime.

There is no greater priority for the City of Chicago than the safety and security of its residents. The City of Chicago and Chicago Police Department have partnered with the University of Chicago Crime Lab to examine available firearm trace data and identify the source of each crime gun recovered in order to develop more impactful solutions that address the root causes of gun violence. This is the second such report.  In its 2014 report, CPD compiled firearm trace data from 2009 to 2013.[3] This report analyzes available firearm trace data over four years, from 2013 to 2016, spanning almost 15,000 firearms traced back to more than 5,000 federally licensed dealers. Using this data, law enforcement and policymakers have identified the regular sources of crime guns trafficked into Chicago with pinpoint accuracy.  More importantly, they are now better equipped to develop policies that will help prevent these guns from getting into the hands of high-risk individuals.

Chicago is in many ways a microcosm of a national epidemic.  The United States' gun homicide rate is nearly 20 times higher than any other industrialized nation.[4] Not surprisingly, its rate of gun ownership per capita far exceeds that of these nations as well.[5] The Graduate Institute of International and Developmental Studies in Geneva estimates nearly half of all guns in circulation worldwide are in the United States, although it makes up just over four percent of the global population.[6] As the trace data and illegal firearm recovery numbers demonstrate, Chicago faces a unique predicament in enforcement efforts against illegal gun trafficking. Illinois is surrounded by states that lack comprehensive firearms regulations, with particularly little oversight of secondary sales markets.[7]





In September of 2016, in the midst of an unacceptable spike in gun violence, Mayor Rahm Emanuel announced his comprehensive public safety strategy, with five main pillars[8]:

1. Strengthening law enforcement resources, including hiring 970 new officers, and providing training and technology to support CPD's crime fight;

2. Investments in violence prevention, including evidence-based mentoring, academic support programs, and restorative justice principles in CPS schools;

3. Legislation to address gun violence, including increased criminal penalties for high-risk gun offenders, and licensure requirements for necessary oversight over Illinois gun dealers;

4. Economic development and employment opportunities to treat the root causes of violence, including an expansion of job programming and support services, financial incentives in economically stagnant neighborhoods, and investment opportunities to attract jobs;

5. Building community trust and legitimacy between CPD and the communities that they serve, including sweeping police reform measures, accountability, transparency, and de-escalation training, as well as a new culture of community policing within the Department

All five pillars of the strategy are essential to address gun violence in Chicago. The Mayor and Superintendent continue to work with community leaders, advocates, researchers, and law enforcement partners to align resources and policies with the City's comprehensive plan. But it is long past time for urgent action on firearm policies that will have a meaningful impact on the illegal gun market. Chicago cannot stem the influx of firearms across its borders alone, particularly given recent limitations on its ability to regulate firearms under local ordinance.[9] Policymakers, law enforcement, and community stakeholders must work together to build a comprehensive system that keeps firearms out of the hands of individuals who are at high-risk for violence. The Illinois legislature is now considering multiple effective proposals, including a pending gun dealer licensing framework that is due for a vote in the coming weeks.[10] In order to be effective, data transparency and enforcement efforts must be regional, and the call for national solutions must persist.

The purpose of this report is to promote informed and intelligent discussion around long-term solutions to the ongoing tragedy that is gun violence in America. This report examines the licensed firearms dealers that are the source for crime guns recovered in Chicago. It further analyzes the amount of time between the original

purchases of firearms from dealers to recovery by the Chicago Police Department. Unfortunately, a significant portion of guns bought at dealers surrounding Chicago are being recovered shortly afterwards. The report also looks at the states outside of Illinois that are contributing to crime guns recovered in Chicago. Not surprisingly, it is the very states with the least restrictive gun laws that are the sources of the guns coming into Chicago and being used to commit crimes.

Finally, recommended solutions are identified to address the clear problem of guns coming into Chicago from other communities and states. It will require effort at regional, state and federal levels, beginning with gun dealer licensing legislation in the state legislature; but there is no doubt that fewer guns in the illegal trafficking market will save lives.

## APPENDIX D:
## TOP TEN SOURCE DEALERS OF CRIME GUNS RECOVERED: 2013-2016 AND YEAR BY YEAR

**Top 10 sources dealers of guns recovered during 2013-2016**

| FFL Name | City | County | State | # Guns | # Purchasers | # Reported Stolen | % of all eTraced Guns | % short TTC (<3yrs) | % short TTC (<1yr) |
|---|---|---|---|---|---|---|---|---|---|
| CHUCK'S GUN SHOP | RIVERDALE | COOK | IL | 997 | 960 | 43 | 7% | 39% | 21% |
| MIDWEST SPORTING GOODS | LYONS | COOK | IL | 676 | 632 | 42 | 5% | 62% | 36% |
| WESTFORTH SPORTS | GARY | LAKE | IN | 341 | 319 | 0 | 2% | 45% | 20% |
| CABELA'S | HAMMOND | LAKE | IN | 253 | 232 | 2 | 2% | 67% | 32% |
| SHORE GALLERIES | LINCOLNWOOD | COOK | IL | 241 | 231 | 9 | 2% | 12% | 5% |
| GAT GUNS | EAST DUNDEE | KANE | IL | 219 | 188 | 9 | 1% | 47% | 24% |
| SUBURBAN SPORTING GOODS | MELROSE PARK | COOK | IL | 202 | 185 | 11 | 1% | 68% | 46% |
| PELCHERS SHOOTER SUPPLY | LANSING | COOK | IL | 193 | 182 | 12 | 1% | 63% | 29% |
| BLYTHE'S SPORT SHOP | GRIFFITH | LAKE | IN | 139 | 138 | 1 | 1% | 19% | 9% |
| SPORTING ARMS & SUPPLY | POSEN | COOK | IL | 128 | 124 | 12 | 1% | 64% | 36% |

**Top 10 sources dealers of guns recovered in 2013**

| FFL Name | City | County | State | # Guns | # Purchasers | # Reported Stolen | % of all eTraced Guns | % short TTC (<3yrs) | % short TTC (<1yr) |
|---|---|---|---|---|---|---|---|---|---|
| CHUCKS GUN SHOP | RIVERDALE | COOK | IL | 251 | 245 | 9 | 8% | 33% | 15% |
| MIDWEST SPORTING GOODS | LYONS | COOK | IL | 129 | 122 | 5 | 4% | 53% | 29% |
| WESTFORTH SPORTS | GARY | LAKE | IN | 82 | 79 | 0 | 2% | 40% | 19% |
| GAT GUNS | EAST DUNDEE | KANE | IL | 66 | 53 | 0 | 2% | 30% | 18% |
| SHORE GALLERIES | LINCOLNWOOD | COOK | IL | 65 | 64 | 2 | 2% | 12% | 6% |
| CABELAS | HAMMOND | LAKE | IN | 47 | 45 | 0 | 1% | 79% | 32% |
| PELCHERS SHOOTERS SUPPLY | LANSING | COOK | IL | 38 | 36 | 1 | 1% | 68% | 41% |
| BLYTHES SPORT SHOP | GRIFFITH | LAKE | IN | 34 | 34 | 0 | 1% | 21% | 6% |
| BELLS GUN & SPORT SHOP | FRANKLIN PARK | COOK | IL | 34 | 34 | 1 | 1% | 0% | 0% |
| RAY OHERRON CO | LOMBARD | DU PAGE | IL | 33 | 33 | 4 | 1% | 18% | 6% |



**Top 10 sources dealers of guns recovered in 2014**

| FFL Name | City | County | State | # Guns | # Purchasers | # Reported Stolen | % of all eTraced Guns | % short TTC (<3yrs) | % short TTC (<1yr) |
|---|---|---|---|---|---|---|---|---|---|
| CHUCKS GUN SHOP | RIVERDALE | COOK | IL | 277 | 271 | 9 | 7% | 39% | 25% |
| MIDWEST SPORTING GOODS | LYONS | COOK | IL | 170 | 159 | 10 | 4% | 58% | 35% |
| WESTFORTH SPORTS | GARY | LAKE | IN | 94 | 92 | 0 | 2% | 40% | 11% |
| SHORE GALLERIES | LINCOLNWOOD | COOK | IL | 73 | 71 | 5 | 2% | 11% | 3% |
| CABELAS | HAMMOND | LAKE | IN | 68 | 67 | 1 | 2% | 71% | 35% |
| PELCHERS SHOOTERS SUPPLY | LANSING | COOK | IL | 53 | 49 | 6 | 1% | 58% | 25% |
| MIDWEST GUN EXCHANGE | MISHAWAKA | ST JOSEPH | IN | 44 | 44 | 0 | 1% | 18% | 0% |
| RAY OHERRON CO | LOMBARD | DU PAGE | IL | 43 | 42 | 7 | 1% | 21% | 2% |
| SPORTING ARMS & SUPPLY | POSEN | COOK | IL | 43 | 39 | 9 | 1% | 58% | 28% |
| SUBURBAN SPORTING GOODS | MELROSE PARK | COOK | IL | 42 | 41 | 0 | 1% | 48% | 40% |

**Top 10 sources dealers of guns recovered in 2015**

| FFL Name | City | County | State | # Guns | # Purchasers | # Reported Stolen | % of all eTraced Guns | % short TTC (<3yrs) | % short TTC (<1yr) |
|---|---|---|---|---|---|---|---|---|---|
| CHUCKS GUN SHOP | RIVERDALE | COOK | IL | 249 | 241 | 12 | 7% | 44% | 26% |
| MIDWEST SPORTING GOODS | LYONS | COOK | IL | 198 | 193 | 16 | 5% | 65% | 44% |
| WESTFORTH SPORTS | GARY | LAKE | IN | 75 | 73 | 0 | 2% | 45% | 20% |
| CABELAS | HAMMOND | LAKE | IN | 58 | 57 | 1 | 2% | 62% | 34% |
| SUBURBAN SPORTING GOODS | MELROSE PARK | COOK | IL | 54 | 52 | 2 | 1% | 67% | 54% |
| SHORE GALLERIES | LINCOLNWOOD | COOK | IL | 48 | 47 | 1 | 1% | 17% | 4% |
| PELCHERS SHOOTERS SUPPLY | LANSING | COOK | IL | 46 | 44 | 1 | 1% | 57% | 11% |
| GAT GUNS | EAST DUNDEE | KANE | IL | 38 | 35 | 3 | 1% | 46% | 27% |
| CABELAS | HOFFMAN ESTATES | COOK | IL | 37 | 32 | 2 | 1% | 78% | 30% |
| BLYTHES SPORT SHOP | GRIFFITH | LAKE | IN | 36 | 36 | 0 | 1% | 17% | 14% |

**Top 10 sources dealers of guns recovered in 2016**

| FFL Name | City | County | State | # Guns | # Purchasers | # Reported Stolen | % of all eTraced Guns | % short TTC (<3yrs) | % short TTC (<1yr) |
|---|---|---|---|---|---|---|---|---|---|
| CHUCKS GUN SHOP | RIVERDALE | COOK | IL | 220 | 219 | 13 | 5% | 41% | 16% |
| MIDWEST SPORTING GOODS | LYONS | COOK | IL | 179 | 169 | 11 | 4% | 69% | 35% |
| WESTFORTH SPORTS | GARY | LAKE | IN | 90 | 87 | 0 | 2% | 56% | 30% |
| SUBURBAN SPORTING GOODS | MELROSE PARK | COOK | IL | 85 | 74 | 8 | 2% | 84% | 47% |
| CABELAS | HAMMOND | LAKE | IN | 80 | 68 | 0 | 2% | 59% | 28% |
| GAT GUNS | EAST DUNDEE | KANE | IL | 77 | 66 | 6 | 2% | 58% | 26% |
| BORDERLINE SHOOTING SPORTS | CRETE | WILL | IL | 74 | 65 | 2 | 2% | 100% | 59% |
| PELCHERS SHOOTERS SUPPLY | LANSING | COOK | IL | 56 | 55 | 4 | 1% | 68% | 39% |
| SHORE GALLERIES | LINCOLNWOOD | COOK | IL | 55 | 51 | 1 | 1% | 8% | 6% |
| BRADIS | CAMBY | MARION | IN | 34 | 34 | 0 | 1% | 35% | 9% |

**APPENDIX E:**
**TOP TEN SOURCE DEALERS OF CRIME GUNS RECOVERED: 2013-2016 AND YEAR BY YEAR**

|    | State | N | % of all eTraced guns |
|----|-------|------|-----|
| 1  | ILLINOIS | 6026 | 40% |
| 2  | INDIANA | 3124 | 21% |
| 3  | MISSISSIPPI | 756 | 5% |
| 4  | WISCONSIN | 599 | 4% |
| 5  | OHIO | 429 | 3% |
| 6  | KENTUCKY | 368 | 2% |
| 7  | GEORGIA | 347 | 2% |
| 8  | TENNESSEE | 322 | 2% |
| 9  | ALABAMA | 289 | 2% |
| 10 | TEXAS | 271 | 2% |
|    |  | 12531 | 84% |



Top 10 source states for recovered guns, 2013-2016

**APPENDIX F:**
**TYPES OF GUNS TRACED, AND TRACES INVOLVING MULTIPLE BUYERS, 2013-2016**

**Types of guns recovered, 2013-2016**

| # Handguns | Handguns | # Rifles | Rifles | # Shotguns | Shotguns |
|---|---|---|---|---|---|
| 19789 | 90% | 1062 | 5% | 1039 | 5% |

**Gun recoveries by single and multiple purchasers, 2013-2016**

| # Guns bought by each purchaser | # Purchasers | % of all eTraced Guns | % Stolen | % Short TTC (<3yrs) | % Short TTC (<1yrs) | % Handguns |
|---|---|---|---|---|---|---|
| 1 | 13645 | 92% | 2% | 27% | 12% | 94% |
| 2 | 367 | 5% | 3% | 61% | 35% | 89% |
| 3 | 65 | 1% | 2% | 62% | 37% | 83% |
| 4 | 22 | 1% | 3% | 61% | 23% | 88% |
| 5 or more | 28 | 2% | 0% | 72% | 37% | 79% |



[1] Bureau of Alcohol, Tobacco, Firearms, and Explosives.  Fact Sheet – National Tracing Center.  (March, 2016).  Available at https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-tracing-center

[2] Cook.  The Technology of Personal Violence, 14 Crime & Just. 1 (1991).

[3] City of Chicago – Office of the Mayor & Chicago Police Department.  Tracing the Guns: The Impact of Illegal Guns on Violence in Chicago. (May 27, 2014).  Available at https://www.cityofchicago.org/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2014/May/05.27.14TracingGuns.pdf

[4] Richard & Hemenway. Homicide, Suicide, and Unintentional Firearm Fatality: Comparing the United States with other high-income countries. J. Trauma Inj. Infect. Crit. Care 70:238-43 (2011).

[5] Webster & Wintemute. Effects of Policies Designed to Keep Firearms From High Risk Individuals; Annu. Rev. Public Health. 36:21-37 (2015).

[6] Small Arms Survey: Estimating Civilian Owned Firearms.  Graduate Institute of International and Developmental Studies, Geneva (2011).  http://www.smallarmssurvey.org/fileadmin/docs/H-Research_Notes/SAS-Research-Note-9.pdf

[7] See Ind. Code Ann. 35-47-2-14 (Indiana Handgun Dealer's License); Wisc. Admin. Code Just 10.04(1) (Wisconsin does not require state gun dealer license, but requires dealer to report all handgun sales); Ohio Rev Code 2923.20(A)(5) (Ohio Lost and Stolen Reporting Law); OCGA 16-11-129(a) (Georgia prohibits registration of firearms); OCGA 16-11-173(b)(1) (Georgia preempts local regulation of gun shows); OCGA 43-16-2 (Georgia Handgun Dealer's License); Ala. Code Ann. 40-12-143 (Alabama only requires license tax for gun show vendors); Ala. Code 13A-11-78 (Alabama Handgun Dealer's License); See also Governing Magazine: Gun Show Background Checks State Laws. January 2016.  http://www.governing.com/gov-data/safety-justice/gun-show-firearms-bankground-checks-state-laws-map.html

[8] Press Release 9/22/2016. Office of the Mayor, City of Chicago.  Mayor Emanuel Outlines Comprehensive Public Safety Strategy. https://www.cityofchicago.org/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2016/September/Outlines_Comprehensive_Public_Safety_Strategy.pdf

[9] The Firearm Concealed Carry Act; Public Act 098-0063, Illinois General Assembly (Rep. Phelps/Sen. Forby), eff. July 9, 2013.

[10] See Senate Bill 1657 engrossed; Illinois General Assembly (Sen. Harmon/Rep Willis).  Available at   http://www.ilga.gov/legislation/fulltext.asp?DocName=10000SB1657eng&GA=100&SessionId=91&DocTypeId=SB&LegID=104404&DocNum=1657&GAID=14&Session=

[11] Author's Note: The data used in this report represents firearms that were recovered by the Chicago Police Department and successfully traced to a federally licensed firearms dealer based on the firearm's make, model, and serial number maintained in ATF records from the initial point of sale.

[12] City of Chicago, Tracing the Guns: The Impact of Illegal Guns on Violence in Chicago, supra note 3.

[13] U.S. Department of Justice, Bureau of Alcohol, Tobacco, and Firearms, National Tracing Center.  ATF Firearms Tracing Guide: Tracing Firearms to Reduce Violent Crime.  (November 2011).  https://www.atf.gov/file/58631/download

[14] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms.  Following the Gun: Enforcing Federal Laws Against Firearms Traffickers.  (June 2000).

[15] Webster & Wintemute.  Effects of Policies Designed to Keep Firearms from High-Risk Individuals.  Annu. Rev. Public Health 2015. (January 7, 2015).  See also Bureau of Alcohol, Tobacco, and Firearms.  Fact Sheet – Multiple Firearms Sales or Other Disposition Reporting.  (March 2016).  Available at https://www.atf.gov/resource-center/fact-sheet/fact-sheet-multiple-firearms-sales-or-other-disposition-reporting.  (Short time to crime coupled with multiple purchase serves as an indicator of firearms trafficking).

[16] See Village Code of Lyons, Illinois, Title 4, Chapter 4-1-3(E); see also Chicago Tribune, "Lyons OK's Unprecedented Gun Shop Regulations," (Oct. 28, 2015).  Available at http://www.chicagotribune.com/news/ct-lyons-gun-shop-ordinance-20151027-story.html.

[17] See Appendix D: Analysis of 2013 to 2016 Chicago Police Crime Gun Recovery Data.  In 2015, 43.94% of the crime guns traced back to Midwest Sporting Goods were recovered within one year of sale.  In 2016, 34.64% of the crime guns traced back to Midwest Sporting Goods were recovered within one year of sale.



[18] City of Chicago, Tracing the Guns: The Impact of Illegal Guns on Violence in Chicago, *supra* note 3.

[19] City of Chicago, Tracing the Guns: The Impact of Illegal Guns on Violence in Chicago, *supra* note 3. *See also* Ind. Code Ann. 35-47-2-14 (Indiana Handgun Dealer's License); Wisc. Admin. Code Just 10.04(1) (Wisconsin does not require state gun dealer license, but requires dealer to report all handgun sales); Ohio Rev Code 2923.20(A)(5) (Ohio Lost and Stolen Reporting Law); OCGA 16-11-129(a) (Georgia prohibits registration of firearms); OCGA 16-11-173(b)(1) (Georgia preempts local regulation of gun shows); OCGA 43-16-2 (Georgia Handgun Dealer's License); Ala. Code Ann. 40-12-143 (Alabama only requires license tax for gun show vendors); Ala. Code 13A-11-78 (Alabama Handgun Dealer's License).

[20] *See* Following the Gun: Enforcing Federal Laws Against Firearm Traffickers, *supra* note 14. *See also* Bureau of Alcohol, Tobacco, Firearms, and Explosives. Fact Sheet – Multiple Firearms Sales Disposition Reporting. (March 2016). Available at https://www.atf.gov/resource-center/fact-sheet/fact-sheet-multiple-firearms-sales-or-other-disposition-reporting

[21] *See* Moore v. Madigan, 702 F.3d 933 (7th Cir. U.S. 2012); People v. Aguilar, 2013 IL 112116 (Ill. S. Ct. 2013)

[22] The Firearm Concealed Carry Act; Public Act 098-0063, Illinois General Assembly (Rep. Phelps/Sen. Forby), eff. July 9, 2013.

[23] 430 ILCS. 65/13.1; 430 ILCS 66/ 90

[24] See Chicago Municipal Code, Article III, Chapter 8-20-110 et seq. (repealed Sep. 11, 2013 but previously pertained to a required Chicago Firearms Permit and registration certificate).

[25] Chicago Municipal Code, Title IV, Chapter 4-144-700 *et seq.* (eff. July 25, 2014); and Title IV, Chapter 4-151-010 *et seq.* (eff. July 6, 2011).

[26] Webster, Vernick, & Bulzacchelli. Effects of State-level Firearm Seller Accountability Policies on Firearms Trafficking. *Journal of Urban Health.* (2009).

[27] Webster. Firearm Seller Accountablity Measures and the Diversion of Guns to Criminals. Johns Hopkins Center for Gun Policy and Research. (2012).

[28] Bureau of Alcohol, Tobacco, Firearms, and Explosive. Congressional Budget Submissions, FY 2018. (May 2017). Available at https://www.justice.gov/file/968946/download.

[29] Bureau of Alcohol, Tobacco, Firearms, and Explosives. Federal Firearms Licensee Statistics Theft / Loss Reports, 2013-2016 Summaries: Firearms Reported Lost and Stolen. Available at https://www.atf.gov/resource-center/data-statistics.

[30] Id.

[31] Id.

[32] ATF, Congressional Budget Submissions, FY 2018, *supra* note 28.

[33] Bureau of Alcohol, Tobacco, Firearms, and Explosives. Loss Prevention for Firearms Retailers. (2016). Available at https://www.atf.gov/firearms/docs/guide/loss-prevention-firearms-retailers/download.

[34] Irvin, Rhodes, Cheney, & Wiebe. Evaluating the Effect of State Regulation of Federally Licensed Firearm Dealers on Firearm Homicide. Am. J. Public Health. (August 2014).

[35] Id.

[36] Id. *See also* Webster, Effects of State-level Firearm Seller Accountability Policies on Firearms Trafficking, *supra* note (xxi).

[37] *See* Senate Bill 1657 *engrossed* (Sen. Harmon/Rep. Willis).

[38] *See* Firearm Owners' Protection Act. Public Act 99-308. (May 19, 1986).

[39] Office of the Inspector General, U.S. Department of Justice, Rep. No. I-2004-005, Inspection of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms, and Explosives. (2004).



[40] 111th Congress; Consolidated Appropriations Act 2010, Public Act 111-117 (2009).

[41] See Following the Gun: Enforcing Federal Laws Against Firearms Traffickers, *supra* note 20.

[42] See Chicago Municipal Code, Title IV, Chapter 4-144-700; (eff. July 25, 2014).

[43] See Senate Bill 1657 *engrossed,* Illinois General Assembly.

[44] Webster, Vernick, Bulzacchelli, & Vittes.  Recent Federal Gun Laws, Gun Dealer Accountability and the Diversion of Guns to Criminals in Milwaukee.  J. Urban Health 89.  (2012).

[45] Fleegler, Lee, & Monuteaux.  Firearm Legislation and Firearm-Related Fatalities in the United States.  JAMA Intern Med. 173.  (2013).

[46] Id.  See also Webster & Wintemute. Effects of Policies Designed to Keep Firearms From High Risk Individuals, *supra* note (iv).

[47] 430 ILCS 65/ *et seq.*

[48] Id.

[49] Brady Handgun Violence Prevention Act.  Public Act 103-159.  103rd Congress.  (Feb. 28, 1994);  430 ILCS 65/3(a) & 3.1.

[50] 430 ILCS 65/3(a-5).

[51] 430 ILCS 65/3(a-10).

[52] Id.

[53] 430 ILCS 65/3(b)

[54] 720 ILCS 5/24-3(k)(1); 430 ILCS 65/3.1 & 14(e)

[55] 430 ILCS 65/3(b); 720 ILCS 5/24-3(k)(1)

[56] 720 ILCS 5/24-3(k)(2)

[57] Miller, Hepburn, & Azrael.  Firearm Acquisition Without Background Checks: Results of a National Survey.  Annals of Internal Medicine.  (Feb. 21, 2017).

[58] See ARMSLIST Power Search available at http://www.armslist.com/classifieds/powersearch; (last accessed on Oct. 12, 2017).

[59] State of Illinois, Office of the Auditor General.  Management Audit of the Department of State Police's Administration of the Firearm Owner's Identification Act.  (April 2012).  Available at http://www.auditor.illinois.gov/Audit-Reports/Performance-Special-Multi/Performance-Audits/2012%20Releases/12-ISP-FOID-Act-Mgmt-Full.pdf

[60] 430 ILCS 65/3(a-15)(1)

[61] See Cal. Penal Code Article 1, Crimes Relating to Sale, Lease, or Transfer of Firearms, Section 27545;  *See also* N.Y. Gen. Bus. Article 39-DDD (898) Private Sale or Disposal of Firearms, Rifles, and Shotguns.

[62] Id.

[63] Cook, Harris, Ludwig, & Pollack.  Some Sources of Crime Guns in Chicago: Dirty Dealers, Straw Purchasers, and Traffickers.  Journal of Criminal Law & Criminology 104 (2015).  Available at http://home.uchicago.edu/ludwigj/papers/JCrimLC%202015%20Guns%20in%20Chicago.pdf

[64] Cook, Parker, & Pollack.  Sources of Guns to Dangerous People: What We Learn By Asking Them.  Journal of Preventive Medicine 79.  (October 2015).

[65] Id.

# Exhibit 11



# DATA COLLECTION, COMPLETENESS, AND METHODOLOGY

This section highlights the steps the New York State Office of the Attorney General ("NYAG") took to collect, clean, and analyze the data outlined in this report.

## DATA COLLECTION

### ATF Trace Data

On June 13, 2016, the Federal Bureau of Alcohol Tobacco Firearms and Explosives ("ATF") provided the data used in this report to the NYAG. Pursuant to the Consolidated and Further Continuing Appropriations Act, 2012, PL 112-55 Nov. 18, 2011), commonly referred to as the "Tiahrt Amendments" to the federal budget, ATF is severely restricted in what trace data it may share and with whom, but may share such data with state and local law enforcement and prosecutors. While the data included summary-level information on the state and date of purchase, recovery location, and certain information about the firearm, it did not, for instance, include the name or address of Federal Firearms Licensed (FFL) dealers who sold the guns ultimately recovered in New York, nor the name and address of the recorded purchasers of the guns, nor the name and address of the possessor of the guns. (ATF stated that such information could be made available with consent of the original tracing parties.) ATF also stated that NYAG could use such information to produce public aggregate statistical reports similar to those published by ATF.

According to ATF, the data included/excluded the following:[48]

- "[A]ll firearms with a recovery state of New York, or, if the recovery state was not provided, the requesting agency state was used if the agency had jurisdiction only within New York."
- "Traces with a recovery date between January 1, 2010 - December 31, 2015 were selected. However, if the recovery date was blank, traces with an entry date between January 1, 2010 - December 31, 2015 were also selected."
- "Duplicate, Sensitive, Firearm Not Recovered, Gun Buyback and Firearm Turned In traces were excluded when present."
- "This information was queried from the Firearms Tracing System (FTS) on May 16, 2016 and all traces may not have been submitted or completed at the time of this data extract."

# Exhibit 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RON PETERSON FIREARMS, LLC,

Plaintiff,

v.

CIVIL NO. 11-CV-678 JC/LFG
(consolidated with 12-CV-167)

B. TODD JONES, ACTING DIRECTOR,
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS & EXPLOSIVES,

Defendant.

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

On February 27, 2012, Defendant filed the certified administrative record in this case.
See Doc. No. 36. This filing included an agency certification that the record filed with the Court "constitute[s] a true and complete copy of all non-privileged materials that constitute the agency administrative record." Certification of Admin. Record [Doc. No. 36-1]. Consistent with this certification, Defendant redacted certain information that Congress has expressly prohibited from disclosure, consisting of the names and identifying information of federal firearms licensees ("FFLs") from whom information was sought in the course of a firearms trace by law enforcement officials. As explained below, Congress has expressly prohibited the disclosure of such information in the course of civil litigation. Despite this prohibition, Plaintiffs Dale Rutherford, doing business as The Cop Shop, and Tracy Rifle & Pistol, Inc. ("Plaintiffs") have moved this Court to order Defendant to produce this privileged and confidential information that has been redacted in the administrative record. However, Plaintiffs fail to demonstrate any need for the redacted information or to overcome the presumption of regularity accorded to an

agency's designation of the administrative record.  Nor do Plaintiffs take any account of the

reasons that prompted Congress to preclude such information from disclosure, including the

privacy concerns of businesses licensed by the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF").  Moreover, the administrative record, as redacted, provides sufficient

information to inform both the Court and Plaintiffs of the relevant decision made by Defendant

and obviates the need for Plaintiffs to obtain additional information in order to litigate this case.

Accordingly, the Court should deny Plaintiffs' motion.

## ARGUMENT

I.  **Federal Law Expressly Prohibits the Disclosure of the Confidential Business Information Sought by Plaintiffs.**

In cases involving review under the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

("APA"), information that is prohibited from disclosure in civil litigation does not constitute part

of the administrative record.[1]  Courts have repeatedly held that agencies may exclude or redact

from an administrative record confidential or sensitive information, particularly where, as here,

federal law expressly prohibits the redacted information from disclosure.  See, e.g., MD Pharm.,

Inc. v. DEA, 133 F.3d 8, 13-15 (D.C. Cir. 1998) (party challenging agency's decision to issue

---

[1] "A complete administrative record . . . does not include privileged materials, such as documents that fall within the deliberative process privilege, attorney-client privilege, and work product privilege."  Tafas v. Dudas, 530 F. Supp. 2d 786, 794 (E.D. Va. 2008); see also Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior, 143 F. Supp. 2d 7, 13 (D.D.C. 2001) ("[D]eliberative intra-agency memoranda and other such records are ordinarily privileged, and need not be included in the record."); Checkosky v. SEC, 23 F.3d 452, 489 (D.C. Cir. 1994) ("In passing on final agency action, we . . . have refused to consider transcripts of closed agency meetings or intra-agency memoranda and documents recording the deliberative process leading to the agency's decision.") (citations and quotations omitted), *superseded on other grounds as recognized by* Marrie v. SEC, 374 F.3d 1196 (D.C. Cir. 2004); Norris & Hirshberg, Inc. v. SEC, 163 F.2d 689, 693 (D.C. Cir. 1947) ("[I]nternal memoranda made during the decisional process . . . are never included in a record.").

license to another firm was not entitled to complete access to all information considered by the agency in light of regulations prohibiting disclosure of "[a]ny confidential or trade secret information disclosed in conjunction with [a licensing] application"); Nat'l Wildlife Fed. v. EPA, 286 F.3d 554, 574 (D.C. Cir. 2002) (disclosure in the administrative record of confidential business information ("CBI") collected by the agency was not required where the "CBI sought was the type of sensitive information and confidential or trade secret information that EPA can properly withhold from public view") (internal punctuation omitted).  Moreover, "designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity.  The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary."  Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy, 485 F.3d 1091, 1097 (10th Cir. 2007) (quoting Bar MK Ranches v. Yuetter, 994 F.2d 735, 740 (10th Cir. 1993)).

Plaintiffs seek disclosure of the "identities of the federally-licensed retail sellers who sold rifles that were later recovered in Mexico from 2008 to 2010," based on "queries made by ATF of its Firearms Tracing System database."  Pl. Br. in Supp. of Mot. to Supplement Admin. Record ("Pl. Br.") at 3 [Doc. No. 41].  However, a federal statute prohibits the disclosure of ATF trace data, including the information sought by Plaintiffs in this case, except for narrowly-defined law enforcement or national security purposes.

Each year since 2003, Congress has included in annual appropriations legislation strict prohibitions on ATF's use of federal funds to disclose information contained in its trace databases.  The most recent enactment of this restriction provides:

*Provided further*, That, during the current fiscal year and in each fiscal year thereafter, **no funds appropriated under this or any other Act may be used to disclose part or all of the contents of the Firearms Trace System database maintained by the National Trace Center of the Bureau of Alcohol, Tobacco, Firearms and Explosives or any information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code, or required to be reported pursuant to paragraphs (3) and (7) of such section**, except to: (1) a Federal, State, local, or tribal law enforcement agency, or a Federal, State, or local prosecutor; or (2) a foreign law enforcement agency solely in connection with or for use in a criminal investigation or prosecution; or (3) a Federal agency for a national security or intelligence purpose; unless such disclosure of such data to any of the entities described in (1), (2) or (3) of this proviso would compromise the identity of any undercover law enforcement officer or confidential informant, or interfere with any case under investigation; and no person or entity described in (1), (2) or (3) shall knowingly and publicly disclose such data; **and all such data shall be immune from legal process, shall not be subject to subpoena or other discovery, shall be inadmissible in evidence, and shall not be used, relied on, or disclosed in any manner, nor shall testimony or other evidence be permitted based on the data, in a civil action in any State (including the District of Columbia) or Federal court** or in an administrative proceeding other than a proceeding commenced by the Bureau of Alcohol, Tobacco, Firearms and Explosives to enforce the provisions of chapter 44 of such title, or a review of such an action or proceeding; **except that this proviso shall not be construed to prevent:** (A) the disclosure of statistical information concerning total production, importation, and exportation by each licensed importer (as defined in section 921(a)(9) of such title) and licensed manufacturer (as defined in section 921(a)(10) of such title); (B) the sharing or exchange of such information among and between Federal, State, local, or foreign law enforcement agencies, Federal, State, or local prosecutors, and Federal national security, intelligence, or counterterrorism officials; or (C) the publication of annual statistical reports on products regulated by the Bureau of Alcohol, Tobacco, Firearms and Explosives, including total production, importation, and exportation by each licensed importer (as so defined) and licensed manufacturer (as so defined), or **statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations**:

Pub. L. No. 112-55, 125 Stat. 552, 609-10 (Nov. 18, 2011) (emphasis added).

The information sought by Plaintiffs – the identities of FFLs who sold firearms that were later recovered in Mexico and successfully traced – is clearly "part . . . of the contents of the Firearms Trace System database," the disclosure of which is expressly prohibited by this

legislation.[2]  Identifying information for the FFLs who sold firearms later recovered in Mexico

and successfully traced is information maintained by ATF in its trace database.  See Decl. of

Charles J. Houser ¶¶ 1-6 (attached as Ex. 1).  This information is used, along with other similar

data, to assist ATF in detecting patterns in the sources of firearms used in crimes.  See id. ¶ 8; see

also generally ATF National Tracing Center Division: Information for Law Enforcement

Agencies (explaining that tracing of firearms recovered by law enforcement officials is used,

among other purposes, to detect patterns in the sources and kinds of crime guns).[3]

    Revealing in a publicly-filed Administrative Record the identities of FFLs who sold

firearms later recovered in Mexico and successfully traced could implicate privacy concerns of

private businesses and jeopardize pending criminal investigations – some of the precise concerns

Congress sought to address.  See Houser Decl. ¶¶ 9-10.  As explained in the House Report for the

2005 Appropriations Act:

> In the last two fiscal years the Committee has expressed serious concern that,
> contrary to provisions of the Gun Control Act, as amended, and Congress' intent,
> *certain sensitive law enforcement information contained in databases maintained*
> *by the ATF* have been subject to release under the Freedom of Information Act
> and through court action to the public, including civil litigants, firearm
> manufacturers and distributors, public interest groups and governmental entities,
> for use other than in bona fide criminal investigations and prosecutions.  The
> Committee concern is not related to budgetary considerations.  The intent has
> been to enforce existing Federal law limiting disclosure of this sensitive law
> enforcement information solely to law enforcement, and, to the extent current
> Federal law does not already so restrict disclosure to so provide now.  It is of great
> concern that releases have occurred, and if repeated, may result in wide-spread

---

[2] By contrast, the unredacted information that was included in the Administrative Record
(indicating the number of firearms recovered from FFLs in particular states, without revealing the
identities of those FFLs) constitutes "statistical aggregate data regarding firearms traffickers and
trafficking channels," 125 Stat. at 610, the disclosure of which is permitted by the statute.

[3] *Available at* http://www.atf.gov/publications/download/p/atf-p-3312-7.pdf.

# Exhibit 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| 10 RING PRECISION, INC. <u>et al.</u>, | ) |
| | ) |
| Plaintiffs, | )   Case No. 5:11-cv-00663-XR |
| | ) |
| v. | ) |
| | ) |
| B. TODD JONES, Acting Director, | ) |
| Bureau of Alcohol, Tobacco, Firearms | ) |
| & Explosives, in his official capacity, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S BRIEF IN OPPOSITION TO INTERVENOR PLAINTIFF'S
MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

On March 8, 2012, Defendant filed the certified administrative record in this case. <u>See</u>
ECF No. 35. This filing included an agency certification that the record filed with the Court
"constitute[s] a true and complete copy of all non-privileged materials that constitute the agency
administrative record." Certification of Admin. Record (attached as Ex. 1). Consistent with this
certification, Defendant redacted certain information that Congress has expressly prohibited from
disclosure, consisting of the names and identifying information of federal firearms licensees
("FFLs") from whom information was sought in the course of a firearms trace by law
enforcement officials. As explained below, Congress has expressly prohibited the disclosure of
such information in the course of civil litigation. Despite this prohibition, Intervenor-Plaintiff
Golden State Tactical, Inc. ("Golden State") has moved this Court to order Defendant to produce
this privileged and confidential information that has been redacted in the administrative record.
However, Golden State fails to demonstrate any need for the redacted information or to
overcome the presumption of regularity accorded to an agency's designation of the administrative

record.  Nor does Golden State take any account of the reasons that prompted Congress to

preclude such information from disclosure, including the privacy concerns of businesses licensed

by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  Moreover, the

administrative record, as redacted, provides sufficient information to inform both the Court and

Golden State of the relevant decision made by Defendant and obviates the need for Golden State

to obtain additional information in order to litigate this case.  Accordingly, the Court should deny

Golden State's motion.

## ARGUMENT

**I.      Federal Law Expressly Prohibits the Disclosure of the Confidential Business
        Information Sought by Golden State.**

In cases involving review under the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

("APA"), information that is prohibited from disclosure in civil litigation does not constitute part

of the administrative record.[1]  Courts have repeatedly held that agencies may exclude or redact

from an administrative record confidential or sensitive information, particularly where, as here,

federal law expressly prohibits the redacted information from disclosure.  See, e.g., MD Pharm.,

Inc. v. DEA, 133 F.3d 8, 13-15 (D.C. Cir. 1998) (party challenging agency's decision to issue

---

[1] "A complete administrative record . . . does not include privileged materials, such as
documents that fall within the deliberative process privilege, attorney-client privilege, and work
product privilege." Tafas v. Dudas, 530 F. Supp. 2d 786, 794 (E.D. Va. 2008); see also Amfac
Resorts, L.L.C. v. U.S. Dep't of the Interior, 143 F. Supp. 2d 7, 13 (D.D.C. 2001)
("[D]eliberative intra-agency memoranda and other such records are ordinarily privileged, and
need not be included in the record."); Checkosky v. SEC, 23 F.3d 452, 489 (D.C. Cir. 1994) ("In
passing on final agency action, we . . . have refused to consider transcripts of closed agency
meetings or intra-agency memoranda and documents recording the deliberative process leading
to the agency's decision.") (citations and quotations omitted), *superseded on other grounds as
recognized by* Marrie v. SEC, 374 F.3d 1196 (D.C. Cir. 2004); Norris & Hirshberg, Inc. v. SEC,
163 F.2d 689, 693 (D.C. Cir. 1947) ("[I]nternal memoranda made during the decisional process
. . . are never included in a record.").

license to another firm was not entitled to complete access to all information considered by the agency in light of regulations prohibiting disclosure of "[a]ny confidential or trade secret information disclosed in conjunction with [a licensing] application"); Nat'l Wildlife Fed. v. EPA, 286 F.3d 554, 574 (D.C. Cir. 2002) (disclosure in the administrative record of confidential business information ("CBI") collected by the agency was not required where the "CBI sought was the type of sensitive information and confidential or trade secret information that EPA can properly withhold from public view") (internal punctuation omitted).  Moreover, it is well settled that, absent a "strong showing" to the contrary, courts presume "that the agency properly designated the Administrative Record."  Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (citations and internal punctuation omitted); see also Malone Mortgage Co. Am., Ltd. v. Martinez, 2003 WL 23272381, at *5 (N.D. Tex. Jan. 6, 2003) ("An agency's designation of the administrative record is entitled to a presumption of administrative regularity.") (citing Wilson v. Hodel, 758 F.2d 1369, 1374 (10th Cir. 1985)).

Golden State seeks disclosure of the "identities of the federally-licensed retail sellers who sold rifles that were later recovered in Mexico from 2008 to 2010," based on "queries made by ATF of its Firearms Tracing System database."  Intervenor Pl. Br. in Supp. of Mot. to Supplement Admin. Record ("Intervenor Br.") at 3 [ECF No. 37].  However, a federal statute prohibits the disclosure of ATF trace data, including the information sought by Golden State in this case, except for narrowly-defined law enforcement or national security purposes.

Each year since 2003, Congress has included in annual appropriations legislation strict prohibitions on ATF's use of federal funds to disclose information contained in its trace databases.  The most recent enactment of this restriction provides:

-3-

*Provided further*, That, during the current fiscal year and in each fiscal year thereafter, **no funds appropriated under this or any other Act may be used to disclose part or all of the contents of the Firearms Trace System database maintained by the National Trace Center of the Bureau of Alcohol, Tobacco, Firearms and Explosives or any information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code, or required to be reported pursuant to paragraphs (3) and (7) of such section**, except to: (1) a Federal, State, local, or tribal law enforcement agency, or a Federal, State, or local prosecutor; or (2) a foreign law enforcement agency solely in connection with or for use in a criminal investigation or prosecution; or (3) a Federal agency for a national security or intelligence purpose; unless such disclosure of such data to any of the entities described in (1), (2) or (3) of this proviso would compromise the identity of any undercover law enforcement officer or confidential informant, or interfere with any case under investigation; and no person or entity described in (1), (2) or (3) shall knowingly and publicly disclose such data; **and all such data shall be immune from legal process, shall not be subject to subpoena or other discovery, shall be inadmissible in evidence, and shall not be used, relied on, or disclosed in any manner, nor shall testimony or other evidence be permitted based on the data, in a civil action in any State (including the District of Columbia) or Federal court** or in an administrative proceeding other than a proceeding commenced by the Bureau of Alcohol, Tobacco, Firearms and Explosives to enforce the provisions of chapter 44 of such title, or a review of such an action or proceeding; **except that this proviso shall not be construed to prevent:** (A) the disclosure of statistical information concerning total production, importation, and exportation by each licensed importer (as defined in section 921(a)(9) of such title) and licensed manufacturer (as defined in section 921(a)(10) of such title); (B) the sharing or exchange of such information among and between Federal, State, local, or foreign law enforcement agencies, Federal, State, or local prosecutors, and Federal national security, intelligence, or counterterrorism officials; or (C) the publication of annual statistical reports on products regulated by the Bureau of Alcohol, Tobacco, Firearms and Explosives, including total production, importation, and exportation by each licensed importer (as so defined) and licensed manufacturer (as so defined), or **statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations**:

Pub. L. No. 112-55, 125 Stat. 552, 609-10 (Nov. 18, 2011) (emphasis supplied).

The information sought by Golden State – the identities of FFLs who sold firearms that

were later recovered in Mexico and successfully traced – is clearly "part . . . of the contents of the

-4-

Firearms Trace System database," the disclosure of which is expressly prohibited by this

legislation.[2]  Identifying information for the FFLs who sold firearms later recovered in Mexico

and successfully traced is information maintained by ATF in its trace database.  See Decl. of

Charles J. Houser ¶¶ 1-6 (attached as Ex. 2).  This information is used, along with other similar

data, to assist ATF in detecting patterns in the sources of firearms used in crimes.  See id. ¶ 8; see

also generally ATF National Tracing Center Division: Information for Law Enforcement

Agencies (explaining that tracing of firearms recovered by law enforcement officials is used,

among other purposes, to detect patterns in the sources and kinds of crime guns).[3]

     Revealing in a publicly-filed Administrative Record the identities of FFLs who sold

firearms later recovered in Mexico and successfully traced could implicate privacy concerns of

private businesses and jeopardize pending criminal investigations – some of the precise concerns

Congress sought to address.  See Houser Decl. ¶¶ 9-10.  As explained in the House Report for the

2005 Appropriations Act:

> In the last two fiscal years the Committee has expressed serious concern that,
> contrary to provisions of the Gun Control Act, as amended, and Congress' intent,
> *certain sensitive law enforcement information contained in databases maintained*
> *by the ATF* have been subject to release under the Freedom of Information Act
> and through court action to the public, including civil litigants, firearm
> manufacturers and distributors, public interest groups and governmental entities,
> for use other than in bona fide criminal investigations and prosecutions.  The
> Committee concern is not related to budgetary considerations.  The intent has
> been to enforce existing Federal law limiting disclosure of this sensitive law
> enforcement information solely to law enforcement, and, to the extent current

---

[2] By contrast, the unredacted information that was included in the Administrative Record
(indicating the number of firearms recovered from FFLs in particular states, without revealing the
identities of those FFLs) constitutes "statistical aggregate data regarding firearms traffickers and
trafficking channels," 125 Stat. at 610, the disclosure of which is permitted by the statute.

[3] *Available at* http://www.atf.gov/publications/download/p/atf-p-3312-7.pdf.

# Exhibit 14

FY2010 Recovery in Mexico excluding duplicates
ANY DEALER where purchaser identified(incl ZFFL)
(Trace entry date - recovery date) is less than 366 days

TYPE 01 Dealer with purchaser identified

| ST | TRC CNT |
|----|---------|
| TX | 1998 |
| CA | 1016 |
| AZ | 783 |
| IL | 181 |
| NM | 130 |
| FL | 105 |
| CO | 92 |
| OK | 81 |
| NV | 74 |
| WA | 57 |
| GA | 51 |
| NC | 49 |
| KS | 46 |
| LA | 39 |
| OR | 37 |
| MI | 35 |
| AL | 34 |
| IN | 33 |
| AR | 30 |
| OH | 27 |
| MN | 24 |
| VA | 24 |
| ID | 23 |
| TN | 22 |
| NE | 21 |
| PA | 21 |
| MO | 21 |
| NY | 20 |
| KY | 19 |
| UT | 19 |
| WI | 17 |
| SC | 16 |
| MS | 14 |
| WY | 13 |
| IA | 13 |
| CT | 10 |
| WV | 8 |
| MT | 8 |
| MA | 6 |
| SD | 6 |
| AK | 6 |
| ME | 5 |
| ND | 4 |
| NH | 4 |
| NJ | 4 |
| DE | 4 |
| MD | 2 |
| RI | 1 |
| HI | 1 |
| GU | 1 |
| BC | 1 |
| VT | 1 |
|    | 5257 |

| ST | TRC CNT |
|----|---------|
| TX | 1538 |
| CA | 866 |
| AZ | 635 |
| IL | 178 |
| NM | 93 |
| FL | 75 |
| CO | 63 |
| OK | 55 |
| NV | 48 |
| WA | 46 |
| KS | 37 |
| NC | 35 |
| MI | 32 |
| OR | 31 |
| IN | 30 |
| LA | 28 |
| AL | 27 |
| GA | 25 |
| OH | 24 |
| AR | 24 |
| MN | 22 |
| PA | 19 |
| NY | 17 |
| VA | 16 |
| WI | 15 |
| NE | 15 |
| ID | 14 |
| TN | 13 |
| MO | 13 |
| KY | 13 |
| UT | 12 |
| SC | 12 |
| WY | 10 |
| IA | 9 |
| CT | 9 |
| MS | 7 |
| AK | 5 |
| SD | 5 |
| MA | 5 |
| NH | 4 |
| DE | 4 |
| NJ | 4 |
| ME | 4 |
| MT | 4 |
| ND | 3 |
| WV | 3 |
| MD | 2 |
| VT | 1 |
| HI | 1 |
| VT | 1 |
|    | 4152 |

ATF AR 0390

**From:** Houser, Charles J.
**Sent:** Monday, November 15, 2010 2:08 PM
**To:** Herbert, Arthur W.
**Subject:** FFL_TRACE_SUMMARY_nodups.xls
**Attachments:** FFL_TRACE_SUMMARY_nodups.xls

Sir: Additional information

This spreadsheet has all duplicates removed throughout and in now for the time frame of FY-2008 through FY-2010
This spreadsheet contains the original queries (w/o dupes)
Now there are additional worksheets
- Just the breakout of FFL for Rifles>22 cal recovered in Mex (no dupes)
- Then we have the same query (FFL for Rifles>22cal recovered in Mex, no dupes) where TTC <= 3 yrs total and by FY
- Then we have the same again where TCC<=1 yr total and by FY

1

**For FY2008 to FY2010**          **All duplicates removed**

Retail Final Disposition US dealers in FLS
US Recovered

| COUNT(*) | FCNT | MEXICO RECOVERED TRACES COUNT(*) | FCNT |
|---|---|---|---|
| 1 FFLS have | 1836 TRACES | 1 FFLS have | 214 TRACES |
| 1 FFLS have | 1767 TRACES | 1 FFLS have | 211 TRACES |
| 1 FFLS have | 1554 TRACES | 1 FFLS have | 199 TRACES |
| 1 FFLS have | 1460 TRACES | 1 FFLS have | 132 TRACES |
| 1 FFLS have | 1301 TRACES | 1 FFLS have | 119 TRACES |
| 1 FFLS have | 1229 TRACES | 1 FFLS have | 114 TRACES |
| 1 FFLS have | 1154 TRACES | 1 FFLS have | 113 TRACES |
| 1 FFLS have | 1132 TRACES | 1 FFLS have | 97 TRACES |
| 1 FFLS have | 1112 TRACES | 1 FFLS have | 96 TRACES |
| 1 FFLS have | 1056 TRACES | 1 FFLS have | 87 TRACES |
| 1 FFLS have | 1017 TRACES | 1 FFLS have | 77 TRACES |
| 1 FFLS have | 981 TRACES | 1 FFLS have | 74 TRACES |
| 1 FFLS have | 952 TRACES | 1 FFLS have | 71 TRACES |
| 1 FFLS have | 914 TRACES | 1 FFLS have | 66 TRACES |
| 1 FFLS have | 869 TRACES | 1 FFLS have | 64 TRACES |
| 1 FFLS have | 856 TRACES | 1 FFLS have | 61 TRACES |
| 1 FFLS have | 805 TRACES | 1 FFLS have | 59 TRACES |
| 1 FFLS have | 797 TRACES | 1 FFLS have | 57 TRACES |
| 1 FFLS have | 786 TRACES | 1 FFLS have | 55 TRACES |
| 1 FFLS have | 785 TRACES | 1 FFLS have | 52 TRACES |
| 1 FFLS have | 693 TRACES | 1 FFLS have | 51 TRACES |
| 1 FFLS have | 692 TRACES | 1 FFLS have | 49 TRACES |
| 1 FFLS have | 685 TRACES | 1 FFLS have | 47 TRACES |
| 1 FFLS have | 681 TRACES | 1 FFLS have | 46 TRACES |
| 1 FFLS have | 673 TRACES | 1 FFLS have | 40 TRACES |
| 1 FFLS have | 632 TRACES | 1 FFLS have | 38 TRACES |
| 1 FFLS have | 629 TRACES | 1 FFLS have | 37 TRACES |
| 1 FFLS have | 607 TRACES | 1 FFLS have | 36 TRACES |
| 1 FFLS have | 598 TRACES | 1 FFLS have | 29 TRACES |
| 1 FFLS have | 593 TRACES | 2 FFLS have | 62 TRACES |
| 1 FFLS have | 539 TRACES | 2 FFLS have | 56 TRACES |
| 1 FFLS have | 534 TRACES | 2 FFLS have | 54 TRACES |
| 1 FFLS have | 531 TRACES | 2 FFLS have | 53 TRACES |
| 1 FFLS have | 530 TRACES | 2 FFLS have | 45 TRACES |
| 1 FFLS have | 527 TRACES | 2 FFLS have | 41 TRACES |
| 1 FFLS have | 525 TRACES | 2 FFLS have | 32 TRACES |
| 1 FFLS have | 500 TRACES | 2 FFLS have | 24 TRACES |
| 1 FFLS have | 497 TRACES | 3 FFLS have | 68 TRACES |
| 1 FFLS have | 490 TRACES | 3 FFLS have | 44 TRACES |
| 1 FFLS have | 475 TRACES | 3 FFLS have | 42 TRACES |
| 1 FFLS have | 471 TRACES | 3 FFLS have | 27 TRACES |
| 1 FFLS have | 465 TRACES | 3 FFLS have | 25 TRACES |
| 1 FFLS have | 461 TRACES | 3 FFLS have | 23 TRACES |
| 1 FFLS have | 456 TRACES | 4 FFLS have | 39 TRACES |
| 1 FFLS have | 455 TRACES | 4 FFLS have | 31 TRACES |
| 1 FFLS have | 453 TRACES | 4 FFLS have | 28 TRACES |
| 1 FFLS have | 446 TRACES | 5 FFLS have | 35 TRACES |

ATF AR 0392

| | | | |
|---|---|---|---|
| 1 FFLS have | 444 TRACES | 5 FFLS have | 33 TRACES |
| 1 FFLS have | 440 TRACES | 6 FFLS have | 30 TRACES |
| 1 FFLS have | 439 TRACES | 6 FFLS have | 17 TRACES |
| 1 FFLS have | 434 TRACES | 8 FFLS have | 26 TRACES |
| 1 FFLS have | 432 TRACES | 9 FFLS have | 21 TRACES |
| 1 FFLS have | 430 TRACES | 9 FFLS have | 18 TRACES |
| 1 FFLS have | 428 TRACES | 9 FFLS have | 16 TRACES |
| 1 FFLS have | 423 TRACES | 10 FFLS have | 22 TRACES |
| 1 FFLS have | 420 TRACES | 10 FFLS have | 20 TRACES |
| 1 FFLS have | 418 TRACES | 11 FFLS have | 19 TRACES |
| 1 FFLS have | 414 TRACES | 12 FFLS have | 12 TRACES |
| 1 FFLS have | 409 TRACES | 14 FFLS have | 14 TRACES |
| 1 FFLS have | 406 TRACES | 15 FFLS have | 13 TRACES |
| 1 FFLS have | 400 TRACES | 18 FFLS have | 15 TRACES |
| 1 FFLS have | 396 TRACES | 23 FFLS have | 11 TRACES |
| 1 FFLS have | 390 TRACES | 44 FFLS have | 10 TRACES |
| 1 FFLS have | 389 TRACES | 54 FFLS have | 9 TRACES |
| 1 FFLS have | 386 TRACES | 55 FFLS have | 8 TRACES |
| 1 FFLS have | 385 TRACES | 84 FFLS have | 7 TRACES |
| 1 FFLS have | 381 TRACES | 96 FFLS have | 6 TRACES |
| 1 FFLS have | 380 TRACES | 147 FFLS have | 5 TRACES |
| 1 FFLS have | 373 TRACES | 256 FFLS have | 4 TRACES |
| 1 FFLS have | 367 TRACES | 413 FFLS have | 3 TRACES |
| 1 FFLS have | 366 TRACES | 1127 FFLS have | 2 TRACES |
| 1 FFLS have | 365 TRACES | 5322 FFLS have | 1 TRACES |
| 1 FFLS have | 364 TRACES | | 3462 |
| 1 FFLS have | 362 TRACES | | |
| 1 FFLS have | 355 TRACES | | |
| 1 FFLS have | 350 TRACES | | |
| 1 FFLS have | 342 TRACES | | |
| 1 FFLS have | 335 TRACES | | |
| 1 FFLS have | 334 TRACES | | |
| 1 FFLS have | 333 TRACES | | |
| 1 FFLS have | 330 TRACES | | |
| 1 FFLS have | 325 TRACES | | |
| 1 FFLS have | 324 TRACES | | |
| 1 FFLS have | 313 TRACES | | |
| 1 FFLS have | 307 TRACES | | |
| 1 FFLS have | 303 TRACES | | |
| 1 FFLS have | 296 TRACES | | |
| 1 FFLS have | 295 TRACES | | |
| 1 FFLS have | 294 TRACES | | |
| 1 FFLS have | 288 TRACES | | |
| 1 FFLS have | 287 TRACES | | |
| 1 FFLS have | 771 TRACES | | |
| 1 FFLS have | 264 TRACES | | |
| 1 FFLS have | 263 TRACES | | |
| 1 FFLS have | 257 TRACES | | |
| 1 FFLS have | 256 TRACES | | |
| 1 FFLS have | 254 TRACES | | |
| 1 FFLS have | 253 TRACES | | |
| 1 FFLS have | 250 TRACES | | |

| | | |
|---|---|---|
| 1 FFLS have | 245 | TRACES |
| 1 FFLS have | 241 | TRACES |
| 1 FFLS have | 239 | TRACES |
| 1 FFLS have | 237 | TRACES |
| 1 FFLS have | 231 | TRACES |
| 1 FFLS have | 224 | TRACES |
| 1 FFLS have | 218 | TRACES |
| 1 FFLS have | 217 | TRACES |
| 1 FFLS have | 216 | TRACES |
| 1 FFLS have | 213 | TRACES |
| 1 FFLS have | 211 | TRACES |
| 1 FFLS have | 209 | TRACES |
| 1 FFLS have | 206 | TRACES |
| 1 FFLS have | 201 | TRACES |
| 1 FFLS have | 193 | TRACES |
| 1 FFLS have | 192 | TRACES |
| 1 FFLS have | 190 | TRACES |
| 1 FFLS have | 188 | TRACES |
| 1 FFLS have | 183 | TRACES |
| 1 FFLS have | 180 | TRACES |
| 1 FFLS have | 176 | TRACES |
| 1 FFLS have | 175 | TRACES |
| 1 FFLS have | 174 | TRACES |
| 1 FFLS have | 172 | TRACES |
| 1 FFLS have | 165 | TRACES |
| 1 FFLS have | 164 | TRACES |
| 1 FFLS have | 162 | TRACES |
| 1 FFLS have | 160 | TRACES |
| 1 FFLS have | 153 | TRACES |
| 1 FFLS have | 148 | TRACES |
| 1 FFLS have | 141 | TRACES |
| 1 FFLS have | 137 | TRACES |
| 2 FFLS have | 619 | TRACES |
| 2 FFLS have | 437 | TRACES |
| 2 FFLS have | 424 | TRACES |
| 2 FFLS have | 379 | TRACES |
| 2 FFLS have | 378 | TRACES |
| 2 FFLS have | 377 | TRACES |
| 2 FFLS have | 376 | TRACES |
| 2 FFLS have | 328 | TRACES |
| 2 FFLS have | 320 | TRACES |
| 2 FFLS have | 318 | TRACES |
| 2 FFLS have | 317 | TRACES |
| 2 FFLS have | 315 | TRACES |
| 2 FFLS have | 305 | TRACES |
| 2 FFLS have | 284 | TRACES |
| 2 FFLS have | 274 | TRACES |
| 2 FFLS have | 270 | TRACES |
| 2 FFLS have | 268 | TRACES |
| 2 FFLS have | 262 | TRACES |
| 2 FFLS have | 258 | TRACES |
| 2 FFLS have | 255 | TRACES |

| | |
|---|---|
| 31 FFLS have | 47 TRACES |
| 34 FFLS have | 53 TRACES |
| 34 FFLS have | 50 TRACES |
| 36 FFLS have | 49 TRACES |
| 38 FFLS have | 42 TRACES |
| 39 FFLS have | 43 TRACES |
| 41 FFLS have | 45 TRACES |
| 45 FFLS have | 40 TRACES |
| 48 FFLS have | 44 TRACES |
| 49 FFLS have | 39 TRACES |
| 51 FFLS have | 41 TRACES |
| 51 FFLS have | 37 TRACES |
| 53 FFLS have | 48 TRACES |
| 58 FFLS have | 38 TRACES |
| 59 FFLS have | 36 TRACES |
| 64 FFLS have | 35 TRACES |
| 71 FFLS have | 34 TRACES |
| 72 FFLS have | 33 TRACES |
| 74 FFLS have | 31 TRACES |
| 82 FFLS have | 32 TRACES |
| 83 FFLS have | 30 TRACES |
| 94 FFLS have | 29 TRACES |
| 102 FFLS have | 27 TRACES |
| 107 FFLS have | 28 TRACES |
| 127 FFLS have | 26 TRACES |
| 127 FFLS have | 25 TRACES |
| 133 FFLS have | 24 TRACES |
| 138 FFLS have | 23 TRACES |
| 161 FFLS have | 22 TRACES |
| 165 FFLS have | 21 TRACES |
| 194 FFLS have | 20 TRACES |
| 212 FFLS have | 18 TRACES |
| 214 FFLS have | 19 TRACES |
| 256 FFLS have | 17 TRACES |
| 273 FFLS have | 16 TRACES |
| 332 FFLS have | 15 TRACES |
| 367 FFLS have | 14 TRACES |
| 413 FFLS have | 13 TRACES |
| 494 FFLS have | 12 TRACES |
| 603 FFLS have | 11 TRACES |
| 685 FFLS have | 10 TRACES |
| 826 FFLS have | 9 TRACES |
| 1064 FFLS have | 8 TRACES |
| 1322 FFLS have | 7 TRACES |
| 1742 FFLS have | 6 TRACES |
| 2362 FFLS have | 5 TRACES |
| 3370 FFLS have | 4 TRACES |
| 5219 FFLS have | 3 TRACES |
| 9908 FFLS have | 2 TRACES |
| 32421 FFLS have | 1 TRACES |

ATF AR 0398

| Weapons Type Rifle and Shotgun US Recovered | | | Weapons Type Rifle and Shotgun MEXICO RECOVERED TRACES | |
|---|---|---|---|---|
| COUNT(*) | FCNT | | COUNT(*) | FCNT |
| 1 FFLS have | 413 TRACES | | 1 FFLS have | 170 TRACES |
| 1 FFLS have | 407 TRACES | | 1 FFLS have | 146 TRACES |
| 1 FFLS have | 285 TRACES | | 1 FFLS have | 143 TRACES |
| 1 FFLS have | 270 TRACES | | 1 FFLS have | 103 TRACES |
| 1 FFLS have | 261 TRACES | | 1 FFLS have | 83 TRACES |
| 1 FFLS have | 236 TRACES | | 1 FFLS have | 68 TRACES |
| 1 FFLS have | 215 TRACES | | 1 FFLS have | 65 TRACES |
| 1 FFLS have | 214 TRACES | | 1 FFLS have | 64 TRACES |
| 1 FFLS have | 206 TRACES | | 1 FFLS have | 60 TRACES |
| 1 FFLS have | 200 TRACES | | 1 FFLS have | 56 TRACES |
| 1 FFLS have | 188 TRACES | | 1 FFLS have | 55 TRACES |
| 1 FFLS have | 185 TRACES | | 1 FFLS have | 51 TRACES |
| 1 FFLS have | 183 TRACES | | 1 FFLS have | 49 TRACES |
| 1 FFLS have | 182 TRACES | | 1 FFLS have | 43 TRACES |
| 1 FFLS have | 178 TRACES | | 1 FFLS have | 41 TRACES |
| 1 FFLS have | 169 TRACES | | 1 FFLS have | 40 TRACES |
| 1 FFLS have | 165 TRACES | | 1 FFLS have | 39 TRACES |
| 1 FFLS have | 156 TRACES | | 1 FFLS have | 37 TRACES |
| 1 FFLS have | 154 TRACES | | 1 FFLS have | 36 TRACES |
| 1 FFLS have | 151 TRACES | | 1 FFLS have | 32 TRACES |
| 1 FFLS have | 144 TRACES | | 1 FFLS have | 31 TRACES |
| 1 FFLS have | 132 TRACES | | 1 FFLS have | 29 TRACES |
| 1 FFLS have | 127 TRACES | | 1 FFLS have | 24 TRACES |
| 1 FFLS have | 118 TRACES | | 1 FFLS have | 23 TRACES |
| 1 FFLS have | 116 TRACES | | 1 FFLS have | 22 TRACES |
| 1 FFLS have | 112 TRACES | | 2 FFLS have | 66 TRACES |
| 1 FFLS have | 108 TRACES | | 2 FFLS have | 35 TRACES |
| 1 FFLS have | 107 TRACES | | 2 FFLS have | 27 TRACES |
| 1 FFLS have | 103 TRACES | | 2 FFLS have | 26 TRACES |
| 1 FFLS have | 102 TRACES | | 3 FFLS have | 34 TRACES |
| 1 FFLS have | 100 TRACES | | 3 FFLS have | 25 TRACES |
| 1 FFLS have | 99 TRACES | | 3 FFLS have | 21 TRACES |
| 1 FFLS have | 91 TRACES | | 4 FFLS have | 19 TRACES |
| 1 FFLS have | 86 TRACES | | 4 FFLS have | 17 TRACES |
| 1 FFLS have | 81 TRACES | | 4 FFLS have | 15 TRACES |
| 1 FFLS have | 77 TRACES | | 5 FFLS have | 20 TRACES |
| 1 FFLS have | 73 TRACES | | 5 FFLS have | 12 TRACES |
| 1 FFLS have | 70 TRACES | | 7 FFLS have | 13 TRACES |
| 1 FFLS have | 68 TRACES | | 8 FFLS have | 18 TRACES |
| 1 FFLS have | 66 TRACES | | 8 FFLS have | 16 TRACES |
| 1 FFLS have | 60 TRACES | | 8 FFLS have | 14 TRACES |
| 1 FFLS have | 59 TRACES | | 13 FFLS have | 11 TRACES |
| 2 FFLS have | 225 TRACES | | 17 FFLS have | 10 TRACES |
| 2 FFLS have | 141 TRACES | | 22 FFLS have | 9 TRACES |
| 2 FFLS have | 114 TRACES | | 26 FFLS have | 8 TRACES |
| 2 FFLS have | 97 TRACES | | 40 FFLS have | 7 TRACES |
| 2 FFLS have | 96 TRACES | | 55 FFLS have | 6 TRACES |

ATF AR 0399

| | | | |
|---|---|---|---|
| 2 FFLS have | 95 TRACES | 65 FFLS have | 5 TRACES |
| 2 FFLS have | 92 TRACES | 120 FFLS have | 4 TRACES |
| 2 FFLS have | 88 TRACES | 225 FFLS have | 3 TRACES |
| 2 FFLS have | 87 TRACES | 600 FFLS have | 2 TRACES |
| 2 FFLS have | 85 TRACES | 2999 FFLS have | 1 TRACES |
| 2 FFLS have | 83 TRACES | | |
| 2 FFLS have | 78 TRACES | | |
| 2 FFLS have | 75 TRACES | | |
| 2 FFLS have | 74 TRACES | | |
| 2 FFLS have | 72 TRACES | | |
| 2 FFLS have | 71 TRACES | | |
| 3 FFLS have | 76 TRACES | | |
| 3 FFLS have | 65 TRACES | | |
| 3 FFLS have | 62 TRACES | | |
| 3 FFLS have | 61 TRACES | | |
| 3 FFLS have | 55 TRACES | | |
| 3 FFLS have | 52 TRACES | | |
| 4 FFLS have | 67 TRACES | | |
| 4 FFLS have | 64 TRACES | | |
| 4 FFLS have | 53 TRACES | | |
| 4 FFLS have | 51 TRACES | | |
| 4 FFLS have | 50 TRACES | | |
| 5 FFLS have | 69 TRACES | | |
| 5 FFLS have | 63 TRACES | | |
| 5 FFLS have | 57 TRACES | | |
| 6 FFLS have | 58 TRACES | | |
| 6 FFLS have | 54 TRACES | | |
| 7 FFLS have | 48 TRACES | | |
| 7 FFLS have | 44 TRACES | | |
| 8 FFLS have | 56 TRACES | | |
| 8 FFLS have | 46 TRACES | | |
| 8 FFLS have | 41 TRACES | | |
| 9 FFLS have | 49 TRACES | | |
| 9 FFLS have | 43 TRACES | | |
| 10 FFLS have | 42 TRACES | | |
| 11 FFLS have | 47 TRACES | | |
| 11 FFLS have | 45 TRACES | | |
| 11 FFLS have | 40 TRACES | | |
| 12 FFLS have | 36 TRACES | | |
| 14 FFLS have | 38 TRACES | | |
| 15 FFLS have | 39 TRACES | | |
| 17 FFLS have | 35 TRACES | | |
| 18 FFLS have | 37 TRACES | | |
| 21 FFLS have | 29 TRACES | | |
| 23 FFLS have | 32 TRACES | | |
| 24 FFLS have | 26 TRACES | | |
| 27 FFLS have | 31 TRACES | | |
| 27 FFLS have | 30 TRACES | | |
| 28 FFLS have | 27 TRACES | | |
| 29 FFLS have | 34 TRACES | | |
| 29 FFLS have | 28 TRACES | | |
| 30 FFLS have | 33 TRACES | | |

RECOVERY MM, Caliber > 22 Retail FFl's

FFL



| ST | COUNT |
|----|-------|
| AZ | 167 |
| AZ | 143 |
| TX | 133 |
| AZ | 103 |
| TX | 73 |
| AZ | 68 |
| TX | 64 |
| TX | 64 |
| TX | 62 |
| TX | 51 |
| CA | 49 |
| TX | 43 |
| AZ | 40 |
| TX | 39 |
| CA | 37 |
| TX | 37 |
| AZ | 36 |
| TX | 34 |
| TX | 34 |
| TX | 29 |
| AZ | 28 |
| AZ | 27 |
| TX | 27 |
| AZ | 27 |
| TX | 27 |
| TX | 26 |
| CA | 26 |
| TX | 25 |
| TX | 25 |
| TX | 25 |
| TX | 24 |
| TX | 21 |
| AZ | 20 |
| AZ | 20 |
| TX | 20 |
| CA | 19 |
| AZ | 19 |
| AZ | 18 |
| TX | 18 |
| TX | 18 |
| TX | 18 |
| TX | 18 |
| CA | 17 |

ATF AR 0406

# Exhibit 15

(https://www.revealnews.org/)


SHARE

# New California law could keep guns away from people like Omar Mateen

*Topics: Criminal Justice (https://www.revealnews.org/topic/criminal-justice/) / Guns (https://www.revealnews.org/topic/guns/) / Law Enforcement (https://www.revealnews.org/topic/law-enforcement/)*
*Categories: Dig (https://www.revealnews.org/blog_category/dig/)*

*By Christina Jewett (https://www.revealnews.org/author/christinajewett) / June 15, 2016*

A law in California that took effect this year is intended to keep guns out of the hands of people like the Orlando, Florida, nightclub shooter: They're suspected to be violent but convicted of no crime.

The gun violence restraining order (http://www.reuters.com/article/us-usa-california-gun-control-idUSKCN0HP2JD20141001) law allows law enforcement officers or family members to ask a judge to approve gun restrictions. If the judge finds that the person has threatened violence or acted in a violent manner, his or her right to buy a gun may be taken away temporarily and his or her guns can be confiscated.

The law was spurred by the 2014 Santa Barbara-area mass shooting by Elliot Rodger, who killed six people and injured more than a dozen others near a college campus.

As in the Orlando case, Rodger drew the attention of law enforcement and his mother, but he avoided the kind of criminal charges that would create a barrier to buying or owning guns.

Rodger had encountered deputies over a fight with a roommate, a conflict at a party and a check requested by his concerned mother, according to an extensive report (http://www.sbsheriff.us/documents/ISLAVISTAINVESTIGATIVESUMMARY.pdf) from the Santa Barbara County Sheriff's Office. He went on to stalk a college campus and kill six people before turning the gun on himself.

The FBI twice opened probes into Omar Mateen (https://www.revealnews.org/blog/omar-mateens-employer-didnt-heed-warnings-from-two-other-killers/), who killed 49 people and injured 53 others in Orlando early Sunday. His former wife also told reporters that Mateen was violent and beat her. With no arrests or restraining orders on record, though, nothing was in place to stop Mateen from buying a gun.

Such gun-related restraining orders exist only in California and Indiana, said Lindsay Nichols, a senior attorney with the Law Center to Prevent Gun Violence. But several states, including Washington, Illinois and New Jersey, are considering them. They're the kind of common-sense measure the nation needs, she

because people are dying on a daily basis in this country. While we have slow progress that is happening, we cannot continue this way as a country."

The California gun restraining order lasts 21 days and can be extended for up to a year. Nichols said the law was not controversial. Legislative records show (http://www.leginfo.ca.gov/pub/13-14/bill/asm/ab_1001-1050/ab_1014_cfa_20140818_105814_sen_floor.html) that law enforcement agencies – including the California Police Chiefs Association – backed it.

*Christina Jewett can be reached at cjewett@cironline.org. Follow her on Twitter:* @By_CJewett (https://twitter.com/By_CJewett).

### Get the Weekly Reveal newsletter

Don't miss out on the next big story. Sign up today.

Email Address

---

REPUBLISH THIS CONTENT

## Related



**Orlando shooter Omar Mateen was a licensed security guard** (https://www.revealnews.org/blog/orlando-shooter-omar-mateen-was-a-licensed-security-guard/)



**More essential reading on the Orlando massacre** (https://www.revealnews.org/blog/essential-reading-on-the-orlando-massacre/)



**Lone wolves are the face of modern domestic terrorism** (https://www.revealnews.org/al what-lone-wolf-terrorism-look the-us/)

About Us (https://www.revealnews.org/about-us/)

Contact Us (https://www.revealnews.org/about-us/contact-us/)

Privacy Policy (https://www.revealnews.org/privacy-policy/)

Terms of Use (https://www.revealnews.org/terms-of-use/)

Brand Assets (https://www.revealnews.org/about-us/brand-assets/)

Corrections

Where to Hear Reveal (https://www.revealnews.org/where-to-hear-reveal/)

Newsletter (https://www.revealnews.org/newsletter/)

StoryWorks (http://storyworks.revealnews.org)

Facebook (https://www.facebook.com/ThisIsReveal

Twitter (https://twitter.com/reveal)

YouTube (https://www.youtube.com/reveal)

iTunes (https://itunes.apple.com/us/podcast/reveal/id886

RSS (http://www.revealnews.org/feed/)

Audio RSS (http://feeds.revealradio.org/revealpod

g

# Exhibit 16

**BBC**

| Home | News | Sport | Weather | Shop | Earth | Travel |

## America's gun culture in 10 charts

21 March 2018

Florida school shooting

**Students across the United States will join a national march to call for tighter gun control and to highlight the issue of school safety.**

The March for Our Lives was organised by pupils at the Marjory Stoneman Douglas High School in Florida, where a former student is accused of killing 17 people last month.

The shooting, one of the worst in US history, renewed debate about gun laws and the rights of gun owners.

## What do young people think about gun control?



**Changing attitudes of 18 to 29-year-olds in the US**
— Control gun ownership
— Protect gun rights

Source: Pew Research Center

**BBC**

When looking at the period before the Parkland shooting, it is interesting to track how young

Support for gun control over the protection of gun rights in America is highest among 18 to 29-year-olds, according to a study by the Pew Research Centre, with a spike after the Orlando nightclub shooting in 2016. The overall trend though suggests a slight decrease in support for gun control over gun rights since 2000.

Pew found that one third of over-50s said they owned a gun. The rate of gun ownership was lower for younger adults - about 28%. White men are especially likely to own a gun.

## How does the US compare with other countries?

About 40% of Americans say they own a gun or live in a household with one, **according to a 2017 survey**, and the rate of murder or manslaughter by firearm is the highest in the developed world. There were more than 11,000 deaths as a result of murder or manslaughter involving a firearm in 2016.

# An international comparison of gun-related killings as a % of all homicides



US (2016) **64%**    England and Wales (2015/16) **4.5%**

Canada (2015) **30.5%**    Australia (2013/14) **13%**

Source: FBI, Homicide Index Home Office, Statistics Canada, Australia Crime Statistics    B B C

Homicides are taken here to include murder and manslaughter. The FBI separates statistics for what it calls justifiable homicide, which includes the killing of a criminal by a police officer or private citizen in certain circumstances, which are not included.

## Who owns the world's guns?

While it is difficult to know exactly how many guns civilians own around the world, by every estimate the US with around 270 million is far out in front.

# Top 10 civilian gun-owning countries

Firearms per 100 residents



Source: Small Arms Survey (2011)

BBC

Switzerland and Finland are the European countries with the most guns per person - they both have compulsory military service for all men over the age of 18. Cyprus, Austria and Yemen also have military service.

## How do US gun deaths break down?

There have been more than **90 mass shootings** in the US since 1982, according to investigative magazine Mother Jones.

Up until 2012, a mass shooting was defined as when an attacker had killed four or more victims in an indiscriminate rampage - and since 2013 the figures include attacks with three or more victims. The shootings do not include killings related to other crimes such as armed robbery or gang violence.

The overall number of people killed in mass shootings each year represents only a tiny percentage of the total number.

# Mass shootings account for a tiny proportion of all gun deaths

### Of the total **33,594** who died in 2014 there were...



21,386
Suicides

11,008
Homicides

of which **14**
died in mass
shootings

**1,200** Other*

*Other includes accidental deaths and war casualties

Source: CDC/Mother Jones. All figures 2014

B B C

There were nearly twice as many suicides involving firearms in 2015 as there were murders involving guns, and the rate has been increasing in recent years. Suicide by firearm accounts for almost half of all suicides in the US, according to the Centers for Disease Control and Prevention.

A 2016 study published in the **American Journal of Public Health** found there was a strong relationship between higher levels of gun ownership in a state and higher firearm suicide rates for both men and women.

## Attacks in US become deadlier

The Las Vegas attack was the worst in recent US history - and five of the shootings with the highest number of casualties happened within the past 10 years.

The Parkland, Florida, attack is the worst school shooting since Sandy Hook in 2012.

# Worst mass shootings in the US since 1991

## Victims killed



Source: FBI/Las Vegas police

BBC

## What types of guns kill Americans?

Military-style assault-style weapons have been blamed for some of the major mass shootings such as the attack in an Orlando nightclub and at the Sandy Hook School in Connecticut.

Dozens of rifles were recovered from the scene of the Las Vegas shooting, Police reported.

## Types of guns used in US murders



- Handguns
- Rifles
- Shotguns
- Other guns

Source: FBI (2016)

B B C

A few US states have banned assault-style weapons, which were totally restricted for a decade until 2004.

However most murders caused by guns involve handguns, according to FBI data.

## How much do guns cost to buy?

For those from countries where guns are not widely owned, it can be a surprise to discover that they are relatively cheap to purchase in the US.

Among the arsenal of weapons recovered from the hotel room of Las Vegas shooter Stephen Paddock were handguns, which can cost from as little $200 (£151) - comparable to a Chromebook laptop.

# Price of a gun in the US



Assault rifles like the ones reportedly found in Paddock's room

Approximately **$1500**

Macbook

Handguns, which were also reportedly among Paddock's arsenal

Approximately **$200**

Chromebook

BBC

Assault-style rifles, also recovered from Paddock's room, can cost from around $1,500 (£1,132).

In addition to the 23 weapons at the hotel, a further 19 were recovered from Paddock's home. It is estimated that he may have spent more than $70,000 (£52,800) on firearms and accessories such as tripods, scopes, ammunition and cartridges.

## Who supports gun control?

US public opinion on the banning of handguns has changed dramatically over the last 60 years. Support has shifted over time and now a significant majority opposes a ban on handguns, **according to polling by Gallup.**

But a majority of Americans say they are dissatisfied with US gun laws and policies, and most of those who are unhappy want stricter legislation.



**Americans unhappy with US gun laws want stricter rules**

Source: Gallup

Some controls are widely supported by people across the political divide - such as restricting the sale of guns to people who are mentally ill, or on "watch" lists.

# Public opinion is most divided over 'concealed carry' policy

% who support each policy



Source: Pew Research Center

B B C

But Republicans and Democrats are much more divided over other policy proposals, such as whether to allow ordinary citizens increased rights to carry concealed weapons - according to a survey from **Pew Research Center.**

In his latest comment on the shootings, President Donald Trump said he would be "talking about gun laws as times goes by". The White House said now is not the time to be debating gun control.

His predecessor, Barack Obama, struggled to get any new gun control laws onto the statute books, because of Republican opposition.

## Who opposes gun control?

The **National Rifle Association (NRA)** campaigns against all forms of gun control in the US and argues that more guns make the country safer.

It is among the most powerful special interest lobby groups in the US, with a substantial budget to influence members of Congress on gun policy.

## Annual lobbying expenditure by the National Rifle Association ($m)



Source: Centre for Responsive Politics                    BBC

In total about one in five US gun owners say they are members of the NRA - and it has especially widespread support from Republican-leaning gun owners, **according to Pew Research**.

In terms of lobbying, the NRA officially spends about $3m per year to influence gun policy.

The chart shows only the recorded contributions to lawmakers published by the Senate Office of Public Records.

The NRA spends millions more elsewhere, such as on supporting the election campaigns of political candidates who oppose gun controls.

## Related Topics

Florida school shooting     United States     US gun laws

## Share this story  About sharing

US & Canada

# Exhibit 17

**The New York Times** | https://nyti.ms/2hODjP5

AMERICAS

# What Explains U.S. Mass Shootings? International Comparisons Suggest an Answer

## Leer en español
## 查看繁體中文版
## 查看简体中文版

The Interpreter

By MAX FISHER and JOSH KELLER     NOV. 7, 2017

When the world looks at the United States, it sees a land of exceptions: a time-tested if noisy democracy, a crusader in foreign policy, an exporter of beloved music and film.

But there is one quirk that consistently puzzles America's fans and critics alike. Why, they ask, does it experience so many mass shootings?

Perhaps, some speculate, it is because American society is unusually violent. Or its racial divisions have frayed the bonds of society. Or its citizens lack proper mental care under a health care system that draws frequent derision abroad.

These explanations share one thing in common: Though seemingly sensible, all have been debunked by research on shootings elsewhere in the world. Instead, an ever-growing body of research consistently reaches the same conclusion.

The only variable that can explain the high rate of mass shootings in America is its astronomical number of guns.

# A Look at the Numbers

The top-line numbers suggest a correlation that, on further investigation, grows only clearer.

Americans make up about 4.4 percent of the global population but own 42 percent of the world's guns. From 1966 to 2012, 31 percent of the gunmen in mass shootings worldwide were American, according to a 2015 study by Adam Lankford, a professor at the University of Alabama.

Adjusted for population, only Yemen has a higher rate of mass shootings among countries with more than 10 million people — a distinction Mr. Lankford urged to avoid outliers. Yemen has the world's second-highest rate of gun ownership after the United States.

Worldwide, Mr. Lankford found, a country's rate of gun ownership correlated with the odds it would experience a mass shooting. This relationship held even when he excluded the United States, indicating that it could not be explained by some other factor particular to his home country. And it held when he controlled for homicide rates, suggesting that mass shootings were better explained by a society's access to guns than by its baseline level of violence.

# Factors That Don't Correlate

If mental health made the difference, then data would show that Americans have more mental health problems than do people in other countries with fewer mass shootings. But the mental health care spending rate in the United States, the number of mental health professionals per capita and the rate of severe mental disorders are all in line with those of other wealthy countries.

A 2015 study estimated that only 4 percent of American gun deaths could be attributed to mental health issues. And Mr. Lankford, in an email, said countries with high suicide rates tended to have low rates of mass shootings — the opposite of what you would expect if mental health problems correlated with mass shootings.

Whether a population plays more or fewer video games also appears to have no impact. Americans are no more likely to play video games than people in any

other developed country.

Racial diversity or other factors associated with social cohesion also show little correlation with gun deaths. Among European countries, there is little association between immigration or other diversity metrics and the rates of gun murders or mass shootings.

# A Violent Country

America's gun homicide rate was 33 per million people in 2009, far exceeding the average among developed countries. In Canada and Britain, it was 5 per million and 0.7 per million, respectively, which also corresponds with differences in gun ownership.

Americans sometimes see this as an expression of deeper problems with crime, a notion ingrained, in part, by a series of films portraying urban gang violence in the early 1990s. But the United States is not actually more prone to crime than other developed countries, according to a landmark 1999 study by Franklin E. Zimring and Gordon Hawkins of the University of California, Berkeley.

Rather, they found, in data that has since been repeatedly confirmed, that American crime is simply more lethal. A New Yorker is just as likely to be robbed as a Londoner, for instance, but the New Yorker is 54 times more likely to be killed in the process.

They concluded that the discrepancy, like so many other anomalies of American violence, came down to guns.

More gun ownership corresponds with more gun murders across virtually every axis: among developed countries, among American states, among American towns and cities and when controlling for crime rates. And gun control legislation tends to reduce gun murders, according to a recent analysis of 130 studies from 10 countries.

This suggests that the guns themselves cause the violence.

# Comparisons in Other Societies

Skeptics of gun control sometimes point to a 2016 study. From 2000 and 2014, it found, the United States death rate by mass shooting was 1.5 per one million people. The rate was 1.7 in Switzerland and 3.4 in Finland, suggesting American mass shootings were not actually so common.

But the same study found that the United States had 133 mass shootings. Finland had only two, which killed 18 people, and Switzerland had one, which killed 14. In short, isolated incidents. So while mass shootings can happen anywhere, they are only a matter of routine in the United States.

As with any crime, the underlying risk is impossible to fully erase. Any individual can snap or become entranced by a violent ideology. What is different is the likelihood that this will lead to mass murder.

In China, about a dozen seemingly random attacks on schoolchildren killed 25 people between 2010 and 2012. Most used knives; none used a gun.

By contrast, in this same window, the United States experienced five of its deadliest mass shootings, which killed 78 people. Scaled by population, the American attacks were 12 times as deadly.

## Beyond the Statistics

In 2013, American gun-related deaths included 21,175 suicides, 11,208 homicides and 505 deaths caused by an accidental discharge. That same year in Japan, a country with one-third America's population, guns were involved in only 13 deaths.

This means an American is about 300 times more likely to die by gun homicide or accident than a Japanese person. America's gun ownership rate is 150 times as high as Japan's. That gap between 150 and 300 shows that gun ownership statistics alone do not explain what makes America different.

The United States also has some of the weakest controls over who may buy a gun and what sorts of guns may be owned.

Switzerland has the second-highest gun ownership rate of any developed country, about half that of the United States. Its gun homicide rate in 2004 was 7.7

per million people — unusually high, in keeping with the relationship between gun ownership and murders, but still a fraction of the rate in the United States.

Swiss gun laws are more stringent, setting a higher bar for securing and keeping a license, for selling guns and for the types of guns that can be owned. Such laws reflect more than just tighter restrictions. They imply a different way of thinking about guns, as something that citizens must affirmatively earn the right to own.

## The Difference Is Culture

The United States is one of only three countries, along with Mexico and Guatemala, that begin with the opposite assumption: that people have an inherent right to own guns.

The main reason American regulation of gun ownership is so weak may be the fact that the trade-offs are simply given a different weight in the United States than they are anywhere else.

After Britain had a mass shooting in 1987, the country instituted strict gun control laws. So did Australia after a 1996 shooting. But the United States has repeatedly faced the same calculus and determined that relatively unregulated gun ownership is worth the cost to society.

That choice, more than any statistic or regulation, is what most sets the United States apart.

"In retrospect Sandy Hook marked the end of the US gun control debate," Dan Hodges, a British journalist, wrote in a post on Twitter two years ago, referring to the 2012 attack that killed 20 young students at an elementary school in Connecticut. "Once America decided killing children was bearable, it was over."

A version of this article appears in print on November 8, 2017, on Page A15 of the New York edition with the headline: Only One Thing Explains Mass Shootings in the United States.

© 2018 The New York Times Company

# Exhibit 18

VICE CHANNELS



# How the Government Makes Gun Records Impossible to Trace

**The agency gets more than 1,000 requests for gun traces each day. But even small-town libraries have better record-keeping systems.**

SHARE   TWEET 

**Dan Friedman**
Sep 6 2016, 12:28pm

ADVERTISEMENT



REAL STATE

WATCH NOW

Mailroom supervisor Teena Younkins unloads boxes at the ATF National Tracing Center on June 23, 2010. Photo by Ricky Carioti/The Washington Post via Getty Images

VICE CHANNELS

*This post originally appeared on the Trace.*

The trace starts with a call or fax to the National Trace Center in Martinsburg, West Virginia. A police department has recovered a gun at a crime scene that was bought from a dealer that has since gone out of business. The inquiring officer turns to the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to find out who purchased the weapon and when.





Federally licensed gun dealers are required to submit sales records to the ATF when they close up shop. The agency has acquired a massive library of such records: some 285 million, which it scans and digitizes. Those documents are saved into one of the 25 "data systems" that help the ATF source guns used in crimes.

The physical records, some 8,000 boxes, are then stashed away in the Trace Center building. Another 7,000 or so are kept in nine shipping containers outside. They are stored there to keep the floor inside from collapsing. The good news is that agents usually don't need to search the boxes by hand. The bad: The computerized system isn't much better.



Waiting for pagead2.googlesyndication.com...



ADVERTISEMENT

The ATF's record-keeping system lacks certain basic functionalities standard to every other database created in the modern age. Despite its vast size, and importance to crime fighters, it is less sophisticated than an online card catalog maintained by a small town public library.

To perform a search, ATF investigators must find the specific index number of a former dealer, then search records chronologically for records of the exact gun they seek. They may review thousands of images in a search before they find the weapon they are looking for. That's because dealer records are required to be "non-searchable" under federal law. Keyword searches, or sorting by date or any other field, are strictly prohibited.

The government takes making gun records difficult to search quite seriously. A Government Accountability Office report released last month concluded that in two data systems, the ATF did not always comply with "restrictions prohibiting consolidation or centralization" of records. The GAO, which is tasked with making sure federal agencies follow the law, was essentially chiding the ATF for making it a bit easier for its hundreds of investigators to do their jobs.

Alarmed headlines from conservative publications followed. A Fox News pundit even falsely claimed the report had found that the ATF had "a list of every gun owner and every gun owned."

Congress imposes conflicting directives on the ATF. The agency is required to trace guns, but it must use inefficient procedures and obsolete technology. Lawmakers in effect tell the agency to do a job but badly.

At this point, you likely have some questions. We're here to help.





### Why are there so many boxes of records anyway?

Until very recently, gun dealers were prohibited from using electronic, cloud-based computing systems unless the ATF granted them specific permission to do so. As a result, many records are on index cards, water-stained paper, or, in some instances, even toilet paper and napkins.

### What happens when the ATF acquires a box of records?

Investigators scan and save them as digital image files. They are like online piles of paper, or PDFs, arranged by one field only.

### How can a database be "non-searchable"?

Trick question: The system can't really be considered a database—there is a reason the ATF uses the phrase "data systems" instead. There is no ability to search the text of a file, and no effort is made to tag files with identifiers that could later be used to sort and search.

"We compare it to an electronic card catalog system, where records are digitally imaged, but not optimized for character recognition," ATF spokesman Corey Ray said.



ADVERTISEMENT

neat

Tax Season Hangover?

GET NEAT TODAY



ADVERTISEMENT

### Why is the ATF required to trace guns but with crappy technology?

The 1968 Gun Control Act gave the ATF authority to regulate federally licensed gun dealers. In 1978, the ATF tried to make dealers report most quarterly sales. The National Rifle Association and other groups attacked the plan and lobbied to kill the reporting requirement. Congress did as the gun lobby requested, blocking the quarterly report proposal and reducing the ATF's budget by $5 million, which happened to be the amount the agency had sought to update its computer capacity.

"From that point on, if you even said 'computer' at ATF headquarters, everybody ran and hid in a closet," said William Vizzard, a former ATF special agent and emeritus professor of criminal justice at California State University, Sacramento.

The war on searchable technology continued. In 1986, Congress enacted the Firearms Protection Act, which bans the ATF from creating a registry of guns, gun owners, or gun sales. Federal lawmakers have also put a rider barring the agency from "consolidation or centralization" of gun dealers' records in every spending bill affecting the agency from 1979 through 2011. At that point, Congress made the prohibition permanent, under law.

### Why can't the ATF use technology ten-year-olds have in their phones?

First comes keyword searches, and the next thing you know, you have national gun registries. That, at least, is the rationale for the law that prevents the ATF from creating a searchable system. Gun rights groups argue that once the government has a list of firearms, it could use that list to confiscate weapons from private citizens.



ADVERTISEMENT



VICE CHANNELS





ADVERTISEMENT

WATCH NOW

## How did the ATF skirt the rules meant to guard against searchability?

Many ATF traces are conducted on guns sold by active dealers. The ATF gives servers to these dealers, upon request, so that they can upload sales records. This saves both parties time: The ATF can conduct a trace without contacting a dealer in every instance, and the dealer doesn't have to spend time handling ATF requests.

When a dealer with a server goes out of business, it hands over that server to the ATF. Between 2000 and 2016, the ATF consolidated all the data from these defunct servers into one data system. But the GAO determined that the agency is not allowed to combine records in that fashion. Thus chastened, the ATF has deleted all 252 million records on the server.

## What is the consequence of restricting the ATF's use of data?

The ATF processes a high number of trace requests: 372,992 last year alone. The agency says a trace takes on average four to seven business days to complete.

If it wasn't for the ban on consolidating data into a searchable system, the ATF could create a database that allowed investigators to immediately check the sales history of any gun used in a crime. The National Trace Center itself, and its 300-plus employees, likely would be obsolete if the ATF were permitted to create a modern, searchable database.

Still, the ATF claims the current system is adequate. "ATF considers the process in place efficient, especially when you consider that most urgent traces are completed within hours—if not minutes—of the request," Ray said.

ADVERTISEMENT



# Exhibit 19

Ⓑ

Politics

# NRA has long history of suppressing data on gun violence



SETH PERLMAN/ASSOCIATED PRESS/FILE

**The NRA believes high-volume stores would become unfairly characterized if gun data were shared publicly.**

**By Annie Linskey**

GLOBE STAFF   MARCH 25, 2018

WASHINGTON — After the high school shootings that killed 17 people in Parkland, Fla., gun control advocates have seized the momentum with attacks on the National Rifle Association and captured public attention with Saturday's nationwide protests.

But the powerful gun lobbying group has a strong, little-known defense against challenges to its absolutist stand on the Second Amendment: federal limits on both research into guns and the distribution of data about the industry.

ADVERTISING



Laws backed by the NRA and other pro-gun groups prevent the public from seeing which firearms dealers are selling the most guns used in crimes, information the federal government collects but won't share, even with premier research universities. The NRA also pushed through rules that had a chilling effect on federal studies focused on how guns affect public health, denying policy makers a road map for better gun laws.

Congress took a small step to loosen restrictions against gun-violence research sponsored by the Centers for Disease Control and Prevention in its budget plan approved last week, but significant appropriations hurdles will remain before the research can restart.

Detractors say the NRA is using a tactic similar to the tobacco industry's suppression of evidence about the health dangers of smoking. The difference: Big tobacco ultimately failed in its efforts while the pro-gun groups have successfully beaten back most legislation they oppose.

The NRA disputes the notion that it's cutting off scientific study.

"Anyone who thinks there's a lack of researchers studying firearms has been ignoring the headlines," said Lars Dalseide, an NRA spokesman. "The fact is a number of studies are released every year. While most are tainted with preconceived outcomes in search of supporting data, there is plenty of funding in that arena."

Gun control supporters were able to use the public outrage over the Parkland shootings to notch a rare victory when the Florida Legislature passed measures that include an increase in the minimum age to own a gun from 18 to 21.

Most gun deaths in the country aren't the result of mass shootings. In cities such as St. Louis, Baltimore, and Detroit, where gun violence is rampant, residents have no access to the bigger picture that might show why so many weapons have flowed into their cities.

The difficulty in gaining access to gun data, or in conducting federally funded research, is the result of decades of work by the NRA. The powerful lobbying group has ensured that legislation — initially attached as riders to larger bills — became law.

One federal law, approved in 1996 and named for Jay Dickey, a former Republican congressman from Arkansas, specified that the Centers for Disease Control and Protection could not conduct research intended to bolster gun control advocacy.

Congress, in its budget bill that was signed by President Trump on Friday, included a provision clarifying that the rule was not meant to choke off all gun research. But the Dickey amendment was never the only reason gun-violence research was curtailed, and therefore advocates are uncertain whether changing it will mean new money will flow into research.

The 1996 provision came amid a massive fight the NRA picked over the role of the National Center for Injury Prevention and Control, which is part of the CDC.

"They wanted to abolish the whole injury center," said Mark Rosenberg, who was the director of the National Center for Injury Prevention and Control when the Dickey Amendment passed as part of a spending bill. Congress compromised; rather than defunding the entire center, lawmakers settled on a narrowly written amendment that barred the CDC from conducting research that advocated for gun control.

> "
>
> *'Most of these gun shops are not in the inner cities. They are out in the suburbs. '*
> *— William Evans, Boston police commissioner*

"This was really a warning shot. A shot across the bow," Rosenberg said. Congress sent another message when it reduced the center's budget by $2.5 million, the exact amount that CDC had used to fund a gun-related study that the NRA disliked.

The final warning came in 1999: Rosenberg was fired from his job.

"People got the message that this is a very hard area to work in. If you're a researcher, you're not going to get funded. If you're in the federal bureaucracy, you're going to get hassled," Rosenberg said.

Dickey, before he died in 2017, forged a friendship with Rosenberg and told NPR in 2015 that he regretted pushing the amendment that has been credited with choking research.

The 2003 Tiahrt Amendment, part of a Justice Department appropriations bill, created a barrier to releasing data, one that has been almost insurmountable to researchers. It stops the Bureau of Alcohol, Tobacco, Firearms and Explosives from sharing information about gun stores that have records of selling firearms that wind up in crime scenes.

When a police department finds a gun used in a crime, it typically asks the ATF to trace the weapon back to the original sale, enabling law enforcement to figure out who initially bought the gun and who sold it. When it was available to the public, such aggregated data provided a powerful way to bring public pressure on gun dealers with terrible records for selling crime guns.

"The inner cities face the violence more than everybody else," said Boston Police Commissioner William Evans. "We see the young kids getting killed. Most of these gun shops are not in the inner cities. They are out in the suburbs. They are interested in making money."

In Massachusetts, law enforcement agencies had roughly 2,000 crime guns traced in 2016, according to the most recent data from ATF. Most of those weapons were purchased out of state, with New Hampshire, Maine, and Florida accounting for the largest supply of such guns to the Bay State.

"We're trying to figure out how we can stem the flow," said Evans, who added that many of the crime guns found in Boston originated from states with lax purchasing laws.

But private researchers and the public don't have more granular data showing which counties or specifically which gun stores are providing the weapons. Police departments are limited, too, and can only obtain trace data about crime guns found on their streets, though they can share this data with other police departments.

"It's critical information," said Lindsay Nichols, who is the federal policy director at the Giffords Law Center to Prevent Gun Violence.

Before the Tiahrt restrictions applied, researchers used the federal data to gain a sophisticated understanding of how guns went from legitimate seller to criminal. "We started to see some really important patterns," said Daniel Webster, a professor of health policy and management at the Johns Hopkins Bloomberg School of Public Health.

Most important, Webster and others found a huge disparity in gun dealers: Roughly 1 percent of all gun stores in the country accounted for more than half of the crime guns the ATF traced in the late 1990s, according to a Hopkins report. And in some cities, Webster found that just a few

stores were responsible for selling weapons recovered in 70 percent to 90 percent of all gun crimes.

Todd Tiahrt, who as a Republican from Kansas was the initial sponsor of the restriction in a 2003 amendment, said in an interview that the main point of his legislation was to prevent the public release of data on gun owners.

"The idea was to protect the privacy of American citizens," said Tiahrt, who left Congress in 2011 and now runs a consulting firm.

The NRA has additional concerns. The group fears that high-volume stores would become unfairly painted as bad actors due to the simple fact that any establishment selling more guns is likely to have more guns end up at crimes scenes. Or, it points out, stores located near major freeways might also be used more frequently by criminals going out of state to purchase a weapon.

The gun rights advocates say the ATF has plenty of authority to shut down stores that repeatedly sell to criminals. But experts counter that the bureau has limited resources.

"Congress makes sure that the ATF budget is insufficient to do its job," said Webster, the Hopkins professor. "It makes sure that the way it's written laws and regulations, [it is] incredibly difficult to shut down a gun shop."

Regardless of whether federal agents are willing to act, Webster said communities should be able to publicly protest stores. He gave the example of the Valley Gun Shop, an infamous dealer in Baltimore County that was shut down after a decade of supplying guns to criminals.

"If I'm living in the shadows of Valley Gun, and I know the rates that those guns end up at crime scenes, I'm boycotting that store. I'm picketing it," Webster said. "Localities need to know this information. Community residents should know it."

*Annie Linskey can be reached at annie.linskey@globe.com. Follow her on Twitter @annielinskey.*

© 2018 Boston Globe Media Partners, LLC

# Exhibit 20

**REDACTED FOR PUBLIC RELEASE**



# Office of the Inspector General
## U.S. Department of Justice

**OVERSIGHT ★ INTEGRITY ★ GUIDANCE**



# Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives Controls over Weapons, Munitions, and Explosives

**REDACTED FOR PUBLIC RELEASE**

Redactions of information that ATF considered to be law enforcement sensitive, and therefore not appropriate for public release, were made to the full version of this report.

Audit Division 18-21                                    March 2018

**REDACTED FOR PUBLIC RELEASE**



# Executive Summary

*Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives Controls over Weapons, Munitions, and Explosives*

## Objectives

The objectives of this audit were to evaluate: (1) the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) controls over weapons, munitions, and explosives; (2) ATF compliance with policies governing weapons, munitions, and explosives; and (3) the accuracy of ATF's weapons, munitions, and explosives inventories.

The audit covers ATF's weapons and munitions inventories, including firearms, Tasers, ammunition, chemical agents, diversionary devices, and explosives, as well as seized weapons, ammunition, and explosives inventories from fiscal years (FY) 2014 through 2017. To accomplish our objectives, we interviewed ATF personnel, evaluated ATF's policies regarding property management, firearms, ammunition, explosives, and diversionary devices. We also reviewed documentation related to firearms that were reported as lost or stolen during the scope of our audit to determine whether ATF took appropriate action. Finally, we assessed compliance with ATF policy and conducted physical inventories at 16 ATF locations.

## Results in Brief

We found that ATF generally has strong physical controls over ATF-owned firearms and explosives. We also found that ATF has strong inventory controls over its firearms. However, we identified deficiencies related to munitions tracking, the accuracy of ATF's munitions inventories, and compliance with munitions and explosives policy. We also identified areas where ATF's policies should be strengthened to improve the safeguarding and accountability of ATF-owned and seized weapons and munitions.

## Recommendations

Our report contains 10 recommendations to improve ATF's controls over its ammunition, explosives, less lethal munitions, as well as its seized weapons and ammunition. ATF's response to the draft report appears in Appendix 2 and our analysis of the response, as well as a summary of actions necessary to close the recommendations, appears in Appendix 3 of this report.

## Audit Results

As of October 2017, ATF reported 35,527 firearms, Tasers, and silencers in its inventory. In addition, ATF seizes around 23,000 weapons each year as a result of its criminal enforcement activity. ATF also operates five Special Response Teams that use a variety of specialty weapons and less-lethal munitions. Additionally, ATF maintains large quantities of explosives at its National Center for Explosives Training and Research (NCETR), as well as small quantities of explosives at its field divisions for training and demonstration purposes.

***ATF Weapons*** - We found that ATF has strong controls over its own weapons, including firearms, Tasers, and silencers, which are tracked through Sunflower – the ATF's electronic property management system. During our physical inventory, we were able to locate all weapons selected for our sample and trace a sample of weapons back to Sunflower, although we noted some data errors in Sunflower. While we verified all of the weapons in our sample, we noted that between FYs 2014 and 2017, ATF reported 26 instances of lost, stolen, or missing firearms. However, we determined that the monthly rate of loss decreased by over 55 percent since a prior 2008 Office of the Inspector General (OIG) audit.

***ATF Ammunition*** - We found that ATF's controls over its ammunition inventories remain inadequate and do not provide accurate inventory counts. This is particularly concerning considering that prior Treasury and Department of Justice (DOJ) OIG audits – the first of which was over 15 years ago – identified and ATF developed policies to address control weaknesses over its ammunition inventories. Specifically, we found that ATF is not adequately tracking ammunition, which is considered a sensitive item. Based on the results of our physical inventory of ammunition at 13 sites, we found that the ammunition tracking records were understated by almost 31,000 rounds. Given that ATF has over 275 offices, the quantity of ammunition that is unaccounted nationwide is likely much greater. We also found that ATF commingled different types of ammunition on its tracking records and did not maintain tracking records for some of its ammunition. Finally, we identified concerns related to the physical security of ATF's



# Executive Summary

*Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives Controls over Weapons, Munitions, and Explosives*

ammunition at several locations, as well as compliance with ATF policy over ammunition.  In our judgment, these practices create a risk that the ammunition may be lost, misplaced, or stolen without detection.

***ATF Explosives*** - ATF maintained explosives inventories at 9 of the 16 sites included in our audit.  Based on our review, we found that ATF generally had strong physical controls over its explosives.  However, during our physical inventory at NCETR, we identified two types of explosive materials for which the quantity on hand was less than the balance recorded on the explosives log.  In both instances, ATF personnel did not follow procedures for conducting explosives inventories.  Therefore, ATF cannot provide evidence that the explosives were not lost or stolen.  We also identified multiple instances at NCETR where the types and quantities of explosives received did not match the paid vendor invoice.  The differences were due to product substitutions or changes in quantity made by the vendor when the requested items were not available or not available in the quantity requested.  While the product substitutions and quantity changes may be fully acceptable, without proper documentation it appears as if ATF approved and paid an invoice for items it did not receive and received items that it did not order.

***ATF Less Lethal Munitions*** - We found that ATF generally had strong physical controls over its less lethal munitions.  However, during our audit we found that ATF did not have policy specifically related to tracking most of its less lethal munitions.  We also identified discrepancies during our physical inventories of less lethal munitions.  As a result, less lethal munitions may be lost, misplaced or stolen without detection.  Furthermore, we identified issues related to compliance with policy over the Miami Special Response Teams' storage of Noise Flash Diversionary Devices, commonly referred to as flash bang grenades, which are considered high explosives.

***Seized Firearms, Ammunition, and Explosives*** - During our physical inventory of seized weapons and munitions, we were able to locate all items in our sample and trace a sample of items back to ATF's evidence tracking system.  We also found that while ATF lost only two seized firearms between FY 2014 and FY 2017, it mistakenly destroyed 27 seized firearms.  Finally, we identified seized firearms and other evidence being stored outside the inner evidence vault, often in plain sight of any ATF personnel with access to the outer vault, which creates a risk that the evidence may be lost, misplaced, stolen, or otherwise compromised.

# Exhibit 21

# Seattle to destroy $30K in used police guns so they don't get 'into the wrong hands'



*Ed Murray, mayor of Seattle waits for President Obama to arrive at SeaTac on Friday, June 24, 2016. (Mike Siegel/The Seattle Times via AP, Pool) more >*

By Jessica Chasmar - The Washington Times - Thursday, June 30, 2016

The Seattle City Council has voted unanimously to melt down the Seattle Police Department's old firearms instead of selling them, the latest step in Mayor Ed Murray's push to reduce gun violence in the city.

The measure was introduced by the mayor and Councilwoman Sally Bagshaw as a step to reduce the number of guns in the country, a local CBS News affiliate, KIRO 7, reported.

"We're going to take the guns and destroy the guns," Mr. Murray told the station. "They're not going to be resold anywhere."

The police department estimated that the plan will cost $30,000 in potential sales each year, but called the size of the budget impact "negligible."

Mr. Murray said it's gun violence that's costing the nation "an incredible amount of money."

"Gun violence is a huge problem for every city in America, and mayors around the country are struggling with what I'm struggling with: How do we reduce the number of guns when Congress won't act? When state legislatures often don't act?" he asked.

Mr. Murray couldn't cite a specific example when a retired Seattle police gun got into the wrong hands.

"You know, there are just too many guns getting into the wrong hands," he said. "They may be part of a crime in another city. The point is that we are not an island."

Seattle police Sgt. Sean Whitcomb also couldn't recall a retired Seattle police gun being used in a crime.

The Second Amendment Foundation, based in Bellevue, called the resolution "stupid," KIRO 7 reported.

The guns that the Police Department would dispose of would go to a licensed dealer and anybody who bought one from a dealer would go through a background check," the group's founder, Alan Gottlieb, said. "The funds being lost by not trading them in or selling them could have been used for better equipment for the police to protect all of us."

The Seattle Police Department has not said how many guns would likely be destroyed each year or how much it would cost to melt them down.

Copyright © 2018 The Washington Times, LLC. Click here for reprint permission.

**The Washington Times Comment Policy**

The Washington Times welcomes your comments on Spot.im, our third-party provider. Please read our Comment Policy before commenting.

## Popular In the Community

**BOY SCOUTS TO PROVIDE CONDOMS AT UPCOMI...**

✳ **GoldSnow**
2d

This is the death-knell of the Boy Scouts.

**DEMOCRATS, DESPERATE, FACE DOOZY OF...**

**Dave Miller**
7h

The criminal organization that's...

# Exhibit 22

# ATF warns Southern California law enforcement officers may be illegally selling guns



ATF in Los Angeles sends a memo to police agencies saying there is an "emerging problem" with law enforcement officers selling guns without a federal firearms license. Some sold more than 100 guns.

By **Greg Moran and Lyndsay Winkley**

---

SHARE THIS 

Head of the ATF's Los Angeles Field Division calls this "an emerging problem."

---

APRIL 12, 2017, 7:15 PM

The head of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives in Los Angeles has sent a memo to Southern California police chiefs and sheriffs saying the agency has found law enforcement officers buying and reselling guns in what could be a violation of federal firearms laws.

The March 31 memo from Eric Harden, the ATF's Los Angeles Field Division special agent in charge, describes the finding as an "emerging problem" the agency has become aware of, and he expressed concern about "the growing trend of law enforcement officials engaging in the business of unlicensed firearms dealing."

He did not say how many officers the agency has found purchasing and reselling weapons, but the memo says some officers had bought more than 100 firearms. Some of the guns have been recovered at crime scenes.

Harden said this is a training and education problem.

"It is our goal to educate, not investigate, to ensure law enforcement officials comply with federal laws in order to avoid unnecessary public embarrassment to themselves and your Department/Agency," Harden wrote.

His memo, obtained by The San Diego Union-Tribune, focuses on the purchase and resale of "off roster" firearms. Those are guns that are not on an approved roster of weapons that can be sold to the public.

The California law establishing the roster has an exemption that allows sworn peace officers to purchase such weapons, however. Another exception allows officers to resell the guns under certain conditions.

But if officers are buying and reselling multiple weapons for profit as a business, they need a federal firearms license, or FFL.

The lack of a license is the conduct that ATF has uncovered and is the subject of the memo.

"Recently, ATF has discovered that some law enforcement officers who do not have an FFL are purchasing 'off roster" firearms ... and reselling those firearms to non-law enforcement entities for a profit," Harden wrote.

That amounts to a violation of federal law of selling firearms without a federal license, the memo said. In addition, if a gun is bought with the intent to sell it later or buy it on behalf of someone else and that was not disclosed on federal transaction records — known as a "straw purchase" — that also breaks federal law for lying on a federal firearms form.

Selling without a license can carry a maximum sentence of five years in prison. Lying on the federal form carries a maximum 10-year penalty.

It is unclear when the ATF discovered the problems, nor what specifically prompted the memo.

Ginger Colbrun, spokeswoman for the ATF Los Angeles office, said the agency noticed that firearms recovered at crime scenes were then traced and some showed they had been purchased within the past three years.

That "time to crime" measure developed by the ATF shows the time frame from when a gun is sold by a licensed dealer to when it is recovered by police during a criminal investigation. The national average is 10 years. A shorter time period can indicate the gun was the product of a straw purchase — bought in order to be sold quickly.

After spotting the trend in routine trace reports, the agency looked closer, Colbrun said. "After further investigation, ATF noticed some law enforcement officers had been making significant purchases of firearms," she said.

She declined to be more specific, saying there were ongoing investigations.

Colbrun also said the memo, addressed to "Dear Law Enforcement Partner," didn't indicate law enforcement officers who might be breaking federal gun laws were getting special treatment by being offered a chance to be educated by the ATF and not prosecuted by federal authorities.

"There is no extra consideration," she said. "We believe the most effective way to stop the behavior is to educate law enforcement in what the laws are and aren't."

The California Police Chiefs Association, which represents chiefs and sheriffs across the state, emailed the memo to its members Tuesday morning.

Local police leaders, including San Diego Police Chief Shelley Zimmerman, Sheriff Bill Gore and Escondido Police Chief Craig Carter, then forwarded the memo on to their departments, officials said Wednesday.

Carter said the email was unexpected. "We hardly ever get an email (from the ATF) if there isn't an issue," he said. "Whether that issue is in this county or somewhere else in the state, I don't know."

He also said he was unaware of any officers or deputies who were being investigated by ATF in San Diego County, but added he may not know of cases being handled by the federal agency.

"I sent it out to every single one of my cops saying, 'Don't forget. This is the way it's supposed to be done.' ...I felt (the memo) was a reminder that these are the rules and we are not exempt from them," Carter said.

Representatives of the San Diego County Sheriff's Department and the San Diego Police Department also said there were no ongoing firearm sale investigations that they are aware of involving their officers or deputies.

Federal prosecutions of state law enforcement officers for selling off-roster weapons are rare. The most recent occurred in Sacramento County, when former Sheriff's Deputy Ryan McGowan was found guilty in June 2015 of selling guns illegally and falsifying federal records to do it.

Prosecutors said he sold 25 guns at an inflated price between 2008 and 2011. McGowan also worked with a licensed gun shop to further circumvent federal law.

One sale involved a buyer who converted two guns to assault weapons and later got into a six-hour standoff with a SWAT team, according to the Sacramento Bee.

This past June, he was sentenced to 18 months in prison.

**Twitter: @gregmoran**

**greg.moran@sduniontribune.com**

Copyright © 2018, The San Diego Union-Tribune

**This article is related to:** Law Enforcement, San Diego County, San Diego Police Department

# Exhibit 23

# Cop convicted of illegal gun dealing sold weapon used in murder

**By Scott Glover, Scott Bronstein and Drew Griffin, CNN Investigates**

🕐 Updated 6:14 AM ET, Wed May 2, 2018



**BREAKING NEWS**                                                                    ✕

President Trump posthumously pardons black heavyweight boxer Jack Johnson

U.S. +                                                                [ Live TV ]

**Ex-officer faces sentence for illegal gun sales** 03:03

**(CNN) —** As a Washington, DC, police officer, Richard Wince knew firsthand about the dangers of black market gun sales and the inherent risk of weapons ending up in the wrong hands.

But that didn't stop him from illegally dealing firearms while off-duty. Prosecutors say he supplied weapons to people who couldn't buy them legally, including a troubled former Marine reservist deemed "mentally incompetent."

Wince sold the 29-year-old former Marine an AK-47 that he used to kill himself about two weeks later, according to court documents reviewed by CNN. Another weapon Wince sold "was used in a murder," the documents state. Authorities declined to provide details about the slaying.

Wince told federal authorities he was "addicted" to websites devoted to buying, selling and trading guns and sold up to two dozen firearms even after he had been questioned by agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives over how one of his guns ended up in the hands of a convicted felon, according to court documents.



Former Washington, DC, police officer Richard Wince has pleaded guilty to dealing firearms without a license.

Peter Newsham, chief of Washington's Metropolitan Police Department, where Wince worked until earlier this year, called his former officer's crimes "a disgrace."

"It's embarrassing for us to have a member of this agency out there illegally selling firearms," Newsham said. "Because people will attribute that behavior to every single one of us who wears this uniform."

The case against Wince offers a glimpse into the problem of unregulated firearms sales in America at a time of fierce national debate over gun control. Law enforcement officials say unlicensed dealers such as Wince provide a steady flow of weapons to criminals who can't buy them legally.



Wince, 51, pleaded guilty to dealing firearms without a license earlier this year. He is scheduled to be sentenced in federal court Wednesday in Richmond, Virginia.

He declined comment for this article.

In a court filing, Wince's attorney described his client as a "devoted husband and father" with "a long history of service to his country." Wince served as a military police officer in the US Navy, as a deputy with the Chesterfield County, Virginia, sheriff's department and, until January, as an officer with Washington's Metropolitan Police Department, according to court records. In all, he spent "more than thirty years" in law enforcement, Wince's filing states.

**Related Article:** How gun background checks work



RICHARD WINCE/FACEBOOK

Wince told federal agents he was "addicted" to websites devoted to the firearms trade.

Wince first came to the attention of the ATF in 2015, when agents discovered that a .38 revolver he once owned turned up in the possession of a "multi-convicted felon" named Darryl Freeman.

The agents interviewed Wince, who told them he collected guns as a hobby and would occasionally buy and sell them over the internet.

As a hobbyist engaged in occasional sales, he would not have been required under federal law to perform background checks on buyers and maintain paperwork on the guns he bought and sold -- as licensed dealers are required to do. Wince told the agents he could not find any records relating to the sale of the .38.

During their interview, court records show, the agents advised Wince that it was a violation of federal law to repeatedly sell guns for a profit without having a license.

The matter might have ended there, but Wince's name would come up again nine months later, resulting in renewed scrutiny of his status in the firearms trade.

That happened when sheriff's deputies in rural Rockingham County, Virginia, were called to check on the well-being of a man who was renting a cabin in the area.

Deputies found a badly decomposed body in the woods. There was an AK-47 and a suicide note on the ground nearby.

There were also several pieces of identification bearing the name of Isaiah Janes.



Former US Marine reservist Isaiah Janes, who was prohibited from purchasing a weapon due to mental instability, bought a gun from a Washington, DC, police officer and used it to kill himself, according to court records.

Investigators spoke to Janes' mother and learned that he had been abusing alcohol and marijuana and had become delusional.

He was involuntarily committed to a psychiatric facility in San Diego a month earlier. As a result, he was prohibited from possessing a weapon.

When Janes returned to his family's home in Rhode Island, he attempted to buy a 12-gauge shotgun at a Dick's Sporting Goods store. But when the clerk conducted a required background check, Janes was identified as a prohibited possessor. The clerk refused the sale.

The law worked.

An ATF agent later called Janes on his cell phone, inquiring about the attempted purchase. Janes told him he didn't realize the incident in San Diego, which he attributed to a misunderstanding with a roommate, prevented him from possessing a gun. He assured the agent he did not have one.

How, then, did Janes get his hands on an AK-47?

When agents traced the weapon, it came back to Wince. The officer had purchased it online, then picked it up at the Dominion Shooting Range on June 21, 2016, court records show.

The GPS in Janes' rental car showed that he visited the same gun range four days later.



Special Agent Adam J. Ulery began searching websites devoted to gun sales and discovered more than 200 posts from users regarding transactions with the profile name "rwince," according to court documents. The phone number for the "rwince" profile matched the number Wince gave agents during their interview months earlier.

Ulery monitored Wince's account and noted that he posted several handguns, an AR-15 rifle and an AK-47 for sale. Wince's post for the AK-47 noted that it came with three magazines and that he would "throw in some ammo," according to court records.

**Related Articles from CNN - Everytown Alert:** gun trading site showed that Wince had made more than 400 posts related to firearms from June 2013 through April of last year.

**Texas massacre, military rushed to add more than 4,000 to gun ban list**

The ATF then set up a sting in which they used an undercover agent in an attempt to buy a gun from Wince.

The agent texted Wince and worked out a deal in which he agreed to pay $375 for a Smith & Wesson 9mm pistol -- a gun Wince had purchased at a police supply shop just a week earlier.

They met in the parking lot of gun store outside Richmond, Virginia. During the meeting, which was secretly recorded, "Wince never asked the undercover agent for any form of identification," court records state.

The agent told Wince he didn't mind a higher price for the gun since he didn't have to fill out paperwork.

Two days later, agents went to Wince's home outside Richmond. He told them he was "addicted" to spending time on two different websites devoted to the buying, selling and trading of guns, the affidavit states. He told the agents he'd made over 1,300 posts on one of the sites.

He told agents he takes photos of the identification of everyone to whom he sells.

They asked him about the AK-47 that turned up next to Janes' body.

"Wince advised that he sold it to a male who was in the military," the affidavit states, but could not provide any further detail about him.

Prosecutors said Wince sold the AK-47 to Janes in a parking lot and did not conduct a background check.



Janes tried to buy a 12-gauge shotgun from a Dick's Sporting Goods, but was turned down after a background check revealed he was prohibited from possessing weapons, according to court records.

Janes' father, Charles, called Wince's actions "abhorrent" because they "put at risk the lives of other human beings."

"It's doubly abhorrent because he was a law enforcement officer," the elder Janes told CNN.

As part of his plea, Wince admitted to illegally selling "at least eight, but no more than 24 firearms" following the initial contact by the ATF. Federal sentencing guidelines call for Wince to receive a prison term of one year to 18 months.

Wince's attorney argued for a lesser sentence than recommended, citing his service in the Navy and law enforcement.

Assistant US Attorney Peter S. Duffey, who is prosecuting the case, wrote that any credit Wince was entitled to for his service was erased by his conduct.

"The very nature and consequences of his actions made the defendant and his law enforcement colleagues less safe in the performance of their duties," he wrote.

*CNN's Aishvarya Kavi and Collette Richards contributed to this report.*



▶

Google Doodle honors Tamara de Lempicka


CNN
Underscored

Meet the exfoliator that visibly sloughs away dead skin



Teen who started fire that burned 48,000 acres ordered to pay $36 million


CNN
Underscored

A genius piece of smart luggage every modern traveler should have

Recommended by

# Exhibit 24

414

**Testimony of**

**Josh Horwitz, Executive Director, Coalition to Stop Gun Violence**

**before the**

**Subcommittee on Commerce, Justice, Science, and Related Agencies**

**of the House Appropriations Committee**

**on**

**Restrictions Imposed on the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Concerning the Release of Crime Gun Trace Data**

The Coalition to Stop Gun Violence (CSGV) thanks the Subcommittee on Commerce, Justice, Science, and Related Agencies for this opportunity to submit testimony in opposition to restrictions contained in previous appropriations for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) that prohibit the release of information contained in the Firearms Trace System database.  CSGV is a 501(c)(4) organization that advocates for progressive policies to reduce gun death and injury in the United States along with our sister organization, the Educational Fund to Stop Gun Violence, a 501(c)(3) affiliate.

The restrictions in question are commonly known as the "Tiahrt amendments" after their sponsor, Representative Todd Tiahrt of Kansas, who introduced them at the behest of the National Rifle Association.  The restrictions currently prohibit ATF from using appropriated funds to release crime gun trace data to anyone other than "a Federal, State, or local law enforcement agency or a prosecutor solely in connection with and for use in a bona fide criminal investigation or prosecution and then only such information as pertains to the geographic jurisdiction of the law enforcement agency requesting the disclosure."  There is also a prohibition on use of the data in civil litigation.

These restrictions prevent state and local officials, law enforcement agencies, and the American public from gaining access to basic information about firearms traced to crime and broader patterns of illegal gun trafficking.  It is becoming increasingly difficult for officials to identify the sources of crime guns that are being used in violent crimes in their communities.  This is hampering efforts to crack down on illegal gun trafficking across America.

Trace data illuminates patterns in firearms trafficking by revealing specific indicators such as guns' "time-to-crime" intervals, multiple crime gun traces to a single source, and higher-than-average gun sales.  In its 2000 *Youth Crime Gun Interdiction Initiative* reports, ATF acknowledged that the purpose of

1

415

disseminating such data is to provide "crime gun information to the Federal, State and local law enforcement agencies that submit trace requests, boosting their information resources for arresting gun criminals, responding to gun violence, and establishing a benchmark for crime gun measurements." Unfortunately, because of the Tiahrt amendments, this type of detailed, aggregate information is no longer available.

Prior to 2002, much of the crime gun trace data derived from ATF investigations *was* available to law enforcement, policy makers and the public. The ATF published multiple reports based on this information, including the *Youth Crime Gun Interdiction Initiative* series, which compiled information gleaned from extensive crime gun tracing in 52 cities (including Washington, D.C.). These reports provided a wealth of valuable data that was used by law enforcement agencies not just to solve existing crimes, but also to identify gun trafficking operations in their communities to prevent further crime.

Former US Attorney General John Ashcroft stopped the public dissemination of crime gun trace data in 2002 as a matter of Bush Administration policy. Subsequently, further restrictions on the data were inserted into annual appropriations for ATF. Each year, the Tiahrt amendments have become more stringent and restrictive.

This situation is particularly dangerous in the context of rising crime rates. In 2005, the percentage of violent crime in America saw its largest single-year increase in 14 years.[1] During that year, there were two violent gun crimes for every 1,000 individuals in the country, as compared to 1.4 per 1,000 in 2004.[2] Municipal officials across the country have pointed to criminals' easy access to firearms as a contributing factor. A 2006 report by the Police Executive Research Forum stated that "officials from one part of the country to the other [have] complained about the proliferation of handguns—a situation that could worsen if proposed federal legislation is passed that would restrict the [ATF] from sharing gun tracing information with local law enforcement agencies."[3]

Furthermore, there is little evidence to support arguments made to justify restricting access to crime gun trace data. In 2002, prior to the enactment of the Tiahrt amendments, the U.S. Court of Appeals for the Seventh Circuit rejected claims that the release of crime gun trace data could jeopardize ongoing law enforcement investigations. In an opinion ordering the release of data ATF had sought to withhold under the Freedom of Information Act, the court stated that "arguments that the premature release of this data might interfere with

---

[1]   Police Executive Research Forum, "Chief Concerns: A Gathering Storm—Violent Crime in America," p. 1 (2006).
[2]   U.S. Department of Justice, Bureau of Justice Statistics Bulletin, "Criminal Victimization, 2005," (September 2006).
[3]   Police Executive Research Forum, "Chief Concerns: A Gathering Storm—Violent Crime in America," p. 2 (2006).

2

416

investigations, threaten the safety of law enforcement officers, result in the intimidation of witnesses, or inform a criminal that law enforcement is on his trail are based solely on speculation." The court also noted that "there is a strong public policy in facilitating the analysis of national patterns of gun trafficking and enabling the City [of Chicago] to enforce its criminal ordinances." [4]

This view has been reinforced by other independent, respected entities. In 2004, in the study *Firearms and Violence: A Critical Review*, a committee of the National Academy of Sciences recommended that "appropriate access be given to data maintained by regulatory and law enforcement agencies, including the trace data maintained by the Bureau of Alcohol, Tobacco and Firearms" and stated that "the inadequacy of data on gun ownership and use is among the most critical barriers to better understanding of gun violence."

Law enforcement, policy makers and researchers need sound information on the illegal trafficking of firearms in order to develop and implement quality crime prevention policies. The current funding restrictions on ATF's release of crime gun trace data work against the public interest in safe communities. We respectfully request that these provisions be excluded from ATF's fiscal year 2008 appropriations legislation. Attached is language identifying the provision we request be excluded.

Thank you for allowing CSGV to submit testimony on this critical law enforcement, public safety, and homeland security issue.

**Attachment**

**LANGUAGE TO STRIKE RIDER ON CRIME GUN TRACE DATA
FROM COMMERCE, JUSTICE, SCIENCE APPROPRIATION**

Strike from Title I, under "General Administration -- Bureau of Alcohol, Tobacco, Firearms and Explosives -- Salaries and Expenses," the language starting with "*Provided further*, That no funds appropriated under this or any other Act with respect to any fiscal year may be used to disclose part or all of the contents of the Firearms Trace System database" and all that follows through "licensed manufacturer (as defined in section 921(a)(10) of such title)," as it appeared in the FY 06 bill (Public Law No. 109-108, 119 Stat. 2290) on pages 2295 and 2296.

---

[4]   *City of Chicago v. United States Department of Treasury, Bureau of Alcohol, Tobacco and Firearms*, 287 F.3d 628; 2002 U.S. App. LEXIS 7537 (7th Cir. 2002).

# Exhibit 25

412

## Statement of Paul Helmke, President of the Brady Campaign and Brady Center to Prevent Gun Violence united with the Million Mom March

Appropriations Committee, Subcommittee on Commerce, Justice, Science, and Related Agencies

House of Representatives

April 26, 2007

The Brady Campaign to Prevent Gun Violence, the nation's largest, non-partisan, grassroots organization dedicated to creating an America free from gun violence, strongly opposes provisions in recent appropriations bills funding the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") that weaken ATF's ability to enforce the nation's gun laws against corrupt or unscrupulous firearms dealers.  Beginning in fiscal year 2004, Congress has added and expanded provisions that hinder ATF's ability to crack down on gun criminals.

One of the most disturbing of the appropriations provisions unduly restricts ATF's ability to disclose information it maintains in the National Trace Center's firearms trace database.  In order to understand how this restriction hurts public safety, it is critical to review what ATF's crime gun trace data has enabled us to know about the issue of guns and crime.  Some examples include:

- Almost 60% of crime guns originate with only 1% of the nation's licensed gun dealers.

- 30% of traced crime guns move so quickly from licensed gun dealers into crime that they likely have been trafficked from dealers.

- Handguns sold in multiple sales account for 20% of traced crime guns.

- In cities and states with strong gun laws, crime guns frequently originate with licensed gun dealers in other states, thus showing that strong gun laws make it more difficult for criminals to access local sources of guns.

Crime gun trace data also has helped communities learn which gun dealers are contributing the most guns to the illegal market.  In short, ATF crime gun trace data has allowed the public to know that the illegal market is continuously supplied by guns diverted quickly to gun traffickers from a relatively small number of licensed gun dealers, through multiple gun sales, straw purchases and other means.

413

In its report *Without A Trace*, our affiliate, the Brady Center to Prevent Gun Violence, documents the numerous scholarly studies that have used crime gun trace data to give policymakers and the public a better understanding of the illegal market in guns. In addition to the studies released by ATF itself, trace studies have been done by researchers at Harvard University, Duke University, Johns Hopkins University, Northeastern University, the University of California at Davis and others. As Dr. Garen Wintemute of the University of California at Davis has said, "trace data are an unsurpassed way of studying guns used in crime." The current restrictions on trace data disclosure are crippling this needed research and depriving our nation of critical information needed to formulate the most effective policies on the life-and-death issue of violent gun crime.

In the past, the proponents of this legislative rider have argued that disclosure of crime gun trace data threatens to disclose undercover and other law enforcement operations against gun traffickers and corrupt dealers. This argument has no merit. For many years ATF had disclosed crime gun trace information to the public, while redacting any data it felt could compromise law enforcement investigations. The more recent restrictions are much broader than needed to protect law enforcement investigations. For instance, they even bar ATF itself from referring to aggregate trace data in its own reports thus depriving the public, along with government and law enforcement officials, of valuable information about guns and crime. There is no reason to believe that the reports issued by ATF containing crime gun trace data have compromised a single law enforcement investigation. Likewise, there is no evidence that the studies and reports based on ATF crime gun trace data previously published by scholars, advocacy groups, the media and other government agencies have revealed confidential ATF sources or adversely affected law enforcement activities.

Because of its harmful effect on public safety, there is strong and growing opposition to the trace data rider. Numerous national law enforcement organizations have stated their opposition to the provision, including the International Association of Chiefs of Police, Police Foundation, International Brotherhood of Police Officers, Hispanic American Police Command Officers Association, and the National Organization of Black Law Enforcement Executives. Additionally, more than 160 chiefs, sheriffs, and other law enforcement officials from across the country have urged Congress to repeal the provision. Mayors from more than 200 cities have also weighed in against the rider, from Portland, Maine to Pascagoula, Mississippi, and Fayetteville, Arkansas to Beaverton, Oregon.

To help communities fight gun violence, Congress should give ATF additional authority and more resources. But recent appropriations bills have prevented ATF from being a more powerful partner with state and local law enforcement in their efforts against gun crime. We urge you to repeal all riders in the Department of Justice bill that hinder ATF's enforcement power, including the undue limitations on the dissemination and use of the trace database.

# Exhibit 26

RIP

| ASSIGNED DATE | ASSIGNED TO | TRACE NUMBER | SERIAL # | REQUESTOR | PURCHASING LAW ENFORCEMENT AGENCY | COMPLETION DATE | CLOSE-OUT CODE | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 10/1/2013 | (b) (6), (b) (7)(C) | (b)(6),(b)(7)(C) | (b)(6),(b)(7)(C) | (b) (6), (b) (7)(C) | Kings County Human Services | 10/1/2013 | S4 | |
| 10/1/2013 | | | | | Rockford IL PD | 10/1/2013 | S4 | |
| 10/3/2013 | | | | | Pineville LA. PD. | 10/3/2013 | SH | |
| 10/3/2013 | | | | | Port Allen LA. PD. | 10/4/2013 | S4 | |
| 10/3/2013 | | | | | City of Kingsville PD | 10/4/2013 | DN | |
| 10/8/2013 | | | | | Berks County DA Office | 10/10/2013 | Wholesale | |
| 10/9/2013 | | | | | NY Waterfront Commission | 10/15/2013 | S4 | |
| 10/10/2013 | | | | | Baltimore PD | 10/11/2013 | Wholesale | |
| 10/15/2013 | | | | | Indianapolis PD | 10/15/2013 | S4 | |
| 10/16/2013 | | | | | Capitol Police | 10/17/2013 | OBR | |
| 10/21/2013 | | | | | Marta Police Department | 10/29/2013 | S2 | |
| 10/22/2013 | | | | | Allegheny County PD | 10/23/2013 | S5 | |
| 10/22/2013 | | | | | Pottawattamie County SO | 10/30/2013 | D5 | |
| 10/28/2013 | | | | | Lafayette AL. PD | 10/29/2013 | S4 | |
| 10/28/2013 | | | | | Marion County SO | 10/31/2013 | S4 | |
| 10/28/2013 | | | | | Colleton County SO | 11/4/2013 | D5 | |
| 11/1/2013 | | | | | Rappahanock County SO | 11/6/2013 | S5 | |
| 11/4/2013 | | | | | Union County Prosecutor | 11/4/2013 | OBR | |
| 11/4/2013 | | | | | Montclair PD | 11/4/2013 | OBR | |
| 11/4/2013 | | | | | Ramah PD | 11/5/2013 | S4 | |
| 11/4/2013 | | | | | PA Office of Attorney General | 11/5/2013 | S4 | |
| 11/5/2013 | | | | | East Greenwich RI. PD. | 11/6/2013 | S4 | |
| 11/6/2013 | | | | | NC Department of Justice | 11/7/2013 | RETAIL CALL | |
| 11/6/2013 | | | | | USDA National Finance Center | 11/18/2013 | DN | |
| 11/6/2013 | | | | | Napa Police Department | 11/6/2013 | TO OBR | |
| 11/6/2013 | | | | | Stevens Point PD | 11/7/2013 | RETAIL CALL | |
| 11/6/2013 | | | | | Saint Petersburg PD | 11/13/2013 | S4 | |
| 11/6/2013 | | | | | California Highway Patrol | 11/14/2013 | TO OBR | |
| 11/7/2013 | | | | | Pendleton PD | 11/18/2013 | DN | |
| 11/7/2013 | | | | | San Diego Police Department | 11/18/2013 | R6 | |
| 11/12/2013 | | | | | Kennebunk Police Department | 11/13/2013 | TO OBR | |
| 11/12/2013 | | | | | U.S. Customs Service | 11/18/2013 | DN | |
| 11/15/2013 | | | | | OK Department of Public Safety | 11/18/2013 | S4 | |
| 11/19/2013 | | | | | GA Bureau of Investigations | 11/20/2013 | TO OBR | |
| 11/20/2013 | | | | | NJ State Police | 11/29/2013 | DN | |
| 11/21/2013 | | | | | Albuquerque PD | 11/26/2014 | S4 | |
| 11/25/2013 | | | | | Shelby County SO | 11/26/2014 | TO OBR | |
| 11/25/2013 | | | | | FBI | 11/27/2013 | S5 | Still a Duty Firearm |
| 11/27/2013 | | | | | Wilder PD | 12/2/2013 | SH | |
| 12/2/2013 | | | | | SC Dept. of Public Safety | 12/3/2013 | TO OBR | |
| 12/2/2013 | | | | | Pima County SO | 12/5/2013 | DN | |
| 12/3/2013 | | | | | Firearms Tracing Unit Ottawa | 12/3/2013 | DN | |
| 12/3/2013 | | | | | Arlington PD | 12/9/2013 | S4 | |
| 12/5/2013 | | | | | Twin Falls PD | 12/16/2013 | DN | |
| 12/9/2013 | | | | | Santa Clara SO | 12/13/2013 | TO OBR | |

1

RJP

| (b) (6), (b) (7)(C) | Agency | Date | Code | Notes |
|---|---|---|---|---|
| 12/9/2013 | Mississippi Highway Patrol | 12/9/2013 | SH | |
| 12/12/2013 | Vineland NJ PD | 12/17/2013 | S7 | |
| 12/12/2013 | Henrico County PD | 12/12/2013 | TO RETAIL CALL | WRONG SERIAL NUMBER |
| 12/13/2013 | Albuquerque PD | 12/30/2013 | DN | |
| 12/13/2013 | Lincoln County SO | 12/17/2013 | DN | |
| 12/13/2013 | Pike County SO | 12/17/2013 | DN | |
| 12/16/2013 | Hidalgo County SO | 12/17/2013 | SH | |
| 12/17/2013 | Magnolia PD | 12/30/2013 | SS | NO RESPONSE FROM AGENCY |
| 12/17/2013 | Baton Rouge PD | 12/19/2013 | TO RETAIL CALL | |
| 12/17/2013 | San Antonio PD | 12/19/2013 | TO OBR | |
| 12/17/2013 | Clayton County PD | 1/7/2014 | SS | Missing From Inventory |
| 12/23/2013 | Scott County SO | 12/30/2013 | SH | |
| 12/26/2013 | Memphis PD | 12/30/2013 | SH | |
| 12/30/2013 | Missouri Dept of Public Safety | 1/10/2014 | S4 | |
| 12/30/2013 | FLA Department of Motor Veh | 1/13/2014 | D7 | |
| 12/30/2013 | Port Wentworth PD | 12/31/2013 | TO OBR | |
| 1/2/2014 | Fulton County NY SO | 1/7/2014 | TO OBR | |
| 1/2/2014 | Detroit PD | 1/9/2014 | S4 | |
| 1/2/2014 | Detroit PD | 1/7/2014 | S7 | |
| 1/6/2014 | Carmel IN PD | 1/13/2014 | S9 | |
| 1/9/2014 | Homeland Security | 1/13/2014 | SS | Still a Duty Firearm |
| 1/10/2014 | Van Buren County SO | 1/14/2014 | SS | STOLEN FIREARM |
| 1/14/2014 | Bellville PD | 11/15/2014 | S7 | |
| 1/14/2014 | Fulton County NY SO | 11/15/2014 | TO RETAIL CALL | |
| 1/15/2014 | Newton County GA SO | 11/21/2014 | TO OBR | |
| 1/15/2014 | Danbury PD | 1/15/2014 | TO RETAIL CALL | |
| 1/15/2014 | Council Bluffs PD | 1/27/2014 | SS | STOLEN FIREARM |
| 1/15/2014 | Bannockburn PD | 1/15/2014 | SH | |
| 1/21/2014 | Rockaway PD | 1/27/2014 | S4 | |
| 1/21/2014 | Sterling PD | 1/27/2014 | TO RETAIL CALL | |
| 1/21/2014 | Johns Creek PD | 1/22/2014 | TO OBR | |
| 1/21/2014 | Suffolk County PD | 1/21/2014 | SH | |
| 1/22/2014 | Pittsburgh PD | 2/4/2014 | DN | |
| 1/22/2014 | San Antonio PD | 1/27/2014 | S4 | |
| 1/24/2014 | U.S. Drug Enforcement Agency | 1/24/2014 | SH | |
| 1/27/2014 | WI Dept of Public Safety | 1/30/2014 | SH | |
| 1/28/2014 | Avondale PD | 2/6/2014 | S4 | |
| 1/29/2014 | Asheville PD | 1/30/2014 | TO WHOLESALE | |
| 1/30/2014 | Arlington SO | 2/12/2014 | SS | Missing From Inventory |
| 2/3/2014 | Belton PD | 2/3/2014 | SS | STOLEN FIREARM |
| 2/3/2014 | Red Willow SO | 2/10/2014 | S4 | |
| 2/4/2014 | Greenwood PD | 2/4/2014 | TO OBR | |
| 2/6/2014 | Chipola College PD | 2/7/2014 | S4 | |
| 2/6/2014 | Utah Dept. Natural Resources | 2/19/2014 | SS | NO RESPONSE FROM AGENCY |
| 2/7/2014 | Oswego County SO | 2/11/2014 | TO OBR | |
| 2/10/2014 | Dekalb County SO | 2/10/2014 | DN | |

2

RIP

| Date | (b) (6), (b) (7)(C) | Agency | Date | Code | Notes |
|---|---|---|---|---|---|
| 2/11/2014 | | Port Saint Lucie PD | 2/11/2014 | TO OBR | STOLEN FIREARM |
| 2/11/2014 | | Winston Salem University | 2/12/2014 | SS | |
| 2/12/2014 | | Palmer PD | 2/18/2014 | DS | |
| 2/18/2014 | | Iowa DMV | 2/25/2014 | TO OBR | |
| 2/19/2014 | | Grant County SO | 2/19/2014 | SH | |
| 2/19/2014 | | Tuscaloosa PD | 2/21/2014 | S4 | |
| 2/19/2014 | | Ok Bureau of Investigations | 2/19/2014 | SS | STOLEN FIREARM |
| 2/20/2014 | | Connorsville PD | 2/27/2014 | S4 | |
| 2/21/2014 | | Winter Park PD | 2/25/2015 | S7 | |
| 2/21/2014 | | Springfield PD | 2/24/2014 | S4 | |
| 2/21/2014 | | Cortland PD | 2/21/2014 | TO OBR | |
| 2/24/2014 | | New York Park Police | 3/3/2014 | TO OBR | |
| 2/25/2014 | | East Brunswick PD | 3/3/2014 | TO OBR | |
| 2/25/2014 | | Vancouver PD | 2/27/2014 | TO RETAIL CALL | |
| 2/26/2014 | | Fairfield County SO | 2/27/2014 | S4 | |
| 2/26/2014 | | Allenhurst PD | 2/27/2014 | TO OBR | |
| 2/27/2014 | | Savannah PD | 3/6/2014 | SH | |
| 2/27/2014 | | 10th District Drug Task Force | 3/6/2014 | S4 | |
| 2/27/2014 | | University of North Texas | 3/6/2014 | S4 | May Be Missing From Inventory |
| 3/3/2014 | | Port Authority PD | 3/18/2014 | SS | |
| 3/4/2014 | | Detroit PD | 3/4/2014 | TO OBR | STOLEN FIREARM |
| 3/5/2014 | | Penn State Univ | 3/5/2014 | SS | |
| 3/5/3014 | | Port Huron PD | 3/6/2014 | S4 | |
| 3/7/2014 | | Kansas City MO PD | 3/10/2014 | SH | |
| 3/11/2014 | | Manchester NJ PD | 3/11/2014 | TO OBR | |
| 3/12/2014 | | Sumner County SO | 3/12/2014 | DN | |
| 3/12/2014 | | Menlo Park PD | 3/21/2014 | DN | |
| 3/12/2014 | | South Haven KO PD | 3/12/2014 | SH | |
| 3/19/2014 | | U.S. District Court | 4/1/2014 | S4 | |
| 3/24/2014 | | Garland County SO | 3/26/2014 | DS | |
| 3/24/2014 | | Montgomery County SO | 3/25/2014 | TO OBR | |
| 3/26/2014 | | U.S. Air Force | 3/26/2014 | W1 | |
| 3/27/2014 | | New York Waterfront | 3/27/2014 | TO RETAIL CALL | |
| 3/31/2014 | | Upper Darby PD | 4/4/2014 | S4 | |
| 3/31/2014 | | East Baton Rouge SO | 4/2/2014 | S4 | |
| 3/31/2014 | | East Baton Rouge SO | 4/1/2014 | DN | |
| 3/31/2014 | | New Orleans PD | 4/2/2014 | SS | FIREARM LOST OR STOLEN |
| 3/31/2014 | | Kinston PD | 4/3/2014 | SH | |
| 4/2/2104 | | S.D. Division of Criminal Inv. | 4/2/2014 | TO RETAIL CALL | |
| 4/3/2014 | | U.S. Customs Service | 4/3/2014 | DN | |
| 4/3/2014 | | U.S. Postal Service | 4/14/2014 | DN | |
| 4/4/2014 | | Marion NC PD | 4/14/2014 | DN | |
| 4/7/2014 | | Bristol PD | 4/10/2014 | DN | |
| 4/8/2014 | | Lehigh County SO | 4/14/2014 | SS | WRONG SERIAL NUMBER |
| 4/9/2014 | (b) (6), (b) (7)(C) | | 4/14/2014 | S4 | |
| 4/10/2014 | | Missouri Dept of Public Safety | 4/14/2014 | TO OBR | |
| 4/11/2014 | | New York City PD | 4/14/2014 | SH | |